IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| SHERI GAIL DURHAM, Individually and as next of Friend of MARISA UMA LAMA DURHAM, MINOR ET AL., | CIV. NO. 08-00342 JMS/LEK |
| Plaintiffs, | ORDER DENYING DEFENDANT FORD MOTOR COMPANY'S MOTION FOR SUMMARY JUDGMENT BASED ON FEDERAL PREEMPTION (DOC. NO. 523) |
| vs. | |
| COUNTY OF MAUI, ET AL. | |
| Defendants. | |

## ORDER DENYING DEFENDANT FORD MOTOR COMPANY'S MOTION FOR SUMMARY JUDGMENT BASED ON FEDERAL PREEMPTION (DOC. NO. 523)

## I. INTRODUCTION

This action arises from a July 26, 2006 two-car accident between a 2004 Ford Focus station wagon (the "subject vehicle") driven by Mark Durham and rented from Maui Windsurfing Vans, Inc. ("Maui Windsurfing"), and a 2003 Hyundai Santa Fe Sport Utility Vehicle ("SUV") driven by Patty Conte. Mark Durham passed away as a result of his injuries in the accident. His daughters, Jessica and Marisa, both passengers in the subject vehicle, also sustained injuries and Jessica passed away over two years later.

As a result of this accident, Plaintiffs Sheri Gail Durham ("Sheri

Durham"), individually and as next friend of Marisa Durham, and Denise Ann

Jenkins ("Jenkins"), as the Administrator of the Estates of Mark Durham and

Jessica Durham, (collectively "Plaintiffs"), allege that the subject vehicle was

defective because it lacked side airbags and its side structure and seat belts in

concert with the seats did not reasonably minimize head and chest injuries in side-

impact collisions involving SUVs.  Plaintiffs therefore allege product defect claims

against Ford Motor Company ("Ford") for negligence, gross negligence, strict

liability, and survival and wrongful death (Counts III, V, and IX of the Second

Amended Complaint ("SAC")).

Currently before the court is Ford's Motion for Summary Judgment

Based on Federal Preemption or in the Alternative for Partial Summary Judgment

("Ford's Preemption Motion").  Based on the following, the court finds that federal

law does not preempt Plaintiffs' claims and DENIES Ford's Preemption Motion.

## II.  <u>BACKGROUND</u>

**A.     Factual Background**

### *1.     Plaintiffs' Claims Arising from the Accident*

This action arises from a July 26, 2006 two-car accident at the

intersection of Pulehu Road and Hansen Road in the County of Maui.  Mark

Durham was driving the subject vehicle on Pulehu Road with his two minor

daughters Jessica and Marisa.  From the police investigation, it appears that Mark

Durham failed to heed a stop sign at the intersection with Hansen Road, resulting

in the SUV driven by Patty Conte on Hansen Road hitting the subject vehicle on its

left side.  Mark Durham passed away as a result of the injuries in the accident.

Jessica and Marisa also sustained injuries, and Jessica passed away over two years

later.

Plaintiffs assert that the subject vehicle was defective because it

lacked side airbags and its side structure and seat belts in concert with the seats did

not reasonably minimize head and chest injuries in side-impact collisions involving

SUVs.  Plaintiffs' causation expert Tyler Kress asserts that Mark Durham's death,

and Jessica Durham's enhanced injuries, were a direct result of the subject

vehicle's "lack of implementation of side-impact protection airbag technology"

and inadequate side structure design.  Ford's Concise Statement of Material Facts

("Ford's SMF") ¶ 8.[1]  In Kress's opinion:

> [A].   Both Mark and Jessica Durham would have had
> much less severe injuries if the appropriate vehicle
> side structure design and side airbags were
> utilized.

---

[1] For purposes of this Order, Plaintiffs do not dispute some of the facts set forth in Ford's SMF.  Plaintiff's Concise Statement of Material Facts 2.  Where Plaintiffs do not dispute a particular fact, the court cites directly to Ford's SMF.  Further, because the court does not rely on Plaintiffs' Separate Concise Statement of Material Facts, Ford's Objection to Plaintiffs' Separate Concise Statement of Material Facts is without merit.

[B].   Use of side impact airbags (such as head/torso/curtain/etc. bags) decreases concentrated forces and spreads loads out.  The impact pulse/duration is also increased thus resulting in decreased risk of acceleration/deceleration related injuries and decreased traumatic torso insult/injury.

[C].   Airbags designed for side impact protection were clearly feasible alternatives and have been known to significantly decrease injury.  In fact, airbag use and structural characteristics for managing occupant compartment side intrusion are the key design approaches (along with seatbelt systems) in providing protection to occupant during side impacts.

