IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| SHERI GAIL DURHAM, Individually and as next of Friend of MARISA UMA LAMA DURHAM, MINOR ET AL., <br><br> Plaintiffs, <br><br> vs. <br><br> COUNTY OF MAUI, ET AL. <br><br> Defendants. <br> _____ | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

CIV. NO. 08-00342 JMS/LEK

ORDER DENYING FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM FOR PUNITIVE DAMAGES (DOC. NO. 518)

## ORDER DENYING FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM FOR PUNITIVE DAMAGES (DOC. NO. 518)

## I. INTRODUCTION

This action arises from a July 26, 2006 two-car accident between a 2004 Ford Focus station wagon (the "subject vehicle") driven by Mark Durham and rented from Maui Windsurfing Vans, Inc. ("Maui Windsurfing"), and a 2003 Hyundai Santa Fe Sport Utility Vehicle ("SUV") driven by Patty Conte. Mark Durham passed away as a result of his injuries in the accident. His daughters, Jessica and Marisa, both passengers in the subject vehicle, also sustained injuries and Jessica passed away over two years later.

As a result of this accident, Plaintiffs Sheri Gail Durham ("Sheri Durham"), individually and as next friend of Marisa Durham, and Denise Ann Jenkins ("Jenkins"), as the Administrator of the Estates of Mark Durham and Jessica Durham, (collectively "Plaintiffs"), allege that the subject vehicle was defective because it lacked side airbags and its side structure and seat belts in concert with the seats did not reasonably minimize head and chest injuries in side impact collisions involving SUVs. Plaintiffs therefore allege product defect claims against Ford Motor Company ("Ford") for negligence, gross negligence, strict liability, and survival and wrongful death (Counts III, V, and IX of the Second Amended Complaint ("SAC")).

Currently before the court is Ford's Motion for Partial Summary Judgment on Plaintiffs' claim for punitive damages ("Ford's Punitive Damages Motion"). Ford argues that Plaintiffs are not entitled to punitive damages because no genuine issue of material fact supports by clear and convincing evidence that Ford acted wantonly or oppressively, and Ford complied with government safety standards and industry custom and practice. As explained below, the court DENIES Ford's Punitive Damages Motion because genuine issues of material fact exist from which a jury could find support by clear and convincing evidence that Ford acted with the requisite culpability for punitive damages.

2

## II. <u>BACKGROUND</u>

### A.    Factual Background

This action arises from a July 26, 2006 two-car accident at the intersection of Pulehu Road and Hansen Road in the County of Maui.  Mark Durham was driving the subject vehicle on Pulehu Road with his two minor daughters, Jessica and Marisa.  From the police investigation, it appears that Mark Durham failed to heed a stop sign at the intersection with Hansen Road, resulting in the SUV driven by Patty Conte on Hansen Road hitting the subject vehicle on its left side.  Ford Ex. A.  Mark Durham passed away as a result of the injuries in the accident.  Jessica and Marisa also sustained injuries, and Jessica passed away over two years later.

Plaintiffs assert claims against Ford for negligence, gross negligence, strict liability, and survival and wrongful death.  In support of these claims, Plaintiffs assert that the subject vehicle was defective because it lacked side airbags and its side structure and seat belts in concert with the seats did not reasonably minimize head and chest injuries in side impact collisions involving SUVs. Plaintiffs further assert that these defects caused Defendants' injuries -- one of Plaintiffs' experts, Tyler Kress, posits that Mark and Jessica Durham would have suffered much less severe injuries if the subject vehicle had the appropriate side

structure design and utilized side airbags.  Pls.' Ex. G, Kress Decl. ¶ 3.

In support of their claim that Ford acted grossly negligent, Plaintiffs assert that Ford's failure to implement a safer side structure and install side airbags in the subject vehicle was wanton, malicious, and grossly negligent when viewed objectively at the time of the accident.  SAC ¶ 72.  In support of this assertion, Plaintiffs have presented evidence regarding, among other things, Ford's knowledge of side impact injuries and the benefits of side airbags, Ford's development and implementation of side airbags, and Ford's decision to make side airbags only optional in the Focus.

