IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| SHERI GAIL DURHAM, INDIVIDUALLY AND AS NEXT FRIEND OF JESSICA HALEY DURHAM AND MARISA UMA LAMA DURHAM, BOTH MINORS, AND AS ADMINISTRATOR OF THE ESTATE OF MARK ALLEN DURHAM, DECEASED, | ) ) ) ) ) ) ) ) ) | CV NO 08-00342 JMS-LEK |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| COUNTY OF MAUI, ET AL., | ) ) | |
| Defendants. | ) ) | |

ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION TO EXCLUDE EXPERT DESIGNATION OF
CLIFFORD WONG, PH.D. AND EVIDENCE OF, RELATED TO,
REPORTED THC IN MARK DURHAM'S POSTMORTEM BLOOD SAMPLE

On April 22, 2010, Plaintiffs Sheri Gail Durham, individually and as next friend of Marisa Uma Lama Durham, minor, and Denise Ann Jenkins, as the Administrator of the Estate of Mark Allen Durham, deceased, and as the Administrator of the Estate of Jessica Haley Durham, deceased (collectively "Plaintiffs") filed the instant Motion to Exclude Expert Designation of Clifford Wong, Ph.D. and Evidence of, or Related to, Reported THC in Mark Durham's Postmortem Blood Sample ("Motion").  On May 27, 2010, Defendant Ford Motor Company ("Ford") and Defendant County of Maui ("the County") each filed a memorandum in opposition and, on May 28, 2010, Ford filed a

joinder in the County's memorandum in opposition and the County filed a joinder in Ford's memorandum in opposition.  Also on May 28, 2010, Defendant Maui Windsurfing Vans, Inc. ("Maui Windsurfing") filed a joinder to each memorandum in opposition. Plaintiffs filed their reply on June 3, 2010.  This matter came on for hearing on June 17, 2010.  Appearing on behalf of Plaintiffs were Robert Chaiken, Esq., Lee Brown, Esq., and Sarah Love, Esq.  Appearing on behalf of Ford were Jerold Matayoshi, Esq., Lois Yamaguchi, Esq., and Howard Grant Law, Esq.  Appearing on behalf of the County was Moana Lutey, Esq.  Appearing on behalf of Maui Windsurfing was Ann Aratani, Esq.  Appearing on behalf of Defendants Byron H. Izuka, M.D., and Byron H. Izuka, M.D., LLC was Jeffery Portnoy, Esq.  Appearing on behalf of Defendants Hawaii Pacific Health, Kapiolani Medical Center for Women and Children, and Shilpa J. Patel, M.D., was Edquon Lee, Esq.  After careful consideration of the Motion, supporting and opposing memoranda, and the arguments of counsel, Plaintiffs' Motion is HEREBY GRANTED IN PART AND DENIED IN PART for the reasons set forth below.

## BACKGROUND

In the instant Motion, Plaintiffs state that a blood sample "purportedly was taken" from Mark Durham the day after his death and was analyzed at Clinical Laboratories of Hawaii in Honolulu ("CLH").  [Motion at 3.]  Clifford Wong, Ph.D., signed a

2

report of the analysis ("CLH Report") which stated, *inter alia*, that CLH's testing confirmed the presence of 2.1 ng/ml of THC[1] in Mark Durham's blood, indicating "recent use" of marijuana.[2] [Id.] In his deposition, however, Dr. Wong testified that a 2.1 ng/ml reading is the lowest detectable quantity of THC, and the test that CLH used has a standard deviation of error equal to ten percent. [Exh. B to Love Decl., 4/22/09 Depo. of Clifford Wong ("Wong Depo."), at 109, 127.]

On December 2, 2009, Ford designated Dr. Wong as a "non-retained expert", stating that he

> may be called upon to testify regarding the comprehensive drug screen test performed on the sample of blood obtained from decedent Mark Allen Durham and the results, which testimony may be considered expert in nature. Plaintiffs are referred to his deposition testimony, given on April 22, 2009 in this matter, for information concerning his background, experience and potential areas of testimony.

[Exh. C to Love Decl., Ford's Expert Witness Disclosures, at 5.] Ford's expert disclosures did not include any other opinion from Dr. Wong. Plaintiffs argue that Ford's adoption of Dr. Wong's deposition testimony is a concession that he has no opinion about

---

[1] THC refers to delta-9-tetrahydrocannabinol. Its acid metabolite is 9-carboxy-11-nor-delta-9-tetrahydrocannabinol. [Motion, Decl. of Sarah M. Love ("Love Decl."), Exh. D, 1/8/10 report of Robert B. Palmer, Ph.D., at 1.] THC "is the active ingredient in marijuana." Hemp Indus. Ass'n v. Drug Enforcement Admin., 333 F.3d 1082, 1085 (9th Cir. 2003).

