IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| SHERI GAIL DURHAM, Individually and as Next Friend of MARISA UMA LAMA DURHAM, Minor, ET AL.,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF MAUI, ET AL.,<br><br>Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIV. NO. 08-00342 JMS/LEK<br><br>ORDER: (1) GRANTING IN PART AND DENYING IN PART JAMES Y. SIM, M.D. AND JAMES Y. SIM, M.D., LLC'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 792); AND (2) GRANTING IN PART AND DENYING IN PART KAPIOLANI MEDICAL CENTER FOR WOMEN AND CHILDREN, HAWAII PACIFIC HEALTH, KAPIOLANI MEDICAL SPECIALISTS, AND SHILPA J. PATEL, M.D.'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 793) |

## ORDER: (1) GRANTING IN PART AND DENYING IN PART JAMES Y. SIM, M.D. AND JAMES Y. SIM, M.D., LLC'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 792); AND (2) GRANTING IN PART AND DENYING IN PART KAPIOLANI MEDICAL CENTER FOR WOMEN AND CHILDREN, HAWAII PACIFIC HEALTH, KAPIOLANI MEDICAL SPECIALISTS, AND SHILPA J. PATEL, M.D.'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 793)

## I. INTRODUCTION

On July 26, 2006, Mark Durham and his two daughters, Jessica and

Marisa, were injured in a two-car accident after Mark Durham failed to heed a stop

sign at the intersection of Pulehu Road and Hansen Road in the County of Maui.

Jessica suffered multiple severe injuries, and passed away from an aortic dissection

over two years later on December 25, 2008.

Plaintiffs Sheri Gail Durham ("Sheri Durham"), individually and as next friend of Marisa Durham, and Denise Ann Jenkins ("Jenkins"), as the Administrator of the Estates of Mark Durham and Jessica Durham, (collectively "Plaintiffs"), allege claims of negligence and gross negligence relating to Jessica's medical treatment provided by Hawaii Pacific Health ("HPH"), Kapiolani Medical Center for Women and Children ("KMCWC"), Kapiolani Medical Specialists ("KMS"), Shilpa J. Patel, M.D. ("Dr. Patel") (collectively, "Kapiolani Defendants"), and James Y. Sim, M.D., and James Y. Sim, M.D., LLC (collectively, "Dr. Sim").

Currently before the court are Dr. Sim's and Kapiolani Defendants' Motions for Summary Judgment, in which they argue that they met the standard of care for Jessica and were not the cause of her injuries and death.  As explained below, the court GRANTS in part and DENIES in part Dr. Sim's Motion for Summary Judgment, and GRANTS in part and DENIES in part Kapiolani Defendants' Motion for Summary Judgment.

///

///

///

## II. <u>BACKGROUND</u>

**A.      Factual Background**

On July 26, 2006, Mark Durham and his two daughters, Jessica and Marisa, were injured in a two-car accident.  Plaintiffs allege that Jessica, twelve years old, suffered a left distal femur fracture, right radial and ulna fracture, a ruptured spleen, pulmonary contusions, respiratory failure and lacerations, and chest trauma.  *See* Second Amended Complaint ("SAC") ¶ 22.

Jessica was initially treated at Maui Memorial Medical Center ("MMMC"), where she underwent an emergency splenectomy.  *See* Doc. No. 857, Pls.' Ex. A, Dr. Stuart Gold Report 3.  MMMC was not equipped, however, to address Jessica's fractured leg.  Doc. No. 795, Kapiolani Defs.' Concise Statement of Facts ("Kap. Defs.' CSF") ¶ 2.[1]  Jessica was therefore transferred to KMCWC, where she received treatment until August 15, 2006, when she was transferred to Children's Medical Center ("CMC") in Dallas, Texas.  Plaintiffs allege that Kapiolani Defendants and Dr. Sim failed to meet the standard of care in caring for Jessica and communicating her needs for follow-up care.  The following evidence is relevant to these allegations:

---

[1]  Where a fact is not in dispute, the court cites directly to either Kapiolani Defendants' CSF or Dr. Sim's CSF.

### 1.   *Proper Placement for Jessica in Honolulu*

At MMMC, Sheri Durham, Jessica's mother, was told that Jessica

would be transferred to either KMCWC or Queen's Medical Center ("QMC"),

depending on which facility first had an open bed.  *See* Doc. No. 795, Kap. Defs.'

Ex. 2, Sheri Durham Depo. 154:9-155:5.  On July 27, 2006, Jessica was transferred

to KMCWC.  *Id.*; *see also id.* Kap. Defs.' Ex. 4, Dr. Izuka Depo. 43:13-25.

Dr. Lawrence A. Peebles, a board-certified general surgeon retained

by Kapiolani Defendants, opines that KMCWC was the only appropriate facility in

Hawaii to handle Jessica's specialized needs and that it would have been outside

the standard of care for KMCWC to refuse MMMC's request to transfer Jessica.

*Id.* Peebles Decl. ¶¶ 20-22; *see also id.* Kap. Defs.' Ex. 6, Dr. Patel Depo. 52:3-17

(asserting that KMCWC was an appropriate facility for Jessica's medical problems

and that KMCWC was able to provide medical treatment Jessica required).  In

comparison, Dr. David G. Zipes, M.D., a pediatric hospitalist retained by Plaintiffs,

opines that KMCWC should not have accepted Jessica as a patient and/or that

KMCWC should have transferred her to QMC because QMC had a level two

trauma center.  Doc. No. 857, Pls.' Ex. B, Dr. Zipes Report 3-4.  Dr. Zipes did

admit, however, that KMCWC's acceptance of a patient such as Jessica would be

nonetheless appropriate if QMC was full at the time of the transfer request.  *See*

4

Doc. No. 795, Kap. Defs.' Ex. 32, Dr. Zipes Depo. 110:2-111:5.

### 2.      Dr. Izuka's Treatment of Jessica

The same day as her transfer, Dr. Izuka, a self-employed physician specializing in pediatric orthopedics, *see* Doc. No. 795, Kap. Defs.' Ex. 4, Dr. Izuka Depo. 9:17-25, 12:5-6, performed an open reduction and internal fixation ("ORIF") on Jessica's femur fracture.  *See* Doc. No. 857, Pls.' Ex. A, Dr. Gold Report 3.  KMCWC provided Dr. Izuka all of the implant sets for fixation of Jessica's femur fracture that he requested, and Dr. Izuka chose the implant set that he believed was appropriate for Jessica's bone size.  *See* Doc. No. 795, Kap. Defs.' Ex. 4, Dr. Izuka Depo. 103:3-104:11.  Dr. Izuka operated on Jessica this one time only, and asserts that he would not have done anything differently with respect to his treatment and care of Jessica.  *Id.* at 18:24-19:1, 36:21-37:4.

In comparison, Dr. Gold, a board-certified orthopedic surgeon retained by Plaintiffs, opines that Dr. Izuka (1) should have performed a complete orthopedic examination prior to operating on Jessica; (2) should have explained to Sheri Durham the risks of ORIF and options beyond ORIF such as external fixation; (3) should have performed an external fixation outside the zone of Jessica's injuries instead of an ORIF; (4) installed the incorrect implant for Jessica's femur; (5) failed to attend to Jessica post-operatively; and (6) failed to

communicate pertinent information to orthopedic providers at CMC.  Doc. No. 857, Pls.' Ex. A, Dr. Gold Report 6-8; *see also id.* Pls.' Ex. I, Dr. Izuka Depo. 92:2-93:2 (stating that an external fixation was "doable" but that ORIF was a better option).

