IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| SHERI GAIL DURHAM, INDIVIDUALLY AND AS NEXT OF FRIEND OF MARISA UMA LAMA DURHAM, MINOR ET AL., | ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) ) ) |
| COUNTY OF MAUI, ET AL. | ) ) |
| Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| _____ | ) |

CIV. NO. 08-00342 JMS/LEK

ORDER (1) AFFIRMING MAGISTRATE JUDGE'S JUNE 30, 2010 ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO EXCLUDE EXPERT DESIGNATION OF CLIFFORD WONG, PH.D. AND EVIDENCE OF OR RELATED TO, REPORTED THC IN MARK DURHAM'S POSTMORTEM BLOOD SAMPLE; AND (2) DENYING PLAINTIFFS' MOTION TO EXCLUDE EVIDENCE OF, OR RELATED TO, REPORTED THC IN MARK DURHAM'S POSTMORTEM BLOOD SAMPLE UNDER FEDERAL RULE OF CIVIL PROCEDURE 403

**ORDER (1) AFFIRMING MAGISTRATE JUDGE'S JUNE 30, 2010 ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO EXCLUDE EXPERT DESIGNATION OF CLIFFORD WONG, PH.D. AND EVIDENCE OF OR RELATED TO, REPORTED THC IN MARK DURHAM'S POSTMORTEM BLOOD SAMPLE; AND (2) DENYING PLAINTIFFS' MOTION TO EXCLUDE EVIDENCE OF, OR RELATED TO, REPORTED THC IN MARK DURHAM'S POSTMORTEM BLOOD SAMPLE UNDER FEDERAL RULE OF CIVIL PROCEDURE 403**

## I.  INTRODUCTION

This action arises from a July 26, 2006 two-car accident in which

Mark Durham and his two daughters, Jessica and Marisa, were injured after Mark

Durham allegedly failed to heed a stop sign at the intersection of Pulehu Road and Hansen Road in the County of Maui.  Mark Durham passed away as a result of his injuries, and a post-mortem blood test signed by Clifford Wong, Ph.D. ("Dr. Wong") from Clinical Laboratories of Hawaii ("CLH") confirmed the presence of 2.1 ng/ml of delta-9-tetrahydrocannabinol ("THC"), which is the active ingredient in marijuana (the "CLH Report").  The CLH report concluded that the amount of THC detected indicates recent use of marijuana.  Defendant Ford Motor Company ("Ford") subsequently designated Dr. Wong as a "non-retained expert" to testify regarding these results, and several Defendants[1] contend that Mark Durham was contributorily negligent in the accident.

Plaintiffs Sheri Gail Durham, individually and as next friend of Marisa Durham, and Denise Ann Jenkins, as the Administrator of the Estates of Mark Durham and Jessica Durham, (collectively "Plaintiffs"), seek to exclude evidence regarding the CLH Report and Mark Durham's alleged marijuana use on the basis that the testing is scientifically unreliable and its relevance is outweighed

---

[1]   The SAC alleges claims against (1) Ford Motor Company for negligence, gross negligence, strict liability, and derivative claims for wrongful death and survivorship; (2) Maui Windsurfing for negligence, strict liability, and survival and wrongful death; (3) the County of Maui for road defect and dangerous conditions at the accident scene; and (4) Hawaii Pacific Health, Kapiolani Medical Center for Women and Children, Kapiolani Medical Specialists, Shilpa J. Patel, M.D., James Y. Sim, M.D., James Y. Sim, M.D., LLC, Byron H. Izuka, M.D., and Byron H. Izuka, M.D. LLC for medical malpractice.  The SAC further alleges claims against Patty Conte, but she is no longer a party to this action.

2

by its prejudicial effect.  On June 30, 2010, Magistrate Judge Leslie E. Kobayashi

issued her Order Granting in Part and Denying in Part Plaintiffs' Motion to

Exclude Expert Designation of Clifford Wong, Ph.D. and Evidence of, Related to,

Reported THC in Mark Durham's Postmortem Blood Sample (the "June 30

Order").  The June 30 Order found that Dr. Wong's findings and testimony

regarding THC are reliable under *Daubert* and are relevant to the issues in this case

such that Dr. Wong could testify as a percipient witness regarding his testimony

and conclusions.  The June 30 Order denied without prejudice, however, Plaintiffs'

request pursuant to Federal Rule of Evidence 403 to exclude this evidence or any

conclusions that Mark Durham's alleged drug use contributed to the accident.