[D].   Mark Durham's injuries, and especially his fatal torso/chest injuries, were a direct result of inadequate side structure design and the lack of implementation (by Ford) of side impact protection airbag technologies.  Additionally, Jessica Durham's leg and chest injuries (including traumatic aorta issues) more-likely-than-not would not have resulted in amputation or death had Ford incorporated reasonable side structure design and airbag technology.

Ford's SMF ¶ 9.

### 2.   *Federal Motor Vehicle Safety Standards*

#### a.   *The National Traffic and Motor Vehicle Safety Act of 1966*

Ford contends that Federal Motor Vehicle Safety Standard

("FMVSS") 208 preempts Plaintiffs' claims.  FMVSS 208 was promulgated by the

National Highway Traffic Safety Administration, an agency of the Department of

Transportation, pursuant to the National Traffic and Motor Vehicle Safety Act of 1966 (the "Safety Act"), 15 U.S.C. § 1381 *et seq.*, recodified as amended, 49 U.S.C. § 30101 *et seq*.  The Safety Act is intended "to reduce traffic accidents and deaths and injuries resulting from traffic accidents."  49 U.S.C. § 30101.  To achieve this goal, the Safety Act empowers the Secretary of Transportation, who oversees the Department of Transportation, to establish FMVSS regulations.  *Id.* § 30111(a).  The Safety Act defines "motor vehicle safety standard" as "a minimum standard for motor vehicle or motor vehicle equipment performance."  *Id.* § 30102(a)(9).  The National Highway Traffic Safety Administration has promulgated dozens of FMVSS provisions pursuant to its powers under the Safety Act.  *See generally* 49 C.F.R. § 571.

The Safety Act contains both a preemption provision and a saving clause preserving common law liability.  The preemption provision states:

> When a motor vehicle safety standard is in effect under this chapter, a State or a political subdivision of a State may prescribe or continue in effect a standard applicable to the same aspect of performance of a motor vehicle or motor vehicle equipment only if the standard is identical to the standard prescribed under this chapter.

49 U.S.C. § 30103(b)(1).  The saving clause thereafter provides, "Compliance with a motor vehicle safety standard prescribed under this chapter does not exempt a person from liability at common law."  *Id.* § 30103(e).

5

### b.     FMVSS 208

Entitled "Occupant Crash Protection," FMVSS 208 includes succinct statements of both its scope and purpose.  As to its scope, the regulation "specifies performance requirements for the protection of vehicle occupants in crashes."  49 C.F.R. § 571.208.S1.  FMVSS 208's stated purpose is "to reduce the number of deaths of vehicle occupants, and the severity of injuries, by specifying vehicle crashworthiness requirements in terms of forces and accelerations measured on anthropomorphic dummies in test crashes, and by specifying equipment requirements for active and passive restraint systems."  *Id*. § 571.208.S2.  FMVSS 208 then details different performance requirements for passenger cars, multipurpose passenger vehicles, trucks, and buses.  These requirements vary based on the type of vehicle and the year it was manufactured.  *Id*. § 571.208.S4.

As a passenger car manufactured in 2004, the subject vehicle was subject to the standards set out in FMVSS 208 subsection S4.1.5, which prescribes "[g]eneral requirements" for "[p]assenger cars manufactured on or after September 1, 1996."  49 C.F.R. § 571.208.S4.1.5.  Subsection S4.1.5.1, titled "Frontal/angular automatic protection system," states:

> a) Each passenger car manufactured on or after
> September 1, 1996 shall:
>
> (1) At each front outboard designated seating

position meet the frontal crash protection requirements of S5.1 by means that require no action by vehicle occupants;

(2) At any front designated seating positions that are not "outboard designated seating positions," as that term is defined at 49 CFR 571.3, and at any rear designated seating positions that are not "rear outboard designated seating positions," as that term is defined at S4.1.4.2(c) of this standard, have a Type 1 or Type 2 seat belt assembly that conforms to Standard No. 209 and S7.1 and S7.2 of this standard; and

(3) At each front designated seating position that is an "outboard designated seating position," as that term is defined at 49 CFR 571.3, and at each forward-facing rear designated seating position that is a "rear outboard designated seating positions," as that term is defined at S4.1.4.2(c) of this standard, have a Type 2 seat belt assembly that conforms to Standard No. 209 and S7.1 through S7.3 of this standard, and, in the case of the Type 2 seat belt assemblies installed at the front outboard designated seating positions, meet the frontal crash protection requirements with the appropriate anthropomorphic test dummy restrained by the Type 2 seat belt assembly in addition to the means that requires no action by the vehicle occupant.

Subsection S4.1.5.3 further specifies that passenger cars manufactured on or after

September 1, 1997 "shall comply with the requirements of S4.1.5.1(a)(1) by means

of an inflatable restraint system at the driver's and right front passenger's

position."[2]  *Id*. § 571.208.S4.1.5.3.