Regarding side impact injuries generally, Ford was aware that while frontal impacts occur more frequently, the risk of injury in side impacts is greater because there is less space between the victim and the point of impact.  Pls.' Ex. A at 201:17-02:16; Pls.' Ex. C.  Ford was also aware that within the class of side-impact accidents, "mass mismatch" accidents -- in which a higher mass vehicle hits a lower mass vehicle -- have a greater risk of injury than in other side-impact accidents.  Pls.' Ex. A at 48:12-23.  During his deposition, Michael Leigh, Ford's corporate representative, estimated based on National Highway Traffic Safety Administration publications that there are approximately 10,000 fatalities caused in side-impact accidents per year, *id.* at 17:15-24, and 90 percent of these fatalities

4

occur in passenger vehicles. *Id.* at 122:24-23:2; *id.* at Depo. Ex. 10 FF00588. In total, Leigh agreed with a 1995 Ford video announcing Ford's development of head/chest airbags for side-impact crashes, which states that "[a]ccording to recent U.S. government accident data, more than 60,000 people are killed or seriously injured in side-impact traffic accidents each year. Twenty Five percent of those victims suffer head injuries." Pls.' Ex. A at 195:17-196:1; Pl.'s Ex. C.

Regarding Ford's knowledge of the benefits of side airbags, Ford asserted in that same 1995 video that side airbags "will make it possible for more people to walk away from potentially fatal crashes," and Ford's Head of Auto Safety touted that side airbags could dramatically reduce head injuries associated in mass-mismatch accidents. Pls.' Ex. C; Pls.' Ex. A at 205:18-06:19. Leigh further explained that side airbags were Ford's answer to reducing the number of head injuries in side-impact crashes. Pls.' Ex. A at 199:1-25.

In 1999, individuals at Ford proposed implementing "improvements in structure, padding, and combinations of throrax/curtain side impact airbag systems" to enhance side impact protection. Pls.' Ex. E, Depo. Ex. 00252001. Ford theorized that implementing these improvements could reduce the risk of serious injuries by 25% in United States passenger cars and carry a variable cost of only $12 per unit. Pls.' Ex. A, Depo. Ex. 2 at 00252001-02. Despite its own

calculations, Ford was also aware that the Insurance Institute for Highway Safety

("IIHS") determined that side airbags could reduce the risk of fatalities by as much

as 45%.  Pls.' Ex. A at 74:6-17.

   Ford began high volume implementation of side airbags in 1997 in the

Mondeo in Europe and in 1999 in the Town Car, Continental, Cougar, and

Winstar.  *Id.* at 36:12-24.  Side airbags came standard on the Focus in Europe

around 1997 or 1998, but were only an option in the United States for the 2000

model year.  *Id.* at 62:19-23, 72:3-12.  It was not until 2008 that Ford altered the

Focus' side structure and made side airbags standard in the United States.  *Id.* at

114:18-21; Pls.' Ex. B. at Depo. Ex. 11.

   Ford was aware that the Focus without side airbags performed poorly.

In 2000, the IIHS performed side-impact testing on the Focus by striking it with a

1996 Ford Explorer and shared its results with Ford by 2002.  *See* Pl.'s Ex. A

at105:4-107:21; *id.* at Depo. Ex. 10 at F00585, F00596.  The IIHS publicly

released its results in 2005, rating the Focus without side airbags "poor."  Pls.' Ex.

B at Depo. Ex. 10.  Specifically, the IIHS found that driver head, neck, and torso

injuries, and driver and rear passenger head protection were all poor.  *Id.*; *see also*

Pls.' Ex. A at 106:22-108:2.  The IIHS concluded that "serious skull fracture

and/or brain injuries, plus rib fractures and/or internal organ injuries would be

likely" for the driver and that "rib fractures as well as a left femur fracture would be possible" for the rear passenger.  Pls.' Ex. B at Depo. Ex. 10.  Not surprisingly, the Focus with side airbags performed better in preventing head and thorax injuries than the Focus without side airbags.  Pls.' Ex. A at 102:1-104:19.