[2] The CLH Report is attached to the Motion as Exhibit A to the Love Declaration.

3

impairment.   At his deposition, Dr. Wong testified:

> my communications for this specific case have been
> primarily to obtain records for deposition on the
> Durham autopsy chemical findings, toxicology
> findings.  So I'm not here in a capacity to
> discuss the impairment issue, since I have not
> seen the police report or looked at the traffic
> reports.

[Wong Depo. at 5-6 (emphasis added).]

In addition to the factors noted above, Plaintiffs argue that other portions of Dr. Wong's testimony indicate that the CLH Report is scientifically unreliable.   He testified that a phenomenon called postmortem redistribution[3] can cause artificially high readings in blood samples.   The deviation factor can be three to five percent, which means that the actual THC reading from Mark Durham could have been less than 2.0.   [Id. at 113-15.]   In addition, CLH does not have records of the solvent reagent used to test Mark Durham's blood, although it is the laboratory's usual practice to keep such records.   [Id. at 123, 125.]   Dr. Wong testified that, for laboratory certification, the lack of the records "would be a major problem in assessing the reliability of that instrument."   [Id. at 125.] He also testified that "[i]t would call to question the validity, as we would not be able to challenge - especially if there was a problem with the analysis, whether or not the reagents were

---

[3] Upon death, the THC which was present in the body's fatty tissue is released and redistributed throughout the body.   [Wong Depo. at 113.]

within - used within their . . . expiration dates." [Id. at 126.] Finally, Dr. Wong testified that, if he were evaluating the findings in the CLH Report, he would be critical of the results. [Id. at 129.]

Dr. Wong also testified that when the "full scan" method was performed on Mark Durham's blood sample, it did not show the presence of THC. [Id. at 108.] Further, after that result, laboratory personnel had to manually reintegrate the specimen because a qualifier was not satisfied. [Id. at 54-55.] This could have been due to an issue with the tuning of an instrument, but CLH did not keep records to show whether the instrument was properly tuned. [Id. at 103-05.] Plaintiffs argue that a tuning problem could have resulted in a false positive.

Plaintiffs state that the CLH Report does not include any data or information regarding when exposure to the allegedly detected compound occurred. They argue that, unlike blood alcohol measurements, there is no measurement of drug metabolites which would indicate marijuana impairment or would proximate exposure or use, particularly when the blood sample is taken post-mortem. According to Plaintiffs, both Dr. Wong and Plaintiffs' expert, Robert Palmer, Ph.D., agree that post-mortem blood testing for the presence of THC is inherently scientifically unreliable. While a person's body eliminates

alcohol and many other drugs in a relatively linear fashion, THC remains in the body for extended periods of time because it adheres to fatty tissue.  [Id. at 141-42.]  It is therefore almost impossible to determine how much marijuana a person has ingested by looking at THC concentrations.

Thus, Plaintiffs contend that the CLH Report's opinion of "recent use indicated" is misleading.  According to Plaintiffs, the Maui Police Department relied on the CLH Report in its official report of the collision and concluded that Mark Durham's use of marijuana was among the causes of the collision.  [Exh. E to Love Decl., Motor Vehicle Accident Report, at 01001022-23.]  Plaintiffs argue that this conclusion is unfounded in light of the problems with CLH's testing processes in this case.

Dr. Palmer opined that there is no scientifically valid or reliable way to conclude that the 2.1 ng/ml reading from Mark Durham's postmortem blood sample indicates recent use of marijuana or that he was impaired from marijuana use at the time of the collision.  Dr. Wong's recent use finding is based on studies on plasma taken from living persons, which are inapplicable to postmortem blood testing.  There are significant irregularities in CLH's testing process which have a negative impact on any opinions relying on the validity of CLH's testing. The integrity of CLH's testing process cannot be confirmed

6

because of the lack of records regarding instrument tuning and
the reagent.  Further, there is an increased risk of error
because the finding was very close to the reporting limit.  The
manual integration after the full scan resulted in qualifier
failure removes the objectivity of computer testing and
introduces human decision making, error and bias.  [Exh. D to
Love Decl.]