Apparently some time after the surgery, doctors at KMCWC noticed a displacement of Jessica's fixed fracture, bending of the installed plate, and angulation of Jessica's leg.  *See id.* Pls.' Ex. A, Dr. Gold Report 4.  Jessica required additional surgery to fix these problems, which, as discussed below, caused her to be transferred to CMC instead of her home in Texas as was originally planned.

### 3.    *Dr. Sim's Treatment of Jessica*

While not submitted as a fact by the parties, apparently on the second day of Jessica's admission at KMCWC, a heart murmur was detected.  *See* Doc. No. 854, Pls.' Opp'n to Dr. Sim Mot. at 5.  On July 28, 2006, an echocardiogram was performed, and Dr. Adeline Winkes, an attending physician at KMCWC, asked Dr. Sim, a board-certified pediatric cardiologist practicing in a partnership, to consult on Jessica's case.  *See* Doc. No. 795, Kap. Defs.' CSF ¶¶ 8-9; Doc. No. 794, Dr. Sim CSF ¶ 3.  Dr. Sim reported his impressions of the July 28, 2006 echocardiogram as showing:

1.     Marked dilation of ascending aorta with effacement of sinotubular junction. The ascending aorta measures about 37 mm and 39 mm in the proximal transverse aortic arch.

2.     Mild aortic and mitral insufficiency.

3.     Left-sided pleural effusion is noted.

Doc. No. 855, Pls.' Ex. 1.

On August 7, 2006, a second echocardiogram was conducted to "follow up for aortic root dilatation." Doc. No. 794, Dr. Sim CSF ¶ 4. Dr. Sim interpreted this echocardiogram as well, and found "marked dilatation of the ascending aorta." *Id.*; *see also* Doc. No. 795, Kap. Defs.' CSF ¶ 10. These findings were reported in Jessica's physician progress notes. *See* Doc. No. 855, Pls.' Ex. 2. Dr. Sandra Clapp, M.D., a pediatric cardiologist retained by Plaintiffs, does not disagree with the information contained in Dr. Sim's July 28 and August 7, 2006 reports. *See* Doc. No. 794, Dr. Sim Ex. G, Dr. Clapp Depo. 41:17-43:12.

On August 8, 2006, Jessica's attending physician at the time, Dr. Winkes, asked Dr. Sim to perform a cardiac consultation. *See id.* Dr. Sim Ex. C, Dr. Sim Depo. 21:24-22:11; *Id.* Dr. Sim Depo. Ex. 3 at 339. The primary role of a consultant is to evaluate the patient, and if appropriate, recommend testing and/or therapy of the condition he was consulted for by the primary care physician. *See id.* Dr. Sim Ex. B, Dr. Richard Friedman Report 3. A consultant also has the responsibility to communicate this information to the referring physician, and in

the case of a minor patient, to communicate this information to the person legally responsible for that minor's well-being. *Id.* In general, a consultant reports on a specific issue, but does not assume care for that issue unless asked otherwise. *See id.* Dr. Sim Ex. H, Dr. Zipes Depo. 147:9-14.

Dr. Winkes' consultation request was "FOR OPINION & RECOMMENDATION ONLY; ATTENDING PHYSICIAN TO REMAIN FULLY RESPONSIBLE FOR THE PATIENT." *Id.* Dr. Sim Ex. C, Sim Depo. Ex. 3 at 339. The reason for the consultation mentioned that Jessica had received multiple fractures from the motor vehicle accident, she had two previous echocardiograms showing an enlarged aorta, and she was without cardiac signs or symptoms at this time. *Id.* The request asks that Dr. Sim "[p]lease evaluate for any recommendations regarding echo results." *Id.*

On August 10, 2006, Dr. Sim performed his consultation. Dr. Sim testified that he examined Jessica, interviewed Jessica's uncle Robert Jenkins and aunt Diane Carroll, and received a letter from Dr. Wright, a pediatric cardiologist who in 1994 performed a ligation of Jessica's patent ductus arteriosus, and who found that no further cardiology follow-up was necessary. *Id.* Dr. Sim Depo. 73:22-79:6. Dr. Sim's consultation report states that "echocardiogram had an incidental finding of generally dilated ascending aorta and transverse aortic arch.

There is no clear reason why this is the case, and the patient does not seem to have any history of connective tissue disorder." *Id.* Dr. Sim Depo. Ex. 6 at 1024.  The consultation report provides that Jessica "does not need any further workup, but she needs to be followed by a pediatric cardiologist." *Id.* at 1025.  As for future steps, the consultation report provides that Dr. Sim "discussed [his] finding and impression to her aunt and uncle, and they will follow through once she returns to the mainland." *Id.*

While Dr. Sim acknowledged that Jessica's aortic dilatation and ascending aorta dilatation were potentially life-threatening[2] and that he did not believe an attending pediatric doctor would necessarily have an appreciation of the seriousness of Jessica's condition, *see id.* Dr. Sim Depo. 55:14-56:10, 70:9-71:24, his sole recommendation to the attending physicians at KMCWC was that Jessica follow up with a pediatric cardiologist when she returned to Texas.  *Id.* at 63:10-25.  In other words, Dr. Sim did not suggest any specific follow-up tests or any time frame for such follow-up.  Dr. Sim further testified that if Jessica were staying on Oahu, he would have recommended that she have another echocardiogram within a month, *id.* at 56:15-21, 62:6-63:5, but that he did not recommend to the

_____

[2] Although Dr. Sim argues that he never admitted that Jessica's condition was life-threatening because the question posed during deposition was only a hypothetical, he later acknowledged that he had "identified a potentially life-threatening cardiovascular issue."  *See* Doc. No. 794, Dr. Sim Ex. C, Dr. Sim Depo. 70:9-13.

attending physician that she have a follow-up echocardiogram within a month on the assumption that a receiving cardiologist would perform such test right away. *Id.* at 63:10-64:4. Rather, Dr. Sim testified that he could not dictate to another doctor when a follow-up should occur. *Id.* at 68:10-16.

Dr. Sim does not recall ever meeting or speaking with Sheri Durham, Jessica's mother. *See id.* at 78:22-79:11. Further, Sheri Durham does not recall being specifically told by any physician in Hawaii that Jessica should see a pediatric cardiologist in Texas. Doc. No. 855, Pls.' Ex. 7, Sheri Durham Depo. 331:6-9. Rather, what Sheri Durham understood "was that after, you know, an EKG, or whatever the techs say, that her aorta was slightly enlarged, and I never really heard anything else about it after that." *Id.* at 319:7-320:1. Further, Jessica's aunt and uncle, Robert Jenkins and Diane Carroll, do not recall being informed that Jessica needed a cardiac follow-up upon her return to Texas. *See id.* Pls.' Ex. 8, Robert Jenkins Depo. 46:14-48:12, 49:21-50:14; *Id.* Pls.' Ex. 14, Diane Carroll Depo. 15:6-16, 33:14-18.