Currently before the court is Plaintiffs': (1) Motion to Exclude

Evidence of, or Related to, Reported THC in Mark Durham's Postmortem Blood

Sample Under Federal Rule of Civil Procedure 403 ("Plaintiffs' Motion"), and

(2) Objections to the June 30 Order ("Plaintiffs' Objections").  Based on the

following, the court AFFIRMS the June 30 Order, and DENIES Plaintiffs' Motion.

///

///

///

///

3

## II. <u>BACKGROUND</u>

**A.     Factual Background**

On July 26, 2006, at approximately 11:52 a.m., Mark Durham was driving his two daughters Marisa and Jessica on Pulehu Road when he allegedly failed to heed the stop sign at the intersection of Hansen Road, resulting in the SUV driven by Patty Conte hitting Mark Durham's vehicle on its left side.  *See* Pls.' Ex. E at 01001023.  Witnesses provided Maui police officers statements that Mark Durham's vehicle was "traveling fast" and "completely 'blew'" the stop sign. *Id.* at 01001008; *see also id.* at 01001009; *see also* Pls.' Reply Ex. E, Polly Berger Depo. 83:24-86:20 (testifying that it was her perception that Mark Durham failed to heed the stop sign); Pls.' Reply Ex. F, Alexander Dreyer Depo. 112:11-115:23 (stating that while he did not see the actual stop sign, it was his perception that Mark Durham ran it given his speed through the intersection).  In comparison, Plaintiffs may deny that Mark Durham ran the stop sign because Marisa testified that she remembered Mark Durham coming to stop.  *See* Pls.' Reply Ex. G, Marisa Durham Depo. 50:8-16.

Mark Durham passed away as a result of his injuries in the accident, and an autopsy was subsequently performed by Dr. Anthony Manoukian.  Pls.' Ex. E at 01001022.  To obtain a blood sample for drug testing, Dr. Manoukian

followed his practice to draw blood from the subclavian vein, where there is less likely to be postmortem fluctuations in the level of drugs and medications.  Ford Ex. N, Manoukian Depo. 20:6-21:5.  To minimize degradation, the sample was frozen, *id.* at 36:22-37:8, and then sent to CLH for a comprehensive drug screen. Pls.' Ex. E at 01001022.

CLH first performed a preliminary screen to determine the presence of THC.  Ford Ex. M, Dr. Wong Depo. 26:11-29:13.  Upon receiving a presumptive positive result, Claudia Nissen, the Technology Supervisor, performed gas chromatography/mass spectrometry (GCMS) using a selective ion monitoring method to determine the quantity of THC.  *Id.* at 32:24-33:11, 107:9-108:22, 118:10-16.  While CLH did not keep records of the specific reagent batch numbers and expiration dates used in each experiment, it was Nissen's custom and practice to ensure that only non-expired reagents were used.  Ford Ex. O, Nissen Depo. 12:6-24, 23:8-16.  Nissen testified that she ensured she used non-expired reagents, followed the requisite procedures in performing GCMS on the sample, and generated a GCMS printout which showed the presence of THC.  *Id.* at 12:6-24, 15:7-16:6.  Dr. Wong then reviewed the GCMS data and prepared a toxicology report for the medical examiner.  *Id.* at 16:2-17:16.

The CLH Report provides:

Blood Drugs*:        Delta-9-Tetrahydrocannabinnol (2.1
                     ng/ml) -- recent use indicated
                     11-nor-delta-9-THC-carboxylic acid
                     (16.5 ng/ml).

Pls.' Ex. E at 01001056.