In essence, then, FMVSS 208 required the subject vehicle to meet specific crash dummy performance standards by (1) using frontal airbags at the driver's and right front passenger's positions in compliance with subsection S5.1 and (2) using designated seat belt assemblies in compliance with subsections S7.1 through S7.3.  *Id*. § 571.208.S4.1.5.1.  The standards in section S5 are "[o]ccupant crash protection requirements for the 50th percentile adult male dummy."  *Id*. § 571.208.S5.  To comply with the requirements of subsection S5.1, the dummy must perform satisfactorily in a frontal crash, *i.e.*, a crash "into a fixed rigid barrier that is perpendicular to the line of travel or the vehicle," and in an angular crash, *i.e.*, a crash into a fixed rigid barrier that is "at any angle up to 30 degrees in either direction from the perpendicular to the line of travel of the vehicle."  *Id*. § 571.208.S5.1.1(a).

Ford's expert Debora R. Marth contends that the subject vehicle satisfied the FMVSS 208 requirements.  Marth Decl. ¶¶ 15, 16, & 18.  Marth contends that Ford could have satisfied the FMVSS 208 requirements by using side-impact airbags in conjunction with other passive restraint technologies, but

---

[2] FMVSS 208 defines "an inflatable restraint system" for the purposes of S4.1.5 as "an air bag that is activated in a crash."  49 C.F.R. § 571.208.S4.1.5.1(b).

notes that Ford did not so.  *Id*. ¶ 17.  Plaintiff's expert Stephan Syson disputes that

conclusion, however, and opines that Ford could not have met any applicable

requirement of FMVSS 208 by installing side-impact airbags.  Syson Decl. ¶ 10.

Notably, FMVSS 208 does not require the subject vehicle to meet any

requirements in lateral crashes, *i.e.*, a crash "laterally on either side," although it

does subject other types of vehicles to lateral crash requirements.  49 C.F.R.

§ 571.208.S5.2.  Vehicles including passenger cars manufactured prior to

September 1986 and trucks over a designated weight are subject to a lateral crash

requirement.  *Id*. § 571.208.S4.1.2 - S4.2.3 (requiring applicable vehicles to

comply with the lateral crash protection requirements specified in subsection S5.2).

For no types of vehicles, however, does FMVSS 208 provide either a requirement

or an explicit option that manufacturers install side-impact airbags, whether or not

those vehicles are subject to the lateral crash requirement in S5.2.

## B.     Procedural History

On July 24, 2008, Plaintiffs filed this action.  The SAC alleges claims

against Ford for negligence, gross negligence, strict liability, and derivative claims

for wrongful death and survivorship, all relating to alleged design defects in the

subject vehicle.[3]

On December 2, 2009, Ford filed its Preemption Motion.  On January

12, 2010, Plaintiffs filed an Opposition, and on January 19, 2010, Ford filed its

Reply.  A hearing was held on February 1, 2010.

## III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of

material fact and the moving party is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(c).  Rule 56(c) mandates summary judgment "against a party who

fails to make a showing sufficient to establish the existence of an element essential

to the party's case, and on which that party will bear the burden of proof at trial."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of*

*Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of

informing the court of the basis for its motion and of identifying those portions of

the pleadings and discovery responses that demonstrate the absence of a genuine

---

[3]  The SAC also alleges claims against Maui Windsurfing for negligence, strict liability, and survival and wrongful death, the County of Maui for road defect and dangerous conditions at the accident scene, medical malpractice claims related to the care provided to Jessica against Kapiolani Medical Center for Women and Children, Hawaii Pacific Health, Dr. Byron H. Izuka, Byron Izuka, M.D., LLC., Dr. Shila Patel, Kapiolani Medical Specialists, Dr. James Y. Sim, and James Y. Sim, M.D., LLC.  The SAC further alleges claims against Conte, but she is no longer a party to this action.

issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004). "When the moving party has carried its burden under Rule 56(c) its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn

11

in his favor." (citations omitted)).

## IV. DISCUSSION

Ford argues that FMVSS 208 contains a comprehensive regulatory scheme that actually conflicts with Plaintiffs' claims. Ford contends that it is therefore entitled to summary judgment because Plaintiffs' lack of side-impact airbag claims are barred by implied conflict preemption. Plaintiffs disagree and contend that the court should strike a declaration from one of Ford's experts. The court considers these issues in turn.