Despite knowing that side airbags in the Focus would decrease injuries and deaths, Ford chose not to make them standard until 2008 in the United States based on "planning and marketing, particularly marketing, because [planning and marketing] have -- they're closest to what we call the pulse of the customer [and] know what the customers are looking for."  Pls.' Ex. A at 137:21-38:6.  Ford utilized this "general approach [] to let customers decide if they wanted that option."  *Id.* at 86:20-87:6.  The cost to Ford of installing side airbags in the Focus was approximately $100 per vehicle, *id.* at 91:14-21, and each sale generated approximately $200 in revenue to Ford.  *See id.* at 92:2-13; *see also* Pls.' Ex. H (stating that for this option, the retail price was $350 and the dealer invoice price was $312).  Less than 10% of consumers, however, purchased this option. *See id.* at 97:15-16.

## B.    Procedural History

On July 24, 2008, Plaintiffs filed this action.  Plaintiffs' SAC alleges claims against Ford for negligence, gross negligence, strict liability, and derivative

claims for wrongful death and survivorship, all relating to alleged design defects in the subject vehicle.[1]

On December 2, 2009, Ford filed its Punitive Damages Motion.  On January 12, 2010, Plaintiffs filed an Opposition, and on January 19, 2010, Ford filed its Reply.  A hearing was held on February 8, 2010.

### III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Rule 56(c) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of

---

[1] The SAC also alleges claims against Maui Windsurfing for negligence, strict liability, and survival and wrongful death, the County of Maui for road defect and dangerous conditions at the accident scene, medical malpractice claims related to the care provided to Jessica against Kapiolani Medical Center for Women and Children, Hawaii Pacific Health, Dr. Byron H. Izuka, Byron Izuka, M.D., LLC., Dr. Shila Patel, Kapiolani Medical Specialists, Dr. James Y. Sim, and James Y. Sim, M.D., LLC.  The SAC further alleges claims against Conte, but she is no longer a party to this action.

the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has carried its burden under Rule 56(c) its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial*."  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

     "An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248).  When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence

9

of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." (citations omitted)).

Nonetheless, the court must "view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254. Relevant to this action, the court must take into account the "clear and convincing" standard of proof that applies to punitive damages when determining summary judgment. *See id.* at 255.

## IV.  DISCUSSION

Ford argues that it is entitled to summary judgment on Plaintiffs' request for punitive damages because there is no clear and convincing evidence that Ford acted wantonly and it complied with government safety standards and industry custom.  The court first outlines the framework on punitive damages and then applies that framework to the facts presented.

### A.    Punitive Damages Framework

"Punitive or exemplary damages are generally defined as those damages assessed in addition to compensatory damages for the purpose of punishing the defendant for aggravated or outrageous misconduct and to deter the defendant and others from similar conduct in the future." *Masaki v. Gen. Motors Corp.*, 71 Haw. 1, 6, 780 P.2d 566, 570 (1989).  "In determining whether an award

10

of punitive damages is appropriate, the inquiry focuses primarily upon the

defendant's mental state, and to a lesser degree, the nature of his conduct." *Id.* at

7; 780 P.2d at 570.

       "'Punitive damages are not awarded for mere inadvertence, mistake,

or errors of judgment.'" *Ass'n of Apartment Owners v. Venture 15, Inc.*, 115 Haw.

232, 297, 167 P.3d 225, 290 (2007) (quoting *Masaki*, 71 Haw. at 7, 780 P.2d at

571) (emphasis omitted).  Rather, the Hawaii Supreme Court has explained:

> [i]n order to recover punitive damages, "the plaintiff
> must prove by clear and convincing evidence that the
> defendant has acted wantonly or oppressively or with
> such malice as implies a spirit of mischief or criminal
> indifference to civil obligations, or where there has been
> some wilful misconduct or that entire want of care which
> would raise the presumption of a conscious indifference
> to consequences."

*Id.* (quoting *Masaki*, 71 Haw. at 16-17, 780 P.2d at 575) (brackets omitted).