Plaintiffs also point out that no other party
identified Dr. Wong as an expert witness and, other than
Plaintiffs' designation of Robert Palmer, Ph.D., no party has
designated a toxicology expert.  Plaintiffs designated Dr. Palmer
as a rebuttal expert in response to Ford's designation of
Dr. Wong.  Plaintiffs argue that the CLH Report, its findings and
conclusions, and any reference to them in other evidence or
testimony (collectively "THC Evidence"), should be excluded from
the case because the CLH Report is scientifically unreliable.
Further, if it is presented to the trier of fact, it would be
unduly prejudicial to Plaintiffs, particularly given the fact
that there is no evidence of a causal link between the reported
finding of THC in Mark Durham's post mortem blood sample and the
collision.

Plaintiffs argue that the Court should exclude the THC
Evidence pursuant to its duty to act as a gatekeeper and to
prevent unreliable scientific or expert testimony from reaching

the jury.  This district court applies the Ninth Circuit's two-part test for determining admissibility.  First, the evidence must be reliable, *i.e.* reflecting scientific knowledge and methods and representing good science.  Second, the evidence must be relevant and advance a material element of the offering party's case.  Further, the evidence should not mislead the jury.

Plaintiffs contend that, even if the THC reading is reliable, it is not relevant unless it tends to show that Mark Durham's driving was impaired at the time of the collision. Dr. Wong himself testified that the mere presence of THC in someone's system does not establish impairment because every person is affected differently by marijuana.  In order to opine as to impairment, a toxicology expert would have to consider overt signs of intoxication.  [Wong Depo. at 136-37.]  Plaintiffs argue that there are no overt or corroborating signs of intoxication in this case.  Plaintiffs emphasize that Dr. Wong specifically denied having an opinion regarding intoxication and the defendants have not identified any other expert regarding the impairment issue.

Plaintiffs argue that Dr. Wong's theories and techniques have not been, and cannot be, tested.  There are numerous problems with the documentation of CLH's testing.  There is no peer review or publication supporting the opinion of recent use based on the presence of THC in a postmortem blood sample.

Further, Dr. Wong's testing methods are not generally accepted in the scientific community, and he admitted that the reading could have been affected by postmortem redistribution of THC. Plaintiffs therefore urge the Court to exclude the THC Evidence.

In its memorandum in opposition, Ford argues that the Motion improperly asks the Court to weigh the evidence and "decide an apparent battle of expert opinions." [Ford Mem. in Opp. at 2.] Ford argues that the issue is for the trier of fact to decide.

Ford emphasizes that the collision occurred during the daytime in dry, clear weather. Witnesses testified that Mark Durham ran a stop sign at a high rate of speed and did not slow or stop when he entered the intersection. In addition to THC, Mark Durham's routine blood screen indicated the presence of 11-nor-delta-9-carboxylic acid. Further, Dr. Wong testified in his deposition that, at the time it tested Mark Durham's blood sample, CLH was accredited by the College of American Pathologists. The accreditation process includes inspection of the laboratory's facilities, including testing the accuracy of the equipment used in Mark Durham's THC test and examining CLH's quality control records. [Wong Depo. at 144-45.[4]]

---

[4] Excerpts of Dr. Wong's April 22, 2009 deposition transcript are attached to Ford's memorandum in opposition as Exhibit C to the Declaration of Lois H. Yamaguchi ("Yamaguchi Declaration").

CLH conducted a preliminary screen (ELISA Test) on Mark Durham's sample to determine whether THC was present. The positive result in the ELISA Test, which does not quantify the amount present, prompted a second test, a gas chromatography/mass spectrometry (GCMS). The GCMS showed 2.1 ng/ml of THC, indicating recent use, and 16.5 ng/ml of 11-nor-delta-9-carboxylic acid. [Id. at 26-29, 32-33, 56.] Dr. Wong testified that the GCMS is considered the "gold standard" for drug testing in the United States, and it is approved by the federal government. [Id. at 41-42.] He testified that there are two methods to identify a sample by GCMS, the selective ion monitoring (SIM) method, and the full scan method. [Id. at 54.] Although the full scan in this case was inconclusive, the SIM method identified the THC compound. [Id. at 107-08, 118.] Dr. Wong opined that the findings were "accurate in regard to the identification of the compound and a quantitation as to the limitations of our instrumentation." [Id. at 118-19.]