Both Dr. Sim's and Kapiolani Defendants' experts opine that Dr. Sim met the standard of care in evaluating Jessica's enlarged aorta. Specifically, Dr. Richard A. Friedman, a board-certified pediatric cardiologist retained by Dr. Sim, opines that Dr. Sim (1) performed his consultation well within the standards of care

10

of a prudent consultant by evaluating Jessica and taking into account the recent trauma and incidental findings on her initial and follow-up echocardiogram; (2) correctly interpreted the echocardiograms; and (3) made appropriate recommendations concerning follow-up of an abnormality which did not require immediate intervention.  *See* Doc. No. 794, Dr. Sim Ex. B, Dr. Friedman Report 4; *see also id.* Dr. Sim Ex. J, Dr. Richard Mitchell Decl. ¶ 15 (stating that the finding of Jessica's aortic root dilation was not sufficient in and of itself to warrant surgery, but rather the appropriate course was to document stability of the initial dilation, and then follow up with serial imaging).

Dr. Charles S. Kleinman, a board-certified cardiologist retained by Kapiolani Defendants, opines that under the circumstances of Jessica's injuries, "it was entirely appropriate that Jessica's internal and orthopedic injuries caused by the car accident were addressed first while informing her family, primary care physician, and receiving hospital of the potential for a dilated aorta which required follow-up care upon her return to Texas."  *See* Doc. No. 795, Dr. Kleinman Decl. ¶ 26.

In comparison, Dr. Clapp opines that Dr. Sim "offered no timetable for the recommended follow-up and he expressed no urgency with regard to the stated need for a follow-up."  *See* Doc. No. 855, Pls.' Ex. 13, Dr. Clapp Report 3.

11

Dr. Clapp therefore asserts that Dr. Sim breached the standard of care "by failing to express to the attending hospitalists that the need for specific cardiology follow-up in Dallas was immediate and important." *Id.* at 5-6.[3]

### 4.    *Jessica's Transfer to CMC*

On August 15, 2006, Jessica was transferred from KMCWC to CMC, arriving on the morning of August 16, 2006. *See* Doc. No. 794, Dr. Sim Ex. E,

---

[3] Dr. Clapp further opines that Dr. Sim breached the standard of care by failing to contact Jessica's former cardiologist Dr. Wright, and that both Kapiolani Defendants and Dr. Sim breached the standard of care by failing to determine an etiology for Jessica's enlarged aorta. As to the first issue, Dr. Clapp fails to explain how Dr. Sim's alleged failure to contact a cardiologist who had cared for Jessica over ten years ago caused Jessica any injury. While Dr. Clapp generally opines that Dr. Sim's breaches in the standard of care contributed to Jessica's death, the court need not accept an expert's conclusion that is not based on evidence. *See Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1252 (9th Cir. 2010) (finding that an expert's conclusory assertions are insufficient to raise a genuine issue of material fact); *see also Walton v. U.S. Marshals Serv.*, 492 F.3d 998, 1008 (9th Cir. 2007). Further, there is no evidence in the record suggesting any causal connection between this failure and Jessica's injuries and/or death. The court therefore GRANTS Dr. Sim's Motion for Summary Judgment to the extent Plaintiffs assert a negligence claim based on his failure to contact Dr. Wright.

As to Kapiolani Defendants' and Dr. Sim's failure to determine the cause of Jessica's enlarged aorta, the SAC asserts that this failure was a breach in the standard of care, and the parties address in their briefs both this issue and whether Jessica's enlarged aorta and aortic dissection was caused by trauma. During the hearing, however, Plaintiffs conceded that the failure to determine the cause of Jessica's enlarged aorta is not relevant to Plaintiffs' claims of negligence as to Kapiolani Defendants and Dr. Sim because their obligations in treating Jessica would be the same regardless of what caused her condition. Indeed, neither Dr. Clapp nor any other expert explains how failing to determine the cause of Jessica's enlarged aorta caused any injury to Jessica -- no expert suggests that treatment would differ if the cause of Jessica's enlarged aorta was trauma as opposed to a congenital defect. Accordingly, for purposes of the Motions for Summary Judgment, the court need not address what may have caused Jessica's enlarged aorta and whether Kapiolani Defendants and/or Dr. Sim breached the standard of care in failing to determine the cause of Jessica's enlarged aorta. Further, based on Plaintiffs' concession, the court GRANTS Dr. Sim's and Kapiolani Defendants' Motion for Summary Judgment to the extent Plaintiffs assert a negligence claim for failure to determine the cause of Jessica's enlarged aorta.

Sheri Durham Depo. 321:16-322:12.  The original plan was to discharge Jessica home, but the plan changed to transferring Jessica to CMC after KMCWC found that Jessica's left leg was dislocated.  *See* Doc. No. 855, Pls.' Ex. 11, Dr. Patel Depo. 100:8-23; Doc. No. 795, Kap. Defs.' CSF ¶ 13; *see also* Doc. No. 794, Dr. Sim Ex. M (stating that Sheri Durham prefers having further procedures done in Texas).  Accordingly, the only reason Jessica was transferred to CMC was to treat the dislocation of her left leg.  *See* Doc. No. 855, Pls.' Ex. 11, Dr. Patel Depo. 100:8-23.

In preparation for Jessica's transfer, Dr. Shilpa Patel, who is a pediatric hospitalist at KMCWC and who oversaw Jessica's transfer to CMC, prepared Jessica's medical information and spoke with doctors in Texas.  Dr. Patel had received Dr. Sim's consultation and recommendation, Doc. No. 794, Dr. Sim Ex. D, Dr. Patel Depo. 98:9-15, 174:19-176:14, and Dr. Sim expected that Dr. Patel would communicate the pertinent findings of his evaluations to the receiving doctor at CMC.  *See id.* Dr. Sim Ex. C, Dr. Sim Depo. 88:7-89:14.  To that end, on August 15, 2006, Dr. Patel prepared a Physician Patient Care Summary, which identifies the medical problems KMCWC found, including Jessica's enlarged aorta of "unclear etiology."  *See* Dr. Sim Ex. E, Sheri Durham Depo. Ex. 4.  The Summary further explains that this condition "does not appear to be associated

13

with the" accident, and recommends "followup with peds cardiology in Texas."

*Id*.  Dr. Patel also prepared a Patient Transfer Form, but did not include on it any

reference to Jessica's enlarged aorta or any of Dr. Sim's findings, diagnoses, or

recommendations for follow-up.  *See* Doc. No. 855, Pls.' Ex. 9.  According to Dr.

Zipes, a patient transfer form is "set up to provide a detailed summary of the

patient's recent medical history, recent and active diagnoses, treatments and care

provided, recommended follow-up care and any other pertinent information that

would help the receiving hospital understand why the patient was transferred there,

and what the patient's on going medical needs are."  Doc. No. 857, Pls.' Ex. B, Dr.

Zipes Report 5.

   Dr. Patel also provided information to Dr. Patrick Heiber, Jessica's

pediatrician since her birth, and Dr. Maria Stephan, an emergency room doctor

with CMC.  Dr. Patel faxed an interim patient care summary and the final patient

care summary to Dr. Heiber, *see id.* Kap. Defs.' CSF ¶ 16, and advised Dr. Heiber

of the need for a cardiology follow-up.  *See id.* Kap. Defs.' Ex. 6, Dr. Patel Depo.