Dr. Wong testified that these findings were "accurate in regard to the identification of the compound and a quantitation as to the limitations of our instrumentation." Ford Ex. M, Dr. Wong Depo. 118:17-119:1. Dr. Wong further explained that through use of Dr. Marilyn Huestis' studies and calculations, he determined that the amounts detected indicated recent use of marijuana. *Id.* at 62:3-63:7, 138:15-139:3. Dr. Wong explained that this "Heustis" methodology is generally accepted in the scientific community, *id.* at 63:5-10, and that he did not actually need to perform the calculation at the time of testing because the amounts of THC found were "well within recent use." *Id.* at 153:7-155:2. Despite his finding of recent use, however, Dr. Wong did not provide any opinion regarding whether Mark Durham was impaired at the time of the accident. *Id.* at 5:13-6:8. In comparison, Dr. Manoukian testified that the presence of the amount of THC found indicates both recent use and that Mark Durham was under the effects of the active

tetrahydrocannabinol molecule.[2]  Ford Ex. N, Manoukian Depo. 26:10-24.

These results from the CLH Report were incorporated into the Maui police investigation file.  *See* Pls.' Ex. A at M00178.  The Motor Vehicle Crash Report, signed by Maui Police Officer Duke Pua, concludes that "[d]rugs was a factor in this crash that claimed the life of Mr. Mark Allen DURHAM.  Toxicology report revealed THC in Mr. Durham's system."  Pls.' Ex. E at 01001023.  In making this conclusion, Officer Pua testified that he considered the CLH toxicology report and that Mark Durham failed to stop at the stop sign or yield to the right of way.  Ford Ex. F, Officer Pua Depo. 13:3-3.  Officer Pua further understood that Mark Durham had vacationed previously on Maui and was traveling a road not normally taken by tourists.  *Id.* at 109:20-110:11.  Indeed, the Durhams had rented the same cottage on Pulehu Road every year for the month of July from 1997 or 1998 until 2006.  *See* Ford Ex. C, Sheri Durham Depo. 21:8-25. Finally, Officer Pua was aware through his training as a drug recognition expert

---

[2]  In their Reply, Plaintiffs attack Dr. Manoukian's opinion, arguing that he "has not offered supportive causal link testimony, and he is not designated as an expert on impairment or the meaning of toxicology testing in any event."  Pls.' Reply 10.  Contrary to Plaintiffs' assertions, Ford designated Dr. Manoukian as an expert, and assert that his testimony may include the topics discussed during his deposition.  *See* Doc. No. 780, at Ex. C.  Further, because the June 30 Order and Plaintiffs' Objections and Motion are directed to the admissibility of the CLH Report and Dr. Wong's opinions, the court will not address an argument raised for the first time in a reply.  *See Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990).  Even if the court did accept Plaintiffs' argument, however, the court's analysis below is not dependent on Dr. Manoukian's testimony.

that marijuana may slow an individual's "perception reaction time" when driving. Maui Ex. A, Pua Depo. 14:18-15:12, 98:5-99:10.

## B.    Procedural Background

In December 2009, Ford identified both Drs. Wong and Manoukian as unretained experts.  Plaintiffs subsequently produced the expert rebuttal report of toxicologist Dr. Robert B. Palmer, who attacked, among other things, Dr. Wong's finding of recent use of marijuana.  *See* Pls.' Ex. A, Dr. Palmer Report.

On April 22, 2010, Plaintiffs filed a motion to exclude any evidence regarding the CLH Report and any testimony by Dr. Wong regarding the presence of THC in Mark Durham's postmortem blood sample.  The County of Maui and Ford opposed Plaintiffs' Motion, and the June 30 Order subsequently issued.

On July 14, 2010, Plaintiffs filed their Objections and Motion.  On July 29, 2010, Ford, Maui Windsurfing Vans, Inc., and the County of Maui each filed Oppositions, and Plaintiffs filed a Reply on August 12, 2010.[3]

## III.  DISCUSSION

## A.    Plaintiffs' Objections to the June 30 Order

Plaintiffs argue that the court should set aside the June 30 Order's *Daubert* determination that the finding of "recent use indicated" in the CLH Report

---

[3]  Pursuant to Local Rule 7.2(d), the court determines Plaintiffs' Objections and Motion without a hearing.

is admissible.  The court first outlines the standard for the court to review the June

30 Order, and then applies that framework to these facts.

### 1.      Standard of Review

Pursuant to 28 U.S.C. § 636(b)(1), Federal Rule of Civil Procedure

72(a), and Local Rule ("LR") 74.1, any party may appeal to the district court any

pretrial nondispositive matter determined by a magistrate judge.  Such an order

may be reversed by the district court judge only when it is "clearly erroneous or

contrary to law."  28 U.S.C. § 636(b)(1)(A); LR 74.1.