### A.   Ford's Preemption Motion

#### 1.   *Preemption Framework*

The preemption doctrine is rooted in the Supremacy Clause of the United States Constitution, which establishes federal law as the "supreme Law of the Land." U.S. Const. art. VI, cl. 2. Federal preemption can be either express or implied, and implied preemption can be either field preemption or conflict preemption. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152-53 (1982). Conflict preemption, which is at issue here, arises when "compliance with both federal and state regulations is a physical impossibility" or when "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id*. (citations and internal quotation marks omitted); *see*

*also Wyeth v. Levine*, --- U.S. ----, 129 S. Ct. 1187, 1193-94 (2009).

The Supreme Court examined the preemptive effect of the Safety Act and FMVSS 208 in *Geier v. American Honda Motor Company*, 529 U.S. 861 (2000). In *Geier*, the Court held that the Safety Act and FMVSS, taken together, preempted the plaintiffs' state tort claim seeking redress against a defendant auto manufacturer who was in compliance with FMVSS 208 but failed to equip the plaintiffs' car with frontal airbags. *Geier* included three holdings relevant to the present case, which the court examines in turn.

First, *Geier* determined that the Safety Act's preemption provision did not preempt the plaintiffs' tort action. At that time, the Safety Act's preemption provision stated:

> Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment[,] any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard.

*Geier*, 529 U.S. at 867 (citing 15 U.S.C. § 1392(d) (1988 ed.)). The Court found that any disagreement over the meaning of this preemption provision was resolved by the Safety Act's saving clause, which provided that "'[c]ompliance with' a federal safety standard 'does not exempt any person from any liability under

13

common law.'" *Id.* at 868 (citing 15 U.S.C. § 1397(k) (1988 ed.)).  The Court

found that "a reading of the express pre-emption provision that excludes common-

law tort actions gives actual meaning to the saving clause's literal language, while

leaving adequate room for state tort law to operate -- for example, where federal

law creates only a floor, *i.e.*, a minimum safety standard." *Id.* (citations omitted).

As a result, the Court concluded that the Safety Act's preemption provision should

be read narrowly and that it did not preempt the plaintiffs' suit.

Second, the *Geier* Court examined whether, given the narrow meaning

of the Safety Act's preemption provision, ordinary preemption principles

nevertheless applied to the plaintiffs' suit.  The Court considered, and rejected, the

possibility that the Safety Act's saving clause might limit the operation of ordinary

preemption principles.  Thus, the Court concluded that ordinary preemption

principles applied.

Finally, the *Geier* Court determined that the Safety Act and FMVSS

208 together actually conflicted with the plaintiffs' tort claims, which would have

mandated installation of frontal airbags.  The Court closely examined the

legislative and regulatory history of the Safety Act and FMVSS 208 and

determined that the Department of Transportation had considered, and rejected,

amending FMVSS 208 to create a mandatory frontal airbag standard.  *Id.* at 879.

14

The Court found that FMVSS 208 "deliberately provided the manufacturer with a range of choices among different passive restraint devices." *Id.* at 875.  This range allowed manufacturers to elect whether or not to use frontal airbags to meet required performance standards. *Id.*  Additionally, the court found that the FMVSS 208 "deliberately sought a *gradual* phase-in of passive restraints." *Id.* (emphasis in original).

Ultimately, the Court found that the legislative and regulatory history demonstrated that the Safety Act and FMVSS 208 stood in actual conflict with the plaintiffs' claims because a mandatory airbag requirement would have presented an obstacle to both "the variety and mix of devices that the federal regulation sought" and "the gradual passive restraint phase-in that the federal regulation deliberately imposed." *Id.* at 881.  Thus, the Court found the plaintiffs' tort action preempted.

Nine years after *Geier*, the Court clarified how the lower courts should examine implied preemption claims in *Wyeth*, 129 S. Ct. 1187 (2009).  In *Wyeth*, the Court examined a plaintiff's state law failure-to-warn claims against a prescription drug manufacturer.  Although the prescription drug manufacturer's label for Phenergan, the drug at issue, had been approved by the federal Food and Drug Administration ("FDA"), the Court found that the FDA's approval did not provide the drug manufacturer with a complete defense to the plaintiff's state tort

claims. *Wyeth*, 129 S. Ct. at 1191.

The Court began its preemption analysis by emphasizing that preemption jurisprudence rests on "two cornerstones." *Id.* at 1194. "First, the purpose of Congress is the ultimate touchstone in every pre-emption case." *Id.* (citations and quotations omitted). And, second, courts examining preemption must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* at 1194-95 (citations and quotations omitted).