      The standard for punitive damages encompasses gross negligence,

which is the "entire want of care [raising] the presumption of indifference to

consequences." *Mullaney v. Hilton Hotels Corp.*, 634 F. Supp. 2d 1130, 1154 (D.

Haw. 2009) (quotations omitted); *see also Pancakes of Haw., Inc. v. Pomare*

*Props. Corp.*, 85 Haw. 286, 293, 944 P.2d 83, 90 (Haw. App. 1997) (defining

gross negligence as  "[i]ndifference to a present legal duty and utter forgetfulness

of legal obligations so far as other persons may be affected." (citation and

quotation signals omitted)); *Ditto v. McCurdy*, 86 Haw. 84, 92, 947 P.2d 952, 960

(1997) (determining that there was an abundance of clear and convincing evidence

upon which the jury could rely to find that the doctor's care of the patient was

"grossly negligent and therefore reckless and consciously indifferent to the

consequences that could arise").

      While the Hawaii Supreme Court has not addressed the precise issue,

other courts have found that a defendant's compliance with government regulations

and/or industry standards is relevant, but not conclusive, to punitive damages.[2]

*See, e.g., O'Gilvie v. Int'l Playtex, Inc.*, 821 F.2d 1438, 1443 (10th Cir. 1987)

("Compliance with FDA standards is not dispositive under Kansas law if a

reasonable manufacturer would have done more."); *Dorsey v. Honda Motor Co.*,

655 F. 2d 650, 656-57 (5th Cir. 1981) (rejecting under Florida law that compliance

with government regulations precludes a finding of punitive damages as a matter of

---

[2] Ford suggests that the Hawaii Supreme Court might find that compliance with government regulations defeats a claim for punitive damages due to *Pickering v. Hawaii*, 57 Haw. 405, 557 P.2d 125 (1976), which affirmed summary judgment on a claim alleging that the State negligently designed a highway median. Ford Reply 4-5. While *Pickering* discusses that the highway median at issue was construed pursuant to federal standards, this fact was not dispositive in its analysis. Indeed, *Pickering* acknowledges that "compliance with established statutory and administrative standards are not necessarily conclusive on the issue of negligence." *Pickering*, 57 Haw. at 408, 557 P.2d at 127.

      Other than its misplaced reliance on *Pickering*, Ford was unable to cite -- and this court did not find -- any cases supporting the notion that compliance with government regulations and/or industry standards acts as an automatic bar to punitive damages. Indeed, Ford even acknowledges that this is not the law. *See* Ford Reply 3.

law); *Jowers v. BOC Group, Inc.*, 608 F. Supp. 2d 724, 767 (S.D. Miss. 2009) ("[C]onformity with established industry standards, while evidence of whether a product is reasonably safe, *may never be conclusive on the point.*" (quotations omitted)); *Denton v. DaimlerChrysler Corp.*, 2008 WL 5111222 at *2 n.3 (N.D. Ga. Dec. 2, 2008) ("The Court must conclude that compliance with standards or regulations does not insulate a defendant from compensatory or punitive damages."); *Reynolds v. General Motors Corp.*, 2007 WL 2908564, at *12 (N.D. Ga. Sept. 28, 2007) ("Compliance with applicable safety regulations does not preclude an award of punitive damages where "there is other evidence showing culpable behavior." (quotations omitted)).[3]

## B.      Application of Framework

Viewed in a light most favorable to Plaintiffs, the evidence establishes that by the mid-1990s, Ford knew that side impact car accidents cause thousands of injuries and hundreds of deaths a year, and that side airbags would significantly reduce injuries associated with these accidents.  *See* Pls.' Ex. A at 201:17-02:16; Pls.' Ex. C.  While Ford rolled out side airbags in other vehicles in the late 1990s,

---

[3]  The parties spend significant energy discussing and distinguishing caselaw addressing the availability of punitive damages where the defendant has complied with government regulations.  Despite their apparent disagreement regarding which cases are most relevant, both parties acknowledge that compliance with safety regulations does not preclude punitive damages where there is other evidence showing culpable behavior.  Pls.' Opp'n 17-18; Ford Reply 3.