In concluding that the test results indicated recent use, Dr. Wong relied on Dr. Marilyn Huestis' methodology to use the 2.1 ng/ML and 16.5 ng/ml findings to determine how recently Mark Durham had used marijuana. Dr. Wong testified that Dr. uestis' methodology is generally accepted in the scientific community. [Id. at 62-63.] Dr. Wong did not actually perform the Huestis calculations when he tested Mark Durham's blood

sample because the 2.1 ng/ml reading for THC was "well within recent use", [id. at 153,] which he testified was four or five hours. [Id. at 155.] Ford emphasizes that Dr. Manoukian, who performed Mark Durham's autopsy, testified that Mark Durham's test results indicated that he would have been under the effects of the active tetrahydrocannabinol molecule. [Exh. E to Yamaguchi Decl., 2/24/09 Depo. of Anthony Manoukian, M.D. ("Manoukian Depo."), at 26.]

As to postmortem redistribution, Dr. Manoukian testified that his pattern in performing an autopsy is to draw blood for the toxicology screen from the subclavicular area before making an incision. This is the preferred location for a blood draw because it is away from the heart and other organs and therefore less likely to have postmortem fluctuations in drug levels. [Id. at 20-21.] Further, once a blood sample is taken, it is kept frozen, which minimizes degradation of the THC over time. [Id. at 36-37.] He also testified that refrigeration of Mark Durham's body in the morgue soon after his death would have slowed the redistribution process. [Id. at 25.]

As to Plaintiffs' argument the testing reagent may have been expired, Dr. Wong testified that, at the time Mark Durham's sample was tested, it was not CLH's practice to maintain records of the expiration dates for the blood reagents. At the time of Dr. Wong's April 2009 deposition, CLH had recently begun

11

maintaining reagent lists.  [Wong Depo. at 135-36.]  Further, according to Dr. Wong, none of the tests that CLH conducted during July 2006 were ever invalidated due to the use of an expired reagent.  [Id. at 143.]  He had no reason to believe that any of the reagents used on Mark Durham's sample were expired because it is the normal practice of the CLH staff to check the expiration dates on the reagent bottles.  [Id. at 147-49.]

     As to the tuning of the instruments used to test Mark Durham's blood sample, Dr. Wong testified that, in July or August 2006, the testing instruments were subjected to an Autotuning process on a daily basis.  If a tuning issue arose during the process, it would be repeated until the instrument passed.  If the instrument could not pass, it would be put out of service.  [Id. at 132-33.]

     As to the manual reintegration, Dr. Wong testified that, after obtaining the initial test data, he reintegrated some of the "peaks" in order "to correlate to the area underneath the peaks that would correspond to marijuana" or "because there was an interference."  [Id. at 44-45.]  He normally performs some manual integration of the peaks because "[s]ometimes there's a peak that runs close and may give an erroneous quantitation[.]" [Id. at 44.]  Dr. Wong testified that the procedure is "standard GC/MS theory" and is reflected in some of the manuals and training materials for the CG/MS.  [Id. at 47.]  Dr. Wong has

12

never been challenged in court for using the manual reintegration process.  He also testified that he was ultimately satisfied with that he had an accurate THC report.  [Id. at 48.]

Ford also points to the deposition testimony of Claudia Nissen, the CLH Toxicology Supervisor, who performed the THC confirmation testing by GCMS on Mark Durham's blood sample on August 23, 2006.  [Exh. F to Yamaguchi Decl., 4/22/09 Depo. of Claudia M. Nissen ("Nissen Depo."), at 8-11.]  She is certified by the American Society of Clinical Pathologists and the National Accreditation Agency.  [Id. at 22-23.]  She testified that it was her custom and practice to ensure that she only used non-expired reagents and that she followed her custom and practice in August 2006.  [Id. at 11-12.]  Ms. Nissen testified that she has never used an expired reagent when running a test, nor has she ever used a reagent which she later realized was expired.  [Id. at 12, 22.]  She also testified that Mark Durham's THC reading indicates recent use.  [Id. at 15.]

Ms. Nissen testified that, although CLH did not keep reagent logs at the time of Mark Durham's testing, it maintained what she called a "recipe book" for all reagents in the laboratory.  The recipe book listed when reagents were made up and when they expired.  It also included buffer numbers, lot numbers, and batch numbers.  In addition, Ms. Nissen testified that she would always look at the reagent bottle to confirm the

material details of the reagent.  [Id. at 26-28.]