174:19-175:11.  In response, Dr. Heiber informed Dr. Patel that he had spoken to a

"Dr. Kines" concerning Jessica's transfer to CMC.[4]  *Id.* at 106:4-22, 107:1-7.  As

---

[4]  Dr. Patel believed that "Dr. Kines" was an orthopedic surgeon, but learned for the first time during her deposition that, according to Plaintiffs' counsel, he was a nurse practitioner. Doc. No. 795, Kap. Defs.' Ex. 6, Dr. Patel Depo. 106:4-22, 108:3-11.

to Dr. Stephan, Dr. Patel remembers speaking to her regarding necessary follow-up for Jessica, and assumes that she discussed Jessica's enlarged aorta and need for follow-up because her practice is to go over the patient care summary and its follow-up components, which included discussion of Jessica's enlarged aorta, its unclear etiology, and the need for follow-up with a pediatric cardiologist in Texas.[5] *See id.* at 177:12-19; *id.* Kap. Defs.' Ex. 15; Doc. No. 857, Pls.' Ex. C, Dr. Patel Depo. 178:10-179:8.

Beyond this information provided by KMCWC, on August 16, 2006, Sheri Durham delivered a "substantial stack" of KMCWC records to someone at the CMC emergency department. *See* Doc. No. 795, Kap. Defs.' Ex. 3, Sheri Durham Depo. 202:23-203:22. The records subpoenaed from CMC indicate that CMC received the KMCWC records on August 16, 2006 during Jessica's emergency department admission. *Id.* Kap. Defs.' CSF ¶ 24; *see also id.* Kap. Defs.' Ex. 28, Dr. Clapp Depo. 52:5-9 (confirming that Jessica's KMCWC records were date-stamped on August 16, 2006 by CMC). The CMC records contain Dr. Sim's two echocardiographic notes, his August 10, 2006 consultation note advising

---

[5] Kapiolani Defendants assert that Dr. Patel testified that she faxed a copy of the patient care summary to CMC. *See* Doc. No. 872, Kap. Defs.' Reply at 7. The court cannot divine from the testimony cited by Kapiolani Defendants, however, that Dr. Patel testified that she faxed this particular form to anyone at CMC. *See* Doc. No. 795, Kap. Defs.' Ex. 6, Dr. Patel. Depo. 119:11-120:14. In any event, whether Dr. Patel faxed this form does not change the court's analysis on summary judgment.

that Jessica required follow-up with a pediatric cardiologist when she returned home, and Dr. Patel's Patient Care Summary. *See* Doc. No. 794, Dr. Sim Ex. F at 240-41, 251-52, 298, 435-39; *see also* Doc. No. 795, Kap. Defs.' CSF ¶¶ 24-25. Sheri Durham also reported on a CMC "Visit Documentation" form that within the past week, Jessica had an enlarged aorta, Doc. No. 794, Dr. Sim Ex. E, Sheri Durham Depo. Ex. 2, and CMC emergency department staff wrote "enlarged aorta" as part of Jessica's past history on an "Inpatient & Emergency Department Consultation Form." *Id.* at Sheri Durham Depo. Ex. 3; *see also* Doc. No. 795, Kap. Defs.' CSF ¶ 35.

The parties' experts provide differing opinions regarding whether Kapiolani Defendants met the standard of care in communicating Jessica's medical information to CMC. On the one hand, Dr. Friedman opines that Dr. Patel fulfilled her duties in transferring Jessica because she incorporated Dr. Sim's recommendations into Jessica's Patient Care Summary and then assured that all pertinent KMCWC records, including the Patient Care Summary and Dr. Sim's consultation report and echo reports, were transmitted to CMC. Doc. No. 794, Dr. Sim. Ex. B, Dr. Friedman Report 5. Further, Dr. George Woodward, a board-certified pediatric emergency medicine physician retained by Kapiolani Defendants, opines that Jessica's transfer to CMC met the standard of care

16

because, among other reasons, (1) KMCWC sent Jessica's medical records to CMC and Dr. Heiber; (2) the discharge summary clearly outlined the need for orthopedic evaluation, the abnormalities found on the echocardiograms, and the need for outpatient pediatric cardiology follow-up in Dallas; (3) Dr. Patel had multiple conversations with Dr. Heiber; and (4) there were significant and coordinated efforts by the KMCWC team to prepare Jessica and her family for transport back to Dallas and to provide the needed medical care.  *See* Doc. No. 795, Dr. Woodward Decl. ¶¶ 9-16; *see also id.* Dr. Fineman Decl. ¶¶ 16-20 (generally opining that Kapiolani Defendants met the standard of care in accepting, treating, and transferring Jessica).

In comparison, Dr. Zipes opines that Kapiolani Defendants breached the standard of care by, among other things, (1) failing to cause, have, or document appropriate hand-off communication with CMC or physicians that were expected to care for Jessica regarding material, recent, pre-transfer changes in Jessica's orthopedic status, as well as the need for specific cardiology follow-up; (2) failing to include on the transfer form and verbally communicate to CMC that a hospitalist was required to specifically request an immediate follow-up by a pediatric cardiologist to evaluate Jessica's condition; and (3) limiting Jessica's transfer to orthopedic service.  *See* Doc. No. 857, Pls.' Ex. B, Dr. Zipes Report 5-7.  Dr.

Clapp similarly opines that Kapiolani Defendants should have communicated verbally and in writing to the accepting doctors that immediate evaluation and follow-up regarding Jessica's enlarged aorta was necessary.  Doc. No. 855, Pls.' Ex. 13, Dr. Clapp Report 5-6.

### 5.   *Jessica's Follow-Up Treatment and Death*

The CMC emergency staff was aware of the non-union and failed open reduction of Jessica's femur and related orthopedic problems.  *See* Doc. No. 795, Kap. Defs.' CSF ¶ 40.  The same day as her arrival, however, CMC's emergency department evaluated and released Jessica home.  *See* Doc. No. 794, Dr. Sim Ex. E, Sheri Durham Depo. 338:25-339:17.

On August 22, 2006, Jessica was admitted to CMC again.  An attending physician noted "Mom's report that doctors in Hawaii told her of enlarged aorta, will continue to follow" and ordered a cardiology consult.  *Id.* Dr. Sim CSF ¶ 12.  Dr. Clapp testified that she would expect the receiving doctor at CMC to review Jessica's medical records, and initiate steps for a cardiology follow-up upon learning of this recommendation.  *See id.* Dr. Sim Ex. G, Dr. Clapp Depo. 53:18-55:19.  Dr. Zipes similarly testified that once a receiving hospital actually has the patient in its hospital, it should make its own independent assessment.  *See* Doc. No. 795, Kap. Defs.' Ex. 32, Dr. Zipes Depo. 47:17-48:6.

18

On August 23, 2006, Jessica's CMC attending physician ordered chest x-rays to "Evaluate Aorta," and noted "Cardiology to review."  Doc. No. 794, Dr. Sim CSF ¶ 12; *see also* Doc. No. 795, Kap. Defs.' CSF ¶¶ 25, 29; *id.* Kap. Defs.' Ex. 25.  The resulting August 23, 2006 radiology report states in part that "the cardiac silhouette is not enlarged.  Aortic arch is left-sided."  Doc. No. 794, Dr. Sim CSF ¶ 12.  Dr. Clapp testified that this radiologic analysis was not the appropriate study to evaluate Jessica's enlarged aorta.  *See id.* Dr. Sim Ex. G, Dr. Clapp Depo. 67:24-68:9.