The threshold of the "clearly erroneous" test is high and significantly

deferential.  "A finding is 'clearly erroneous' when although there is evidence to

support it, the reviewing court on the entire evidence is left with the definite and

firm conviction that a mistake has been committed."  *United States v. U.S. Gypsum

Co.*, 333 U.S. 364, 395 (1948); *Mathews v. Chevron Corp.*, 362 F.3d 1172, 1180

(9th Cir. 2004); *Boskoff v. Yano*, 217 F. Supp. 2d 1077, 1083 (D. Haw. 2001);

*Thorp v. Kepoo*, 100 F. Supp. 2d 1258, 1260 (D. Haw. 2000).  In comparison, a

magistrate judge's order is contrary to law if the judge applies an incorrect legal

standard or fails to consider an element of the applicable standard.  *See Hunt v.

Nat'l Broad. Co.*, 872 F.2d 289, 292 (9th Cir. 1989) (noting that such failures

constitute abuse of discretion).

## 2.    *Application*

The June 30 Order determined admissibility by applying the familiar

*Daubert* standard.  The court first outlines the *Daubert* standard and then addresses

Plaintiffs' arguments.

### a.    *Daubert* standard

Pursuant to Federal Rule of Evidence 702, an expert may testify "[i]f

scientific, technical, or other specialized knowledge will assist the trier of fact to

understand the evidence or to determine a fact in issue."  The court has the

responsibility of acting as a gatekeeper to prevent unreliable expert testimony from

reaching the jury.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)

("*Daubert I*").  In carrying out this responsibility, the court has discretion and

flexibility in determining what evidence is relevant, reliable, and helpful to the trier

of fact.  *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1420 (9th Cir. 1998); *United*

*States v. Cordoba*, 104 F.3d 225, 228 (9th Cir. 1997) ("District Courts must strike

the appropriate balance between admitting reliable, helpful expert testimony and

excluding misleading or confusing testimony to achieve the flexible approach

outlined in *Daubert*.") (quoting *United States v. Rincon*, 28 F.3d 921, 926 (9th Cir.

1994).

The Ninth Circuit has articulated a two-prong analysis for

admissibility.  First, the proffered testimony must be reliable, *i.e.*, the expert's testimony reflects scientific knowledge, the findings are derived by the scientific method, and the work product amounts to "good science."  *Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*") (citation and quotation signals omitted).  Second, the testimony must meet the "fit" requirement, *i.e.*, "it logically advances a material aspect of the proposing party's case."  *Id.*

For the first inquiry of reliability, the focus is on the expert's "principles and methodology, not on the conclusions that they generate."  *Daubert I*, 509 U.S. at 594-95.  "Scientific evidence is deemed reliable if the principles and methodology used by an expert are grounded in the methods of science."  *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1056 (9th Cir. 2003).  Accordingly, the expert's methods must be adequately explained.  *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002); *see also Daubert II*, 43 F.3d at 1319 (holding that the expert must "explain the methodology . . . followed to reach [his or her] conclusions"); *United States v. Rincon*, 28 F.3d 921, 924 (9th Cir. 1994) (explaining that the methods used by the expert must be described "in sufficient detail" such that the district court can determine if they are reliable).  Depending on the facts of the case, factors such as "methodology, testing, peer review and publication, error rates, and 'acceptability' in the relevant scientific community"

may prove helpful in determining the reliability of a particular scientific technique. *See McDevitt v. Guenther*, 522 F. Supp. 2d 1272, 1291 (D. Haw. 2007) (citing *Daubert*, 509 U.S. at 593-95).