Applying these principles, the Court held that the plaintiff's state law claims did not create an obstacle to federal drug labeling regulations and, as a result, that the plaintiff's claims were not preempted by federal law. The Court emphasized that the Federal Food, Drug, and Cosmetic Act ("FDCA"), which authorizes the FDA regulations, does not include an express preemption provision. *Id.* at 1200. The FDA did, however, include preemption language in a preamble to its labeling regulation, stating that the FDA's labeling requirements were "both a 'floor' and a 'ceiling' . . . preempt[ing] conflicting or contrary State law." *Id.* Despite this preemption language, the Court found that "[i]n keeping with Congress' decision not to pre-empt common-law tort suits [against prescription drug manufacturers for inadequate labeling], it appears that the FDA traditionally

16

regarded state law as a complementary form of drug regulation." *Id*. at 1202.  As a result, the Court found that the plaintiff's tort claims did not present an obstacle to the FDA's regulations.

The Court went on to distinguish *Wyeth* from *Geier* in several respects.  First, *Wyeth* concerned the general regulatory powers of the FDA, and not a specific federal regulation like FMVSS 208.  *Id*. at 1203.  Second, and more significantly, the Court found no evidence in *Wyeth* that the FDA was pursuing a federal scheme as the Department of Transportation had been in *Geier*.  The Court stated that *Geier* turned on the fact that the plaintiffs' claim that car manufacturers had a duty to install frontal airbags "presented an obstacle to achieving 'the variety and mix of devices that the federal regulation sought.'"  *Id*. (citing *Geier*, 529 U.S. at 875, 881).  In contrast, the Court found no such plan in place in *Wyeth*.  *Id*.

### 2. *Preemption Application*

#### a. *Effect of the Safety Act's express preemption provision*

The court must first determine whether the Safety Act's express preemption provision preempts Plaintiffs' tort claims.  Although Congress has modified the language of the Safety Act's express preemption since *Geier*, the current express preemption clause appears identical in meaning to the clause at

issue in *Geier*,[4] with only minor changes having been made for ease of reading.[5] Given the essential similarities between the former and current express preemption clauses, and the fact that the common law liability saving clause remains unchanged, the court finds *Geier* controlling.

Accordingly, as in *Geier*, this court applies ordinary preemption principles.

### b.   *Implied conflict preemption*

Ford does not contend that the first type of conflict preemption, *i.e.*,

----

[4] When the Court considered the Safety Act in *Geier*, the express preemption clause read:

> Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no state or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment[,] any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the federal standard.

*Geier v. American Honda Motor Co.*, 529 U.S. 861, 867 (2000) (citing 15 U.S.C. § 1392(d) (1988 ed.)).  The Safety Act's express preemption clause now states:

> When a motor vehicle safety standard is in effect under this chapter, a State or a political subdivision of a State may prescribe or continue in effect a standard applicable to the same aspect of performance of a motor vehicle or motor vehicle equipment only if the standard is identical to the standard prescribed under this chapter.

 49 U.S.C. § 30103(b)(1).

[5] The Historical and Statutory notes to 49 U.S.C. § 30103(b)(1) explain that the language changes where made for "clarity" as well as for "consistency and to eliminate unnecessary words."

impossibility preemption, is at issue here.  Thus, the court examines if conflict

preemption is present because of "an obstacle to the accomplishment and execution

of the full purposes and objectives of Congress."  *See Fid. Fed. Sav. & Loan Ass'n*,

458 U.S. at 153.  The court finds no such conflict.

i.      No evidence of conflict

The purpose of Congress -- "the ultimate touchstone in every pre-

emption case," *Wyeth*, 129 S. Ct. at 1194 -- reveals no conflict between federal law

and Plaintiffs' side-impact airbag claims.  Congress' stated purpose in adopting the

Safety Act was "to reduce traffic accidents and deaths and injuries to persons

resulting from traffic accidents."  49 U.S.C. § 30101.  To accomplish this purpose,

Congress empowered the Department of Transportation with the authority to

establish minimum motor vehicle safety standards -- such as FMVSS 208.  At the

same time, Congress included a saving clause, 49 U.S.C. § 30103(b)(1), "leaving

adequate room for state tort law to operate."  *Geier*, 529 U.S. at 868.  The court

finds no direct conflict between Congress' goal of reducing traffic deaths and

injuries and allowing Plaintiffs' tort claims to proceed.  *See Wyeth*, 129 S. Ct. at

1214-15 (Thomas, J., concurring) (citing 15 U.S.C. § 1381 (1988 ed.))

(emphasizing the predominant effect of the "express statutory goal of the Safety

Act" in preemption analysis).

Similarly, the court finds no direct conflict between FMVSS 208's purpose and allowing Plaintiffs' tort claims to proceed.  Similar to the Safety Act, FMVSS 208's stated purpose is "to reduce the number of deaths of vehicle occupants, and the severity of [their] injuries . . . ."  49 C.F.R. § 571.208.S2. Allowing Plaintiffs' tort claims to proceed is likely to advance -- not thwart -- this statutory and regulatory purpose.