13

Ford offered side airbags in the U.S. Focus as an option only, even though (1) side airbags came standard in European Focus, Pls.' Ex. A at 62:19-23, 72:3-12; (2) Ford was aware that side impacts were more severe for smaller vehicles such as the Focus where the chance of a "mass-mismatch" is higher, Pls.' Ex. C; (3) the Focus without side airbags rated "poor" in side impact crashes, Pls.' Ex. B at Depo Ex. 10; (4) the cost of installing side airbags in the Focus was only $100 per vehicle, Pls.' Ex. A at 91:14-21; and (5) less than 10% of Focus purchasers chose the option of installing side airbags.  *Id.* at 97:15-16.  Rather than allow safety and feasibility to guide Ford's determination of when to make side airbags standard, Ford relied on marketing "because they have -- they're closest to what we call the pulse of the customer [and] know what the customers are looking for."  *Id.* at 137:21-38:6.

In sum, this evidence supports that Ford (1) was aware that the Focus without side airbags posed a higher risk of injury, (2) was capable of making side airbags standard in the Focus, and (3) nonetheless deliberately chose to make side airbags in the Focus only an option.  Viewed in a light most favorable to Plaintiffs, this evidence raises a fact question supporting punitive damages by clear and convincing evidence.

In opposition, Ford argues that summary judgment should be granted

14

because it complied with government regulations and/or industry customs such that the record as a whole does not support a finding of punitive damages.  The court rejects this argument.  First, the government regulations upon which Ford relies -- Federal Motor Vehicle Safety Standards 208 and 214 -- are not as "comprehensive" as Ford suggests, but rather lay out minimum safety standards regarding side impacts.  *See* Doc. No. 740.  Second, viewing the evidence in a light most favorable to Plaintiffs, the court finds that a fact question still exists regarding whether a jury could find by clear and convincing evidence that punitive damages are warranted even though Ford complied with government and industry standards. *See also Dorsey*, 655 F.2d at 655-56 (overturning trial court's setting aside of punitive damages even though defendant had complied with government standards because evidence established that Honda was aware of the design deficiencies creating an unreasonable risk of harm to passengers and there were practical ways of improving its crashability); *Reid v. BMW of N. Am.*, 430 F. Supp. 2d 1365, 1374 (N.D. Ga. 2006) (finding that evidence that BMW defendants knew of an alleged defect in the radiator and failed to warn others of it was sufficient for punitive damages issues to go to the jury, despite defendants' compliance with regulations and/or standards); *Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521, 536 (Tenn. 2008) (upholding jury verdict for punitive damages even though defendant

15

complied with federal regulations because the evidence presented supports the conclusion that defendant was aware that compliance was insufficient).

Ford also argues that it did not act with the requisite culpability because side airbags were an emerging technology and Ford was simply cautious in rolling out the technology.  Ford Reply 7-10.  Ford further points to evidence that suggests that Ford was a leader in the industry by being the first manufacturer to offer side airbags in less expensive vehicles.  Ford Reply 10 (citing Pls.' Ex. A at Depo Ex. 4).  While Ford's evidence may certainly be relevant to the ultimate determination of punitive damages, it is not sufficient to establish that Ford is entitled to summary judgment.  As explained above, Plaintiffs have presented contradictory evidence that Ford did not make side airbags standard in the U.S. Focus out of marketing considerations, yet included them as a standard feature in the European model.  Viewing the evidence in a light most favorable to Plaintiffs, a jury could find that this and the other evidence outlined above establishes by clear and convincing evidence that Ford acted with the requisite culpability to support punitive damages.

The court therefore DENIES Ford's Punitive Damages Motion.

# V. **CONCLUSION**

Based on the above, the court DENIES Ford's Punitive Damages

Motion.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, February 17, 2010.



    /s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Durham et al. v. County of Maui et al.*, Civ. No. 08-00342 JMS/LEK, Order Denying Ford Motor Company's Motion for Partial Summary Judgment on Plaintiffs' Claim for Punitive Damages (Doc. No. 518)