Ford emphasizes that it never retained Dr. Wong as an expert.  Ford characterizes him as a percipient expert witness akin to a treating physician.  Out of an abundance of caution, Ford included Dr. Wong in its expert disclosures.

Ford emphasizes that, in evaluating the admissibility of expert testimony, courts must focus on the reliability of the expert's methodology, not the results.  Ford notes that Plaintiffs do not question Dr. Wong's or CLH's qualifications to give expert testimony.  Ford also argues that the evidence is clearly relevant.  Plaintiffs have claimed that Mark Durham never used marijuana at all, and they deny that he caused or contributed to the damages and injuries in this case.  Ford argues that Plaintiffs have merely alleged human error or procedural laboratory errors and that these are relevant to the weight that the trier of fact gives the evidence.  They are not determinative of admissibility.  Ford contends that granting the Motion would require the Court to essentially adopt Dr. Palmer's rebuttal report.

Finally, Ford argues that the Court should not exclude the THC Evidence pursuant to Fed. R. Evid. 403 because exclusion is an extraordinary remedy that is to be used sparingly.  Although the evidence poses a danger of prejudice, Ford argues that the potential danger does not substantially outweigh the

14

probative value.  The evidence is relevant to the proper and fair distribution of fault and responsibility for the damages and injuries claimed in this action.

The County raises the same primary arguments that Ford raised: that Dr. Wong's opinions are sufficiently reliable and relevant; that Plaintiffs' arguments go to the weight of the evidence rather than admissibility; and that the evidence is probative and not unfairly prejudicial.  The County also points out that Mark Durham was familiar with the intersection of Pulehu Road and Hansen Road where the accident occurred because their family had previously stayed at a residence on Pulehu Road for prolonged periods on several different occasions.  The County contends that the most reasonable explanation for Mark Durham running the stop sign is that he was impaired.

The County emphasizes that Dr. Wong employed the GCMS test based on standard operating procedures and that he used a checklist to ensure the procedures were followed correctly. [Wong Depo. at 65-68.]  The County argues that the GCMS testing procedure has been tested and has a known rate of error.  The County also reiterates that it is generally accepted in the relevant scientific community.

Finally, the County argues that, even if the Court questions the accuracy of the CLH Report's findings regarding the quantity of THC detected, the report would be admissible to

15

impeach Sheri Durham's testimony that Mark Durham never used marijuana.

In their reply, Plaintiffs reiterate many of the arguments they raised in the Motion.  In addition, Plaintiffs argue that Ford and the County have failed to demonstrate that the results of Mark Durham's blood test should be admitted to show that he was impaired and that this alleged impairment caused or contributed to the accident.  Plaintiffs argue that, without any evidence of a causal connection, Dr. Wong's testimony and any other evidence of THC in Mark Durham's postmortem blood would be unfairly prejudicial.

## **DISCUSSION**

Federal Rule of Evidence 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

It is well established that:

It is the trial judge's responsibility to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).  In making this determination, the judge must make "a preliminary assessment of whether the

> reasoning or methodology underlying the testimony
> is scientifically valid and . . . whether that
> reasoning or methodology properly can be applied
> to the facts in issue." <u>Id.</u> at 592-93, 113 S.Ct.
> 2786.
>     Although "[m]any factors will bear on the
> inquiry," some of the considerations considered
> relevant by the Supreme Court to such an
> assessment include: (a) whether the theory or
> technique can and has been tested; (b) whether the
> theory or technique has been subjected to peer
> review and publication; (c) the known or potential
> rate of error for the technique; and (d) the
> theory or technique's general degree of acceptance
> in the relevant scientific community. <u>Id.</u> at
> 593-94, 113 S.Ct. 2786.

<u>Boyd v. City & County of San Francisco</u>, 576 F.3d 938, 945 (9th

Cir. 2009) (alterations in original).  The reliability inquiry is

"flexible", and these factors will not always apply.  <u>See</u> <u>Kumho</u>

<u>Tire Co. v. Carmichael</u>, 526 U.S. 137, 141 (1999).  The <u>Daubert</u>

inquiry focuses on the reliability of "principles and

methodology, not on the conclusions that they generate."

<u>Daubert</u>, 509 U.S. at 595.  Further, in determining whether the

proffered expert's methods constitute acceptable science, courts

must review the proposed testimony in the context of the field.