While not submitted in the record, Jessica was apparently transferred to Texas Scottish Rite Hospital ("TSRH") on August 31, 2006.  *See* Doc. No. 793, Kap. Defs.' Mot. at 8.  That same day, Dr. Philip Wilson requested a chest exam, and found that the aorta was normal.  Doc. No. 795, Kap. Defs.' Ex. 26.  Further, on September 1, 2006, a TSRH physician noted that Jessica's aorta was initially enlarged after the motor vehicle accident and is now normal.  *Id.* Kap. Defs.' CSF ¶ 32.  Despite the evaluations by CMC and TSRH, Kapiolani Defendants and Plaintiffs agree that had Jessica undergone a cardiology consultation in Dallas, the problem with her aorta would have been diagnosed and medically addressed.  *Id.* ¶ 43.

On December 25, 2008, Jessica passed away from an aortic dissection.

*See* Doc. No. 794, Dr. Sim Ex. J, Dr. Mitchell Decl. ¶¶ 9-10.

**B.     Procedural History**

On July 24, 2008, Plaintiffs filed this action.  Plaintiffs' SAC alleges

claims against Dr. Sim and Kapiolani Defendants for negligence and gross

negligence relating to their treatment of Jessica and their communications to

Jessica's family and CMC regarding necessary steps in Jessica's follow-up care.[6]

On May 5, 2010, Dr. Sim and Kapiolani Defendants filed their

Motions for Summary Judgment.  On July 6, 2010, Plaintiffs filed their

Oppositions, and Dr. Sim and Kapiolani Defendants filed their Replies on July 13,

2010.  A hearing was held on July 23, 2010.

## III.  STANDARD OF REVIEW

Summary judgment is proper where there is no genuine issue of

material fact and the moving party is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(c).  Rule 56(c) mandates summary judgment "against a party who

fails to make a showing sufficient to establish the existence of an element essential

to the party's case, and on which that party will bear the burden of proof at trial."

---

[6] The SAC also alleges claims against (1) Ford Motor Company for negligence, gross negligence, strict liability, and derivative claims for wrongful death and survivorship; (2) Maui Windsurfing for negligence, strict liability, and survival and wrongful death; (3) the County of Maui for road defect and dangerous conditions at the accident scene; and (4) Dr. Izuka for additional medical malpractice claims.  The SAC further alleges claims against Patty Conte, but she is no longer a party to this action.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004). "When the moving party has carried its burden under Rule 56(c) its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at

248).  When considering the evidence on a motion for summary judgment, the

court must draw all reasonable inferences on behalf of the nonmoving party.

*Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille*

*Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence

of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn

in his favor." (citations omitted)).

## IV. **DISCUSSION**

Dr. Sim and Kapiolani Defendants seek summary judgment on

Plaintiffs' claims of negligence and punitive damages.  The court addresses the

parties' arguments on each of these claims.

### A.    **Negligence**

In order to prevail on a medical malpractice claim in Hawaii, a

plaintiff must prove the following elements by a preponderance of the evidence:

> (1) A duty, or obligation, recognized by the law,
> requiring the defendant to conform to a certain standard
> of conduct, for the protection of others against
> unreasonable risks;
> (2) A failure on the defendant's part to conform to the
> standard required: a breach of the duty;
> (3) A reasonably close causal connection between the
> conduct and the resulting injury[;] and
> (4) Actual loss or damage resulting to the interests of
> another.

*Takayama v. Kaiser Found. Hosp.*, 82 Haw. 486, 498-99, 923 P.2d 903, 915-16

(1996) (citing *Knodle v. Waikiki Gateway Hotel, Inc.*, 69 Haw. 376, 385, 742 P.2d 377, 383 (1987)) (brackets in original).  "[I]t is well settled that negligence and causation are independent legal requirements[] and that a finding of negligence does not automatically imply causation." *Id.* (quoting *Craft v. Peebles*, 78 Haw. 287, 307, 893 P.2d 138, 158 (1995) (some alterations added)).

Plaintiffs assert that Dr. Sim was negligent in his communications with Kapiolani Defendants and Sheri Durham regarding the need for specific and urgent follow-up regarding Jessica's enlarged aorta.  Plaintiffs further assert that Kapiolani Defendants were negligent by: (1) accepting Jessica as a patient from MMMC; (2) providing orthopedic treatment to Jessica;[7] and (3) during Jessica's transfer (a) failing to communicate to CMC the need for specific and urgent follow-up for Jessica's enlarged aorta, (b) limiting Jessica's transfer for orthopedic treatment (as opposed to including cardiology follow-up), and (c) failing to communicate to CMC new developments regarding Jessica's orthopedic condition.  Both Dr. Sim and Kapiolani Defendants argue that their conduct met the standard of care, and Kapiolani Defendants further argue that their actions were not the legal cause of Jessica's injuries and/or death.  The court first addresses whether Dr. Sim

---

[7]  Although at the hearing Plaintiffs apparently conceded that they were no longer alleging that Kapiolani Defendants were negligent in providing orthopedic care to Jessica, the court nonetheless addresses this allegation given that the parties address it in their briefs.

23

or Kapiolani Defendants breached the standard of care, and then addresses

Kapiolani Defendants' causation argument.

### 1.    *Breach of Standard of Care*

"[T]he established standard of care for all professionals is to use the

same degree of skill, knowledge, and experience as an ordinarily careful

professional would exercise under similar circumstances." *Kahoʻohanohano v.*

*Dep't of Human Servs.*, 117 Haw. 262, 296, 178 P.3d 538, 572 (2008).  "[T]he

standard of care for a claim based on allegedly negligent medical *treatment* must

be established by reference to prevailing standards of conduct in the applicable

medical community." *Carr v. Strode*, 79 Haw. 475, 485 n.6, 904 P.2d 489, 499 n.6

(1995).

"[I]n medical malpractice actions, expert opinion is generally required

to determine the 'degree of skill, knowledge, and experience required of the

physician, and the breach of the medical standard of care.'" *Kahoʻohanohano*, 117

Haw. at 296, 178 P.3d at 572 (quoting *Exotics Hawaii-Kona, Inc. v. E.I. Du Pont*

*De Nemours & Co.*, 116 Haw. 277, 300, 172 P.3d 1021, 1044 (2007)); *Craft*, 78

Haw. at 298, 893 P.2d at 149 ("[I]n medical malpractice actions, the question of

negligence must be decided by reference to relevant medical standards of care for

which the plaintiff carries the burden of proving through expert medical

testimony."); *see also Carr*, 79 Haw. at 298 n.6, 904 P.3d at 499 n.6.

        a.      *Dr. Sim's care of Jessica*

Dr. Sim argues that he met the standard of care because he performed his job as a consultant, Plaintiffs' expert Dr. Clapp does not disagree with the information in his echocardiogram reports, and he provided his consultation report to the attending physician, which explained that Jessica needed follow-up with a pediatric cardiology in Texas. *See* Doc. No. 792, Dr. Sim Mot. at 18. While Dr. Sim has presented evidence supporting these assertions, Plaintiffs have also presented evidence raising the fact question whether Dr. Sim should have discussed his findings with Sheri Durham and provided specific recommendations for follow-up in Texas.

Specifically, there is no evidence that Dr. Sim met with Sheri Durham, *see* Doc. No. 794, Dr. Sim. Ex. C, Dr. Sim Depo. 78:22-79:11, despite the fact that a consultant has the responsibility to communicate information to the person legally responsible for a minor's well-being. *See id.* Dr. Sim Ex. B, Dr. Friedman Report 3. Given that Sheri Durham did not understand that Jessica required any particular follow-up, *see* Doc. No. 855, Pls.' Ex. 7, Sheri Durham Depo. 319:7-320:1, it is a question of fact whether Dr. Sim breached the standard of care in failing to discuss Jessica's condition and his recommendations with Sheri Durham.