The second inquiry, the "fit" requirement, is directed "primarily to relevance." *Daubert I*, 509 U.S. at 591. "'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.'" *Id.* (quoting 3 Weinstein & Berger ¶ 702[02], p. 702-18). This inquiry is not merely a reiteration of the relevancy inquiry -- "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Id.* at 595 (citation and quotation signals omitted). "Federal judges must therefore exclude proffered scientific evidence under Rules 702 and 403 unless they are convinced that [the evidence] speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury." *Daubert II*, 43 F.3d at 1321 n. 17.

      *b.*    *Application*

The June 30 Order outlined all of the evidence presented and then explained that the CLH Report and Dr. Wong's testimony were admissible under *Daubert*:

12

> The CLH Report and Dr. Wong's testimony regarding THC are sufficiently reliable under <u>Daubert</u> because the methodology underlying the analysis of Mark Durham's blood sample is scientifically valid.  The arguments that Plaintiffs have raised regarding issues including, but not limited to, margin of error and postmortem redistribution are proper subjects for cross-examination; they do not render the test results inadmissible.  Further, the Court FINDS that the CLH Report and Dr. Wong's testimony regarding THC are relevant to the issues in this case.

June 30 Order 17-18.

Plaintiffs argue that the June 30 Order erred by failing to evaluate Dr. Wong's determination that the amounts of THC detected indicated "recent use," and by finding that the THC evidence is relevant.[4]  The court rejects both these arguments.

i.      The "recent use" determination

As to Plaintiff's argument that the June 30 Order failed to evaluate Dr. Wong's "recent use" determination, the June 30 Order expressly recognized the evidence presented regarding the Heustis methodology Dr. Wong relied upon in making his determination of recent use.  *See* June 30 Order at 5-6, 10. Accordingly, Plaintiffs' argument that the June 30 Order overlooked this evidence

---

[4]  Plaintiffs do not argue that the June 30 Order erred in determining that the testing of the blood sample and the result that it contained 2.1 ng/ml of Delta-9-Tetrahydrocannabinnol and 16.5 ng/ml of 11-nor-delta-9-THC-carboxylic acid meets the *Daubert* inquiry.  Accordingly, the court's analysis is limited to Plaintiff's objections regarding the "recent use" finding and relevance.

rings hollow.

Further, to the extent Plaintiffs' argument could be construed as asserting that the June 30 Order erred in its determination that Dr. Wong's "recent use" determination meets *Daubert*, the court disagrees.  Dr. Wong's testimony shows that his determination is based on a methodology that is generally accepted in the field and has been published and subject to peer review.  Specifically, Dr. Wong explained that he came to this determination applying the Heustis methodology, which is generally accepted in the scientific community.  *See* Ford Ex. M, Dr. Wong Depo. 62:3-63:10, 138:15-139:3; *see also Evans v. Toyota Motor Corp.*, 2005 WL 3844071, at *3 (S.D. Tex. Sept. 2, 2005) (finding expert's testimony regarding post-mortem drug testing which relied on the Heustis methodology admissible because, among other reasons, it is subject to peer review and can be evaluated by other experts in the field).  Dr. Wong further explained that he did not need to perform the actual calculation under this methodology because the amounts of THC detected were "well within" showing recent use. Ford Ex. M, Dr. Wong Depo. 153:7-155:2.

While Plaintiff's expert Dr. Palmer asserts that the Heustis methodology is questionable as applied to post-mortem blood samples,[5] Pls.' Ex.

---

[5]  Dr. Palmer further asserts that "recent use" "is not a term of art either recognized or
(continued...)