The court also finds that *Geier* is easily distinguished from the instant case.  While *Geier* examined the effect of frontal airbag regulations found within the four corners of FMVSS 208, *Geier*, 529 U.S. at 878 (citing 49 Fed. Reg. 28996),  FMVSS 208 contains no provisions addressing side-impact airbags.  The lateral impact standard that is included in FMVSS 208 fails to consider or require side-impact airbags and, in any event, does not apply to the subject vehicle.  *See* 49 C.F.R. § 571.208.S5; *id.* § 571.208.S4.1.2 - S4.2.3 (requiring applicable vehicles, not including the subject vehicle, to comply with the lateral crash protection requirements specified in subsection S5.2).  Thus, FMVSS 208 does not conflict with Plaintiffs' side-impact airbag claims because FMVSS 208 contains no side-impact airbag requirements, much less conflicting ones.

*Geier* is further distinguishable based on its reliance on FMVSS 208's list of specific alternative options.  When *Geier* was decided, FMVSS 208 reflected

20

a federal regulatory scheme aimed at achieving a "variety and mix" of passive restraint devices. *Geier*, 529 U.S. at 881. At that time, manufacturers had the option to install frontal airbags, or not, by deciding among a "range" of passive restraint devices. *Id*. at 875. This available mix of options was the cornerstone of *Geier*'s holding -- imposing tort liability for failure to install a frontal airbag would have obstructed the regulatory design by removing manufacturers' ability to choose among the specified passive restraint device alternatives. Now, however, the whole regulatory scheme of options and alternatives so central to the holding in *Geier* is no longer in effect for the subject vehicle. Thus, "[i]n keeping with Congress' decision not to pre-empt common-law tort suits," it appears that FMVSS 208 and state tort claims, such as Plaintiffs', are "a complementary form of [] regulation." *Wyeth*, 129 S. Ct. at 1202 (finding that federal prescription labeling law did not preempt the plaintiffs' state failure-to-warn claim).

The Ninth Circuit has similarly distinguished *Geier* when examining conflict preemption claims that do not involve a direct showing that Congress intended to preserve an explicit array of options. In *Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d 856 (9th Cir. 2009), the Ninth Circuit determined that an Arizona statute mandating that employers use E-Verify -- an electronic system that verifies employees' citizenship -- did not conflict with a federal statute that made

the use of E-Verify voluntary.  The *Chicanos* plaintiffs relied on *Geier* and

contended that Arizona's law conflicted with Congress' intent to keep the use of E-

Verify voluntary.  The Ninth Circuit disagreed, however, and found that "while

Congress made participation in E-Verify voluntary at the national level, that did

not in and of itself indicate that Congress intended to prevent states from making

participation mandatory."  *Id*. at 866.  Indeed, the court determined that by making

participation in E-Verify voluntary, Congress had "implicitly strongly encouraged"

the use of E-Verify such that Arizona's mandate was "consistent with and

further[ed the] purpose" of the federal law.  *Id*. at 867.

　　　　Likewise, in *Oxygenated Fuels Ass'n v. Davis*, 331 F.3d 665 (9th Cir.

2003), the Ninth Circuit distinguished *Geier* and found that a California law

banning the use of a gasoline additive known as MTBE did not conflict with the

federal Clean Air Act.  The *Oxygenated Fuels* plaintiffs relied on *Geier* to contend

that California's ban was preempted by federal law because Congress intended to

give gasoline producers an unrestricted choice among fuel additives.  The Ninth

Circuit found *Geier* distinguishable because *Geier* relied on "abundant evidence"

-- not present in the case of the Clean Air Act -- that Congress intended "to give

auto manufacturers a choice" among alternatives.  *Oxygenated Fuels*, 331 F.3d at

672.

The *Oxygenated Fuels* plaintiffs further argued that the ban created a conflict because Congress intended to ensure an adequate and reasonably priced supply of gasoline.  The court found no conflict, however, because "the statutory text describing the purposes of the [Clean Air] Act mentions no such goal . . . . [and] saying that Congress might not have wanted to cause a substantial increase in gasoline prices is not the same as saying that assuring inexpensive gasoline was a goal of the Act."  *Id*. at 673.  Without "'clear evidence' that Congress meant to assert federal control," *id*. (citing *Geier*, 529 U.S. at 885), the court found that California's ban was not preempted by federal law.

Like *Chicanos* and *Oxygenated Fuels*, the present record does not offer strong evidence of Congress' intent to foreclose state tort claims.  Instead, as in those cases, the present case concerns a tort claim that is "consistent with and furthers [the] purpose" of federal law.[6]  The statutory text describing the purpose of the Safety Act states only that it is intended "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents."  49 U.S.C.  § 30101.