<u>See</u> <u>Boyd</u>, 576 F.3d at 946.  The court's role "is to make certain

that an expert, whether basing testimony upon professional

studies or personal experience, employs in the courtroom the same

level of intellectual rigor that characterizes the practice of an

expert in the relevant field."  <u>Kumho Tire</u>, 526 U.S. at 152.

    Having reviewed the CLH Report, Dr. Wong's deposition,

and the other supporting evidence, this Court FINDS that the CLH

Report and Dr. Wong's testimony regarding THC are sufficiently reliable under Daubert because the methodology underlying the analysis of Mark Durham's blood sample is scientifically valid. The arguments that Plaintiffs have raised regarding issues including, but not limited to, margin of error and postmortem redistribution are proper subjects for cross-examination; they do not render the test results inadmissible.  Further, the Court FINDS that the CLH Report and Dr. Wong's testimony regarding THC are relevant to the issues in this case.

Plaintiffs have asked the Court to exclude this evidence, and other related evidence, under Federal Rule of Evidence 403, which provides that a court has the discretion to exclude relevant evidence that is otherwise admissible "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  The Court, however, finds that a ruling on 403 exclusion is premature. Exclusion of the CLH Report, Dr. Wong's testimony, or other related evidence is a matter that is best left for the judge to make at trial.

The Court, however, notes that Dr. Wong has clearly denied giving any opinions as to whether Mark Durham was impaired at the time of the accident.  In addition, when Ford disclosed

Dr. Wong as a non-retained expert witness, Ford did not produce any opinions or reports. Dr. Wong's testimony is therefore limited to what he did as a percipient witness. To the extent that Dr. Wong drew conclusions and formed opinions in within professional expertise while testing Mark Durham's blood sample, he may give opinion testimony akin to a treating physician, if the opinions were disclosed in the CLH Report and/or his deposition testimony. The disclosure of any opinions beyond the report and his deposition would be untimely because defendants failed to disclose the opinions prior to the defendants' expert disclosure deadline. Similarly, any other witnesses who will testify regarding THC in Mark Durham's blood sample, such as Dr. Manoukian, are also limited to their percipient witness testimony.

Plaintiffs' Motion is therefore DENIED as to the request for an order excluding the CLH Report and any testimony by Dr. Wong regarding THC, as reflected in either the CLH Report or his deposition testimony. Plaintiff's Motion is GRANTED as to the request to exclude any other expert testimony regarding THC. With regard to the Maui Police Department Report ("Police Report"), Plaintiff's Motion is DENIED as to the inclusion of the CLH's findings in the Police Report, and DENIED WITHOUT PREJUDICE as to any opinion in the Police Report regarding whether Mark Durham's alleged drug use was a factor in the accident. The

admissibility of such causation findings is contingent upon the trial court's ruling on foundation, relevancy, and Rule 403. Similarly, Plaintiff's Motion is DENIED WITHOUT PREJUDICE as to any testimony regarding the alleged prior use of marijuana by Mark Durham, subject to the trial court's ruling on foundation, relevancy, and Rule 403.

## CONCLUSION

On the basis of the foregoing, Plaintiffs' Motion to Exclude Expert Designation of Clifford Wong, Ph.D. and Evidence of, or Related to, Reported THC in Mark Durham's Postmortem Blood Sample, filed April 22, 2010, is HEREBY GRANTED IN PART AND DENIED IN PART.

The Court DENIES the Motion as to: 1) the CLH Report and any expert testimony that Dr. Wong may offer as a percipient witness, as reflected in the CLH Report and/or his deposition testimony; and 2) the inclusion of CLH's findings in the Police Report.  The Court GRANTS the Motion and EXCLUDES all other defense expert testimony regarding THC.  The Motion is DENIED WITHOUT PREJUDICE as to: 1) the Maui Police Department Report, to the extent that it expresses any opinions about whether Mark Durham's alleged drug use was a factor in the accident; and 2) any evidence regrading Mark Durham's alleged prior marijuana use.

IT IS SO ORDERED.

20

DATED AT HONOLULU, HAWAII, June 30, 2010.



/S/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States Magistrate Judge

SHERI GAIL DURHAM, ETC., ET AL. V. COUNTY OF MAUI, ET AL; CIVIL NO 08-00342 JMS-LEK; ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO EXCLUDE EXPERT DESIGNATION OF CLIFFORD WONG, PH.D. AND EVIDENCE OF, RELATED TO, REPORTED THC IN MARK DURHAM'S POSTMORTEM BLOOD SAMPLE