There is also a question of fact whether Dr. Sim met the standard of care in communicating with the attending physician at KMCWC the details of Jessica's condition and the necessary follow-up steps.  Viewed in a light most favorable to Plaintiffs, the evidence presented establishes that (1) Dr. Sim knew that Jessica's condition was potentially life-threatening and that an attending physician might not appreciate the seriousness of the condition, *see* Doc. No. 794, Dr. Sim. Ex. C, Dr. Sim Depo. 55:14-56:10, 70:9-71:24; (2) Dr. Sim would have recommended that Jessica have another echocardiogram within a month if she were staying on Oahu, *id.* at 56:15-21, 62:6-63:5; and (3) Dr. Sim made no specific recommendations regarding follow-up tests to be performed or the time frame for those tests.  *See id.* Dr. Sim Depo. Ex. 3 at 339.  Plaintiff's expert Dr. Clapp therefore opines that Dr. Sim breached the standard of care by not communicating a particular timetable for recommended follow-up and that the need for specific cardiology follow-up in Dallas was immediate and important.  *See* Doc. No. 855, Pls.' Ex. 13, Dr. Clapp Report 3, 5.  While Dr. Sim's expert Dr. Friedman asserts that Dr. Sim met the standard of care, *see* Doc. No. 794, Dr. Sim Ex. B, Dr. Friedman Report 4, the court cannot resolve this battle of the experts on summary judgment.  *See Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 235 F.3d 1184, 1192 (9th Cir. 2000) ("Weighing the credibility of conflicting expert witness

testimony is the province of the jury."); *Scharf v. U.S. Att'y Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979) (providing that it is "not the court's function" on summary judgment to resolve an issue of fact created by conflicting expert testimony).

Accordingly, the court DENIES Dr. Sim's Motion for Summary Judgement on Plaintiffs' negligence claim.

      b.    *KMCWC's acceptance of Jessica from MMMC*

Kapiolani Defendants argue that KMCWC's acceptance of Jessica from MMMC was appropriate and therefore met the applicable standard of care. In support of their assertions, Dr. Peebles opines that KMCWC was the only appropriate facility in Hawaii to handle Jessica's specialized needs and that it would have been outside the standard of care for KMCWC to refuse MMMC's request to transfer Jessica.  Doc. No. 795, Dr. Peebles Decl. ¶¶ 20-22; *see also id.* Kap. Defs.' Ex. 6, Dr. Patel Depo. 52:3-17 (asserting that KMCWC was an appropriate facility for Jessica's medical problems and that KMCWC was able to provide the medical treatment Jessica required).

In opposition, Plaintiffs have failed to raise a genuine issue of material fact that KMCWC's acceptance of Jessica fell below the applicable standard of care.  While Plaintiffs' expert Dr. Zipes opines that KMCWC should not have accepted Jessica as a patient and/or that KMCWC should have transferred her to

QMC, Doc. No. 857, Pls.' Ex. B, Dr. Zipes Report 3-4, he admitted that KMCWC's acceptance of Jessica would be appropriate if QMC was full at the time of the request.  *See* Doc. No. 795, Kap. Defs.' Ex. 32, Dr. Zipes Depo. 110:2-111:5.  Plaintiffs have presented no evidence indicating that QMC had availability during Jessica's stay at KMCWC and indeed, both Sheri Durham and Dr. Izuka testified that they were told QMC did not have availability.  *See* Doc. No. 795, Kap. Defs.' Ex. 2, Sheri Durham Depo. 154:9-155:5 (relaying what she was told about why Jessica was transferred to KMCWC); *Id.* Kap. Defs.' Ex. 4, Dr. Izuka Depo. 43:13-25 (same).

Accordingly, the court GRANTS Kapiolani Defendants' Motion for Summary Judgment as to Plaintiffs' negligence claims based on KMCWC's acceptance of Jessica from MMMC.

        *c.*    *Kapiolani Defendants' orthopedic treatment of Jessica*

Kapiolani Defendants argue that Plaintiffs have presented no evidence that Kapiolani Defendants breached the standard of care in providing Jessica orthopedic care.  The court agrees.

While Plaintiffs assert that Dr. Gold's Report "generally establish[es] fact issues concerning Kapiolani Defendants' negligence in the treatment and care

of Jessica's orthopedic injuries,"[8] Doc. No. 856, Pls.' Opp'n to Kap. Defs' Mot. at

5, Plaintiffs ignore that Dr. Gold's Report was limited to opining regarding Dr.

Izuka's negligence, not Kapiolani Defendants.  *See* Doc. No. 857, Pls.' Ex. A, Dr.

Gold Report 6-8.  Neither Dr. Gold nor any of Plaintiffs' other experts provide any

opinion that Kapiolani Defendants breached the standard of care in their orthopedic

treatment of Jessica.  Rather, the evidence presented establishes that KMCWC

provided Dr. Izuka all of the implant sets for fixation of Jessica's femur fracture

that Dr. Izuka requested, and Dr. Izuka chose the implant set that he believed was

appropriate for Jessica's bone size.  *See* Doc. No. 795, Kap. Defs.' Ex. 4, Dr. Izuka

Depo. 103:3-104:11.  Further, to the extent Plaintiffs argue that Kapiolani

Defendants should be held liable for Dr. Izuka's alleged negligence, Dr. Izuka is a

self-employed physician, *see id.* at 9:17-25, and Plaintiffs proffer no theory why

Kapiolani Defendants should be held liable for Dr. Izuka's alleged negligence.

Accordingly, the court GRANTS Kapiolani Defendants' Motion for

Summary Judgment on Plaintiffs' negligence claim to the extent based on their

orthopedic care of Jessica.

------

[8] Plaintiffs further argue that the court should not consider Kapiolani Defendants'
arguments regarding orthopedic care because the deadline to seek summary judgment on these
claims has already passed.  Kapiolani Defendants' Motion is appropriate, however, for newly
added parties such as Dr. Patel and KMS.  Given that the argument raised by Dr. Patel and KMS
apply equally to all Kapiolani Defendants, the court finds that it is in the interest of judicial
economy for the court to address this argument as it applies to all Kapiolani Defendants.

d.     *Kapiolani Defendants' transfer of Jessica to CMC*

Kapiolani Defendants argue that their transfer of Jessica to CMC met the standard of care because CMC staff were informed of Jessica's enlarged aorta and orthopedic problems through Dr. Patel's communication with Dr. Stephan and CMC's receipt of records outlining Jessica's medical care.  While Kapiolani Defendants have presented evidence and expert opinion supporting these assertions, Plaintiffs have also presented evidence suggesting that Kapiolani Defendants breached the standard of care by (1) failing to communicate to CMC the need for specific and urgent follow-up for Jessica's enlarged aorta; (2) limiting Jessica's transfer for orthopedic treatment (as opposed to including cardiology follow-up); and (3) failing to communicate to CMC new developments regarding Jessica's orthopedic condition.

Specifically, as to Kapiolani Defendants' failure to communicate the specific need for cardiology follow-up, nowhere in Jessica's medical records do Kapiolani Defendants recommend a particular time frame for follow-up or any particular tests needed.  Both Dr. Zipes and Dr. Clapp opine that Kapiolani Defendants' failure to communicate that the need for specific cardiology follow-up was important and necessary and a breach in the standard of care.  *See* Doc. No. 855, Pls.' Ex. 13, Dr. Clapp Report 5; Doc. No. 857, Pls.' Ex. B, Dr. Zipes Report 6-7.