A, Palmer Decl. at 10-11, this counter-opinion simply provides an alternative view

on methodology that can be brought out during trial.[6]  *See Ruiz-Troche v. Pepsi*

*Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) ("*Daubert* does

not require that a party who proffers expert testimony carry the burden of proving

to the judge that the expert's assessment of the situation is correct.  As long as an

expert's scientific testimony rests upon good grounds, based on what is known, it

should be tested by the adversary process -- competing expert testimony and active

cross-examination -- rather than excluded from jurors' scrutiny for fear that they

will not grasp its complexities or satisfactorily weigh its inadequacies." (citation

and quotation signals omitted)); *see also Primiano v. Cook*, --- F.3d---, 2010 WL

1660303, at *4 (9th Cir. Apr. 27, 2010) ("Shaky but admissible evidence is to be

attacked by cross examination, contrary evidence, and attention to the burden of

proof, not exclusion.").  Accordingly, the court finds that the June 30 Order

---

[5](...continued)
generally accepted in the toxicology community."  Pls.' Ex. A, Palmer Decl. at 10-11.  The focus
at this stage, however, is "solely on principles and methodology, not on the conclusions that they
generate."  *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 595 (1993).

[6] In their Reply, Plaintiffs argue that the particular Heustis model Dr. Wong used has not
been recognized in the scientific or legal community as applicable to postmortem blood samples.
Pls.' Reply 7-8.  Contrary to Plaintiffs' argument, however, Dr. Wong asserted that the model he
used is generally accepted in the scientific community.  *See also BNSF Ry. Co. v. LaFarge Sw.,
Inc*., 2009 WL 4279850, at *5 (D. N.M. Feb. 3, 2009) (suggesting only that "[e]rrors in
converting postmortem blood to antemortem plasma concentrations [using the Heustis
methodology] *may* have an impact on predictions using model I" (emphasis added)).

properly found that the CLH Report and Dr. Wong's testimony meets the first inquiry of Daubert.

ii.    Relevance of THC evidence

As to Plaintiffs' argument that evidence of exposure to THC is irrelevant, the court disagrees.  Evidence of drug consumption, when combined with other evidence attributing fault, may be "highly relevant to the issue of the causal relationship between [a party's conduct] and [] the injuries."  *Loevsky v. Carter*, 70 Haw. 419, 430, 773 P.2d 1120, 1127 (1989); *see also Kaeo v. Davis*, 68 Haw. 447, 452-53, 719 P.2d 387, 391-92 (1986) (finding evidence that defendant had drunk several beers was relevant in action stemming from motor vehicle accident in light of evidence calling into question the care in which he drove the vehicle); *Gustavson v. Gaynor*, 503 A.2d 340, 342 (N.J. Super. 1985) (stating general rule from various jurisdictions that "evidence of prior drinking is admissible as being relevant to the issue of the driver's fitness only when there is some supplementary evidence from which the trier of the fact may reasonably conclude that the drinking affected the safe operation of the vehicle").

Looking at the THC evidence in context of the facts of this case and more specifically, the circumstances of the accident, the court finds that this evidence is relevant.  While Plaintiffs have presented some evidence that Mark

16

Durham stopped at the intersection and may alternatively argue that the intersection was dangerous, Defendants will present evidence that (1) Mark Durham was driving with his two daughters on Pulehu Road shortly before noon in dry conditions; (2) he had driven through this intersection in the past; and (3) he caused the accident when he "blew" the stop sign at a high rate of speed. Defendants' evidence suggests that Mark Durham was not driving with due care, and the positive drug result for THC and Dr. Wong's conclusion that the amounts found show recent use of marijuana provide a plausible explanation for this lack of due care -- *i.e.*, that he was impaired while driving the vehicle.  In other words, the CLH Report provides a plausible explanation why Mark Durham failed to heed the stop sign and is thus directly relevant to the issue of whether he is contributorily negligent.

          That Dr. Wong did not provide an opinion regarding impairment does not affect the analysis -- a jury could reasonably infer from the CLH Report that marijuana did in fact impair Mark Durham's ability to operate the subject vehicle in a safe manner.[7]  *See, e.g.*, *Harris v. Kubota Tractor Corp.*, 2006 WL 2734460, at

---

          [7] Indeed, courts have found that a witness' drug use is admissible to attack his ability to perceive relevant events -- despite no direct evidence of impairment -- so long as the memory of the witness is legitimately at issue.  *See, e.g.*, *United States v. Cameron*, 814 F.2d 403, 404-05 (7th Cir. 1987) ("Evidence that a witness has used illegal drugs may be probative of the witness' possible inability to recollect and relate." (citation and quotation signals omitted)); *Cuthbertson*

(continued...)