---

[6] Indeed, the court faces a more straightforward proposition in deciphering Congress' purpose here than did the Ninth Circuit in *Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d 856 (9th Cir. 2009).  In *Chicanos*, Congress addressed the use of E-Verify.  In the present case, however, the Safety Act and FMVSS 208 fail to contemplate side-impact airbags at all -- there is no designation that side-impact airbag use be voluntary.  As a result, the court is not faced with a situation like *Chicanos* of needing to determine whether Congress' voluntary scheme is a ceiling or a floor because no side-impact airbag scheme of any sort appears in the Safety Act or FMVSS 208.

Neither the Safety Act nor FMVSS 208 mentions any goal of allowing

manufacturers *not* to install side-impact airbags.  Without clear evidence of such a

purpose, the court finds that Plaintiffs' claims are not preempted by federal law.

> ii.     Ford's opposition arguments

Ford nonetheless contends that FMVSS 208 actually conflicts with

Plaintiffs' tort claims.  Ford never identifies, however, *how* FMVSS 208 actually

conflicts with Plaintiffs' claims.  Instead, Ford argues that preemption is required

because FMVSS 208 "specifies performance requirements for the protection of

vehicle occupants in ***crashes***,"  Ford Reply 3 (citing 49 C.F.R. § 571.208.S1)

(emphasis Ford's), including side-impact crashes such as the one involving the

subject vehicle.  Even if the court accepted that FMVSS 208 operated this broadly,

however, Ford fails to show how such a broad reading of FMVSS 208 creates an

actual or implied conflict with Plaintiff's tort claims.  In other words, even if

FMVSS 208 regulates all types of crashes, Ford still has not shown how Plaintiff's

claims stand as an obstacle to the accomplishment or execution of FMVSS 208.[7]

Ford also contends that FMVSS 208 conflicts with Plaintiffs' tort

claims because requiring Ford to install side-impact airbags would foreclose options

---

[7]  Alternatively, if Ford suggests that FMVSS 208 regulates all crashes so
comprehensively that no additional requirements may be imposed, the court rejects that reading
because it renders the Safety Act's saving clause meaningless by precluding all liability under
the common law.

left open to Ford by FMVSS 208.  Ford fails, however, to point to any options left open to it by FMVSS 208 that are foreclosed by Plaintiffs' claims.  Unlike the provisions at issue in *Geier* -- which explicitly allowed manufacturers to satisfy regulatory requirements by either installing frontal impact airbags or by selecting alternative passive restraint systems, 529 U.S. at 878 (citing 49 Fed. Reg. 28996) -- no provision of FMVSS 208 gives Ford the option to forgo installation of side-impact airbags.  Also unlike the system of alternatives at play in *Geier*, no portion of FMVSS 208 explicitly states that Ford could be in compliance by electing to use particular passive restraint components to the exclusion of side-impact airbags.

Ford confuses the issue by arguing that it could have met the crash test requirements of FMVSS 208 by "equipp[ing] the subject vehicle with standard side impact airbags (among several other passive restraint technologies)." Marth Decl. ¶ 17.  Even accepting this opinion as true, however, FMVSS 208 nevertheless does not provide Ford with an explicit option that permitted it to forgo the use of side-impact airbags.  Unlike the manufacturer in *Geier*, Ford could not elect a system of passive restraints from a designated set of options.  Thus, Ford

could not, and did not, elect an "option" permitted by federal regulation that allowed it to forgo the use of side-impact airbags.[8]

Ford argues that the present case is analogous to *Pokorny v. Ford Motor Co.*, 902 F.2d 1116 (3d Cir. 1990), and *Carden v. General Motors Corp.*, 509 F.3d 227 (5th Cir. 2007), which both held that the plaintiffs' tort claims were preempted by FMVSS 208. In both cases, however, the plaintiffs sought relief despite the fact that the manufacturers had complied with an explicit option delineated in FMVSS 208. *Pokorny*, 902 F.2d at 1123; *Carden*, 509 F.3d at 230. As a result, both courts found that the plaintiffs' claims posed an actual conflict with the federal regulation. *Pokorny*, 902 F.2d at 1123; *Carden*, 509 F.3d at 232 (finding preemption because the plaintiffs' claim "would foreclose a deliberate option left to manufacturers under Standard 208, namely the option of installing manual lap-only seat belts"). Here, unlike in *Pokorny* and *Carden*, no explicit option in FMVSS 208 permitted Ford to forgo the use of side-impact airbags. Thus, the present case is distinguishable because Plaintiffs' claims would not foreclose any options available to Ford under the Safety Act or FMVSS 208.

---

[8] The court likewise rejects Ford's attempt to label its decision *not* to install side-impact airbags as an "option." Ford's expert provides no support for this proposition. Indeed, Ford fails to explain or identify any options with the text of FMVSS 208 that are applicable to the subject vehicle.