30

As to limiting Jessica's transfer to orthopedic care, there is no evidence that Kapiolani Defendants communicated to CMC that Jessica needed an immediate follow-up with a pediatric cardiologist. Rather, Jessica's transfer to CMC was for orthopedic care, not for cardiology care. *See* Doc. No. 794, Dr. Sim Ex. E, Sheri Durham Depo. Ex. 4; Doc. No. 855, Pls.' Ex. 11, Dr. Patel Depo. 100:8-23. Dr. Zipes opines that it was a breach in the standard of care for Kapiolani Defendants to limit Jessica's transfer to orthopedic needs. *See* Doc. No. 857, Pls.' Ex. B, Dr. Zipes Report 6-7.

Finally, as to Kapiolani Defendants' failure to communicate to CMC new developments regarding Jessica's orthopedic condition, Plaintiffs' expert Dr. Zipes explains that:

> there was no documented phone call or other verbal communication with an orthopedic provider at Children's Medical Center, from either Dr. Patel . . . or Dr. Izuka or anyone else from Kapi'olani Medical Center, regarding material, recent, pre-transfer changes in Jessica's clinical status -- mainly the failure of the initial ORIF and active infection with low grade fever. Similarly, there was no communication regarding any urgency, or the timing in which there was any need to address these status changes, or any existing, active medical conditions.

Doc. No. 857, Pls.' Ex. B, Dr. Zipes Report 4. Dr. Zipes opines that the failure to follow the general standard of care for transfer communications delayed treatment of Jessica's unstable fracture and wound infections. *Id.* at 7.

31

The court recognizes that the experts presented by Kapiolani

Defendants disagree with Plaintiffs' experts on these points, *see* Doc. No. 795, Dr.

Woodward Decl. ¶¶ 9-16; *see also id.* Dr. Fineman Decl. ¶¶ 16-20, but the court

cannot resolve these conflicting expert opinions on summary judgment.  *See Wyler*

*Summit P'ship*, 235 F.3d at 1192; *Scharf*, 597 F.2d 1242.  Accordingly, the court

finds that genuine issues of material fact exist regarding whether Kapiolani

Defendants breached the standard of care in transferring Jessica to CMC.

### 2.    *Causation*

Kapiolani Defendants argue that CMC's and TSRH's conduct are

superseding causes of Jessica's injuries and death, which relieve Kapiolani

Defendants of liability.[9]  Based on the following, the court rejects this argument.

"[A] superseding cause is generally one which operates, in succession

to a prior wrong, as the proximate cause of an injury."  *Keomaka v. Zakaib*, 8 Haw.

App. 518, 530, 811 P.2d 478, 485 (1991) (quoting 57A Am. Jur. 2d Negligence

§ 596, at 569 (1989)); *see also* Restatement (Second) of Torts § 440 (defining

---

[9]  Kapiolani Defendants also argue that they did not cause Jessica's injury or death because they met the standard of care such that CMC and TSRH staff were aware of Jessica's enlarged aorta and performed their own evaluations.  *See* Doc. No. 793, Kap. Defs.' Mot. at 13-16.  Because the court finds that genuine issues of material fact exist regarding whether Kapiolani Defendants met the standard of care, a genuine issue of material fact likewise exists as to whether Kapiolani Defendants were the cause of Jessica's death -- that is, whether Jessica would have survived had CMC been made aware of the need for specific and immediate cardiology follow-up.

"superseding cause" as "an act of a third person or other force which by its
intervention prevents the actor from being liable for harm to another which his
antecedent negligence is a substantial factor in bringing about").  In Hawaii, "[t]he
test to determine whether an intervening negligent act is a superseding cause is one
of foreseeability of the third person's conduct."  *Ontai v. Straub Clinic & Hosp.
Inc.*, 66 Haw. 237, 248, 659 P.2d 734, 743 (1983).

The Hawaii Supreme Court has recognized that the question of
superseding cause is rarely for the court to determine:

> [i]t is a rare case where the court may hold, as a matter of
> law, that the intervening act breaks the chain of causation
> because whether it was reasonably foreseeable is a
> question of fact and not of law.  *The second act will
> break the chain of causation only where, under no
> rational interpretation of the evidence, could the later act
> of negligence have been reasonably foreseen.*

*Taylor-Rice*, 91 Haw. 60, 76, 979 P.2d 1086, 1102 (1999) (quoting *McKenna*, 57
Haw. at 466, 558 P.2d at 1023).

Although Kapiolani Defendants have presented evidence that CMC
and TSRH should have reviewed Jessica's medical records from KMCWC and
made their own determinations regarding the level of care Jessica required, *see*
Doc. No. 794, Dr. Sim Ex. G, Dr. Clapp Depo. 53:18-55:19; Doc. No. 795, Kap.
Defs.' Ex. 32, Dr. Zipes Depo. 47:17-48:6, they have presented no expert opinion

33

that CMC and TSRH breached any particular standard of care in Jessica's treatment from which the court could find negligence.  The court therefore rejects that Kapiolani Defendants have established that CMC and TSRH are the superseding cause of Jessica's injuries and death as a matter of law.

In sum, the court DENIES Kapiolani Defendants' Motion for Summary Judgment on Plaintiffs' negligence claim based on (1) the failure to communicate to CMC the need for specific and urgent follow-up for Jessica's enlarged aorta; (2) the limitation of Jessica's transfer for orthopedic treatment (as opposed to including cardiology follow-up); and (3) the failure to communicate to CMC new developments regarding Jessica's orthopedic condition.

## B.     Punitive Damages

Both Dr. Sim and Kapiolani Defendants argue that summary judgment should be granted on Plaintiffs' claims for punitive damages against them because their alleged misconduct does not support such finding.  The court first outlines the framework on punitive damages and then applies that framework to the facts presented.

### 1.     Framework

As the court has previously stated in this action, *see Durham v. County of Maui*, 692 F. Supp. 2d 1256 (D. Haw. 2010), "[p]unitive or exemplary

damages are generally defined as those damages assessed in addition to

compensatory damages for the purpose of punishing the defendant for aggravated

or outrageous misconduct and to deter the defendant and others from similar

conduct in the future." *Masaki v. Gen. Motors Corp.*, 71 Haw. 1, 6, 780 P.2d 566,

570 (1989). "In determining whether an award of punitive damages is appropriate,

the inquiry focuses primarily upon the defendant's mental state, and to a lesser

degree, the nature of his conduct." *Id.* at 7; 780 P.2d at 570.

"'Punitive damages are not awarded for mere inadvertence, mistake,

or errors of judgment.'" *Ass'n of Apartment Owners v. Venture 15, Inc.*, 115 Haw.

232, 297, 167 P.3d 225, 290 (2007) (quoting *Masaki*, 71 Haw. at 7, 780 P.2d at

571) (emphasis omitted). Rather, the Hawaii Supreme Court has explained:

> [i]n order to recover punitive damages, "the plaintiff
> must prove by clear and convincing evidence that the
> defendant has acted wantonly or oppressively or with
> such malice as implies a spirit of mischief or criminal
> indifference to civil obligations, or where there has been
> some wilful misconduct or that entire want of care which
> would raise the presumption of a conscious indifference
> to consequences."