*3 (W.D. La. Sept. 22, 2006) (admitting evidence of positive drug test for metabolites of cocaine and THC despite no direct evidence of impairment because "it may, in the mind of the jury, tend to establish that Harris was impaired at the time of the accident, an issue in this case"); *Berryman v. Commonwealth*, 237 S.W.3d 175, 178 n.6 (Ky. 2007) (noting that even without evidence of impairment, "the finder of fact would be permitted to draw a reasonable inference that the Xanax did, in fact, impair Berryman's ability to operate a motor vehicle in a safe, lawful manner"); *Canalez v. Bob's Appliance Serv. Ctr., Inc.*, 89 Haw. 292, 299, 972 P.2d 295, 302 (1999) (reciting its decision in earlier unpublished opinion that evidence of a positive drug screen for THC in a bicycle accident "was relevant and material to: (1) whether Canalez operated his bicycle while under the influence of marijuana; and (2) whether Canalez was therefore negligent" where the evidence otherwise suggested that Canalez may not have been operating the bicycle with due care).[8]

---

[7](...continued)
*v. Excel Indus., Inc.*, 179 F.R.D. 599, 603 (D. Kan. 1998) ("A deponent's drug use may be admissible to attack his ability to perceive the underlying events."). Similar to the situation where a witness' memory is at issue, Mark Durham's actions in the accident are at issue and the fact of his marijuana usage is relevant to whether he was negligent in causing the accident.

[8] Plaintiffs attempt to distinguish *Canalez* and other cases cited by Defendants on the basis that they did not involve any "*Daubert*-type question about the admissibility or reliability of a toxicology test result for use of predictive estimates." Pls.' Reply 13. The court does not cite *Canalez* as assisting in the first prong of *Daubert*; rather, *Canalez* addresses the relevance of
(continued...)

The court therefore OVERRULES Plaintiffs' Objections to the June

30 Order.

## B.	Motion to Exclude Evidence

Federal Rule of Evidence 403 provides that relevant evidence may be

excluded "if its probative value is substantially outweighed by the danger of unfair

prejudice, confusion of the issues, or misleading the jury . . . ."  Because all

relevant evidence is prejudicial, Rule 403 is aimed at limiting *unfair* prejudice:

> [r]elevant evidence is inherently prejudicial; but it is only
> unfair prejudice, substantially outweighing probative
> value, which permits exclusion of relevant matter under
> Rule 403.  Unless trials are to be conducted as scenarios,
> or unreal facts tailored and sanitized for the occasion, the
> application of Rule 403 must be cautious and sparing.  Its
> major function is limited to excluding matter of scant or

---

[8](...continued)
the evidence, relating to the second prong of *Daubert*.

Plaintiffs also rely on *Loevsky v. Carter*, 70 Haw. 419, 773 P.2d 1120 (1989), as supporting the proposition that evidence of intoxication is admissible on the issue of negligence only where the intoxication is sufficient to impair the driver.  *Loevsky*, however, does not so hold.  *Loevsky*, a civil action arising from a motorcycle accident, addressed whether the defendant's alleged consumption of alcohol prior to the accident was relevant.  *Loevsky*, 70 Haw. at 429, 773 P.2d at 1127.  While the court found under the particular facts before it that admission of expert testimony regarding the defendant's potential blood alcohol content was speculative and therefore inadmissible, the court nonetheless found admissible the evidence regarding defendant's alcohol consumption.  *Id.* at 430, 773 P.2d at 1127.  Indeed, other Hawaii cases have rejected Plaintiffs' proposition that evidence of impairment is necessary for drug and/or alcohol use to be relevant.  *See, e.g.*, *Kaeo v. Davis*, 68 Haw. 447, 453, 719 P.2d 387, 391 (1986) (finding that given the manner in which the defendant, Davis, had driven the vehicle, "a jury could infer 'four beers,' though insufficient to cause Davis to be intoxicated in a strict penal sense, were sufficient to impair his capacity to perceive the dangers with the clarity, make the decisions with the prudence, and operate the vehicle with the skill and caution required by law" (citations and quotations signals omitted)).