Ford's true concern appears to be that Plaintiffs' tort claims, if successful, could require Ford to do more than is required by FMVSS 208.  That is the effect, however, and indeed the purpose, of minimum federal standards like those created pursuant to the Safety Act.  *See* 49 U.S.C. § 30111(a) (defining FMVSS as a "minimum standard").  Given that the court must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," *Wyeth*, 129 S. Ct. at 1194-95 (citations and quotations omitted), the fact that Plaintiffs' claims might require Ford to do more than meet the federal standard set in FMVSS 208 is not a reason in and of itself to preempt Plaintiffs' state tort claims.

In further opposition, Ford urges the court to follow the decisions rendered by other courts that have found side-impact airbag claims preempted by FMVSS 208.  *See Ellison v. Ford Motor Co.*, 650 F. Supp. 2d 1298 (N.D. Ga. 2009); *Anthony v. Abbott*, 289 F. Supp. 2d 667 (D. V.I. 2003); *Chase v. Ford Motor Co.*, No. 1168886, slip. op. (Cal. Super. Ct. Santa Barbara Cty. May 2, 2008) (available in Ford's Request for Judicial Notice (Doc. No. 528), Ex. A).  Those holdings are not binding and lack persuasive effect because the vehicles at issue were subject to different FMVSS 208 requirements than the subject vehicle in this case.

The vehicles in *Ellison*, *Anthony*, and *Chase* were all apparently subject to FMVSS 208 subsection S4.2, which regulates "trucks and multipurpose passenger vehicles with a [gross vehicle weight rating] of 10,000 pounds or less." 49 C.F.R. § 571.208.S4.2; *Ellison*, 650 F. Supp. 2d at 1303; *Anthony*, 289 F. Supp. 2d at 669; Porterfield Decl. Ex. D.  Unlike the provision of FMVSS 208 applicable to the subject vehicle -- *i.e.*, subsection S4.1, which provides no options -- subsection S4.2 includes a list of explicit options that allow manufacturers to select how they will satisfy the regulatory requirements.  *See* 49 C.F.R. § 571.208.S4.2.2 ("Trucks and multipurpose passenger vehicles with a GVWR of 8,500 pounds or less . . . shall meet the requirements of S4.1.2.1, or at the option of the manufacturer, S4.1.2.2 or S4.1.2.3 (as specified for passenger cars) . . . .").  The applicable regulations in *Ellison*, *Anthony*, and *Chase* were therefore similar to the options-based standard at issue in *Geier*.  The present case is clearly distinguishable -- no options are listed in the FMVSS 208 standard that applied to the subject vehicle.

In sum, the court finds that Plaintiffs' claims do not stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, as expressed in either the Safety Act or FMVSS 208.  Having found no such conflict between Congress' purpose and the present suit, and in keeping with

28

Congress' decision to include a saving clause in the Safety Act preserving state law tort claims, the court finds that federal law does not impliedly preempt Plaintiffs' claims.  Accordingly, Plaintiffs' claims are not barred by federal preemption.

## B.    Marth Declaration

Plaintiffs argue that the court should strike Ford's expert witness declaration from Debora R. Marth because, according to Plaintiffs, Marth's declaration is conclusory, contradicted by other testimony, and demonstrably false. Ford disagrees, and has withdrawn one of the paragraphs that Plaintiffs dispute from Marth's declaration.  Ford Reply 13-14 n.2 (withdrawing paragraph 15 of the Marth declaration and describing its initial inclusion as "inadvertent[].").

Marth's declaration is conclusory and provides no support or explanation for the assertion that "Ford could have equipped the subject vehicle with standard side-impact airbags (among several alternative passive restraint technologies)" in order to meet the requirements of FMVSS 208.  *See* Marth Decl. ¶ 17.  At the hearing, Ford admitted that Marth's declaration provided "inadequate foundation" to support its conclusions.  The court will not strike Marth's declaration, however, because Marth's conclusions are immaterial to the court's holding.  As explained above, even crediting Marth's conclusions in whole, the

29

court finds that Plaintiffs' claims present no obstacle to the accomplishment and

execution of the full purpose and objectives of FMVSS 208 and the Safety Act.

Accordingly, the court DENIES WITHOUT PREJUDICE Plaintiffs'

request to strike the Marth declaration.

## V.  CONCLUSION

Based on the above, the court DENIES Ford's Preemption Motion.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, February 12, 2010.



   /s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Durham et al. v. County of Maui et al.*, Civ. No. 08-00342 JMS/LEK, Order Denying Defendant Ford Motor Company's Motion for Summary Judgment Based on Federal Preemption (Doc. No. 523)