*Id.* (quoting *Masaki*, 71 Haw. at 16-17, 780 P.2d at 575) (brackets omitted).

The standard for punitive damages encompasses gross negligence,

which is the "entire want of care [raising] the presumption of a conscious

indifference to consequences."[10]  *Mullaney v. Hilton Hotels Corp.*, 634 F. Supp. 2d 1130, 1154 (D. Haw. 2009) (quotations omitted); *see also Pancakes of Haw., Inc. v. Pomare Props. Corp*., 85 Haw. 286, 293, 944 P.2d 83, 90 (Haw. App. 1997) (defining gross negligence as "[i]ndifference to a present legal duty and utter forgetfulness of legal obligations so far as other persons may be affected" (citation and quotation signals omitted)); *Ditto v. McCurdy*, 86 Haw. 84, 92, 947 P.2d 952, 960 (1997) (determining that there was an abundance of clear and convincing evidence upon which the jury could rely to find that the doctor's care of the patient was "grossly negligent and therefore reckless and consciously indifferent to the consequences that could arise").

---

[10]  Plaintiffs appear to suggest a lesser standard for gross negligence based on Hawaii Standard Civil Jury Instruction 8.17 (1999), which defines gross negligence as follows:

> Gross negligence is conduct that is more extreme than ordinary negligence.  It is an aggravated or magnified failure to use that care which a reasonable person would use to avoid injury to himself, or other people or damage to property.  But gross negligence is something less than willful or wanton conduct.

*See* Doc. No. 854, Pls.' Opp'n to Dr. Sim Mot. at 21.  The Hawaii Supreme Court Order approving these instructions provides that "approval for publication and distribution is not and shall not be considered by this court or any other court to be an approval or judgment as to the validity or correctness of the substance of any instruction."  *See* Order Approving Publication and Distribution of the Hawaii Standard Civil Jury Instructions (Oct. 11, 1999).  Accordingly, to the extent Hawaii Standard Civil Jury Instruction 8.17 suggests a lesser standard for gross negligence, the court applies the standard as developed through Hawaii caselaw.

### 2.    *Application*

As discussed above, there is a genuine issue of material fact whether Dr. Sim breached the standard of care by failing to adequately communicate specific recommendations for follow-up.   There is also a genuine issue of material fact whether Kapiolani Defendants breached the standard of care in their transfer of Jessica to CMC.   That these alleged breaches occurred, however, do not on their own amount to either willful misconduct or an entire want of care that would support punitive damages.   *See Masaki*, 71 Haw. at 7; 780 P.2d at 571 (stating that "to justify an award of punitive damages, 'a positive element of conscious wrongdoing is always required'" (quoting C. McCormick, Handbook on the Law of Damages § 77, at 280 (1935)).   Rather, to survive summary judgment on their punitive damages claim, Plaintiffs must present evidence raising a genuine issue of material fact that Dr. Sim and Kapiolani Defendants acted willfully or were grossly negligent.   Even when viewed in a light most favorable to Plaintiffs, the evidence simply does not support such inference as to these Defendants.

As for Dr. Sim, Dr. Sim has presented evidence that the role of a consultant is limited and that Dr. Sim's role in treating Jessica was that of a consultant.   *See* Doc. No. 794, Dr. Sim Ex. B, Dr. Friedman Report 3; *id.* Dr. Sim Ex. H, Dr. Zipes Depo. 147:9-14.   Further, Dr. Sim did everything that was asked

of him by Kapiolani Defendants -- he analyzed Jessica's two echocardiograms, and

provided a consultation regarding his findings.  Plaintiffs' expert Dr. Clapp does

not disagree with Dr. Sim's interpretations of Jessica's echocardiograms, *see id.*

Dr. Sim Ex. G, Dr. Clapp Depo. 41:17-43:12, and all of Dr. Sim's findings became

a part of Jessica's medical records at KMCWC, and were provided to CMC.  *See*

Doc. No. 794, Dr. Sim Ex. F at 240-41, 251-52, 298, 435-39.

While Dr. Sim did not suggest a specific course of action and he knew

both that Jessica had a potentially life-threatening condition and that Dr. Patel may

not have recognized the significance of his findings, this evidence on its own does

not support the inference that Dr. Sim acted with a conscious indifference to the

consequences of his actions.  Rather, all of the evidence presented suggests that Dr.

Sim believed that a cardiologist would review Jessica's file and determine the

appropriate follow-up tests that were necessary.[11]  *See, e.g.*, Doc. No. 794, Dr. Sim

Ex. C, Dr. Sim Depo. 63:10-64:4 (stating that he did not recommend to the

attending physician that Jessica have a follow-up echocardiogram within a month

on the assumption that a receiving cardiologist would perform such test right

away), 68:10-16 (stating that he could not dictate to another doctor when a follow-

---

[11]  There is no evidence presented suggesting that Dr. Sim believed a cardiologist would either not recognize the significance of Jessica's condition or fail to perform the appropriate tests.

up should occur).

As for Kapiolani Defendants, they made significant efforts to transfer and communicate relevant information to CMC. Specifically, Dr. Patel: (1) prepared a Patient Care Summary identifying Jessica's medical problems and recommendations for follow-up, Doc. No. 794, Dr. Sim Ex. E, Sheri Durham Depo. Ex. 4; (2) provided CMC Jessica's medical records, *id.* Dr. Sim. Ex. F; and (3) had discussions with an emergency doctor at CMC regarding follow-up steps for Jessica. *See* Doc. No. 795, Kap. Defs.' Ex. 6, Dr. Patel Depo. 177:12-19; *id.* Kap. Defs.' Ex. 15; Doc. No. 857, Pls.' Ex. C, Dr. Patel Depo. 178:10-179:8. Although Dr. Patel could have filled out the Patient Transfer Form more accurately and specifically expanded the transfer to include cardiology follow-up, these facts on their own do not support the inference that Dr. Patel purposely limited Jessica's transfer or otherwise withheld information from CMC in a manner that was wanton, willful, or with a want of care to the consequences in transferring Jessica.

The court therefore GRANTS Dr. Sim's and Kapiolani Defendants' Motion for Summary Judgment on Plaintiffs' claim for punitive damages.

## V.  CONCLUSION

Based on the above, the court GRANTS in part and DENIES in part Dr. Sim's Motion for Summary Judgment, and GRANTS in part and DENIES in

part Kapiolani Defendants' Motion for Summary Judgment.  Remaining against these Defendants are Plaintiffs' negligence claim against Dr. Sim based on failure to communicate specific recommendations for cardiology follow-up, and Plaintiffs' negligence claim against Kapiolani Defendants for (1) failing to communicate to CMC the need for specific and urgent follow-up for Jessica's enlarged aorta; (2) limiting Jessica's transfer for orthopedic treatment (as opposed to including cardiology follow-up); and (3) failing to communicate to CMC new developments regarding Jessica's orthopedic condition.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, July 28, 2010.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Durham et al. v. County of Maui et al.*, Civ. No. 08-00342 JMS/LEK, Order: (1) Granting in Part and Denying in Part James Y. Sim, M.D. and James Y. Sim, M.D., LLC's Motion for Summary Judgment (Doc. No. 792); and (2) Granting in Part and Denying in Part Kapiolani Medical Center for Women and Children, Hawaii Pacific Health, Kapiolani Medical Specialists, and Shilpa J. Patel, M.D.'s Motion for Summary Judgment (Doc. No. 793)