> cumulative probative force, dragged in by the heels for
> the sake of its prejudicial effect.

*United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000).  Evidence is

unfairly prejudicial when it has an "'undue tendency to suggest decision on an

improper basis, commonly, though not necessarily, an emotional one.'"  *Id.*

(quoting Advisory Committee Notes to Federal Rule of Evidence 403).  For

example, evidence that a person uses drugs may be highly prejudicial.  *See*

*United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1017 (9th Cir. 1995); *United*

*States v. Blackstone*, 56 F.3d 1143, 1146 (9th Cir. 1995) (stating that evidence may

be particularly prejudicial where it "connects a party "with a highly charged public

issue, such as . . . narcotics" (quoting 1 Weinstein's Evidence § 403[3], pp.

43-44)).  The balancing of the unfair prejudice and probative value lies within the

district court's discretion.  *United States v. Larios*, 640 F.2d 938, 941 (9th Cir.

1981).

Plaintiffs argue that all evidence regarding the positive THC result

should be excluded pursuant to Rule 403 because this evidence is highly

prejudicial and there is no evidence that Mark Durham was actually impaired at the

time of the accident.  Pls.' Mot. 17-18.  The court recognizes that this evidence is

prejudicial -- that Mark Durham may have used marijuana and then operated a

vehicle with his two children is certainly likely to cast him in a poor light in the

20

eyes of the jury.

As explained above, however, this evidence is also probative to the issues in this action -- Mark Durham's alleged recent drug use shows a lack of care on his part and suggests that he may have been contributorily negligent in causing the accident.  Specifically, Defendants have presented evidence that Mark Durham may have driven the vehicle without due care -- the accident occurred in daylight, in dry conditions, and on a road which Mark Durham knew, yet he "blew" the stop sign at a high rate of speed.  As explained above, a jury can infer from the positive test result for THC and corresponding finding of recent use that Mark Durham was impaired while driving the vehicle, and expert testimony is not necessary to establish this link.  *See, e.g.*, *Canalez*, 89 Haw. at 305, 972 P.2d at 308 (reciting its decision in earlier order that the trial court properly admitted evidence of marijuana use because "a reasonable jury could have inferred from the circumstances surrounding the accident that Canalez's marijuana use was sufficient to impair his capacity to perceive the dangers with the clarity, make the decisions with the prudence, and operate the bicycle with the skill and caution required by law" (quotations omitted)).

In sum, the CLH Report and Dr. Wong's opinions are highly relevant to the issue of whether Mark Durham was contributorily negligent in causing the

accident.  While this evidence is also prejudicial, the court finds that its prejudicial

effect does not substantially outweigh its probative value of providing a plausible

explanation of the accident.  The court therefore DENIES Plaintiffs' Motion to

exclude this evidence pursuant to Rule 403.[9]

## IV.  CONCLUSION

Based on the above, the court AFFIRMS the June 30 Order, and

DENIES Plaintiffs' Motion to Exclude Evidence Of, or Related To, Reported THC

in Mark Durham's Postmortem Blood Sample under Rule 403.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, August  31, 2010.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Durham et al. v. County of Maui et al.*, Civ. No. 08-00342 JMS/LEK, Order (1) Affirming Magistrate Judge's June 30, 2010 Order Granting in Part and Denying in Part Plaintiffs' Motion to Exclude Expert Designation of Clifford Wong, Ph.D. and Evidence Of or Related To, Reported THC in Mark Durham's Postmortem Blood Sample; and (2) Denying Plaintiffs' Motion to Exclude Evidence Of, or Related To, Reported THC in Mark Durham's Postmortem Blood Sample under Federal Rule of Civil Procedure 403

---

[9] In making this determination, the court recognizes that the Motor Vehicle Crash Report concludes that "[d]rugs was a factor in this crash that claimed the life of Mr. Mark Allen DURHAM."  Pls.' Ex. E at 01001023.  Because the parties' briefing provides insufficient analysis regarding evidence beyond the CLH Report and Dr. Wong's opinions, the court expresses no opinion regarding whether this conclusion in the Motor Vehicle Crash Report is admissible at trial.