# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| SHERI GAIL DURHAM, Individually and as Next Friend of MARISA UMA LAMA DURHAM, Minor, ET AL., | ) ) ) | CIV. NO. 08-00342 JMS/RLP |
| | ) ) | ORDER (1) DENYING PLAINTIFFS' MOTION IN LIMINE NO. 4 TO |
| Plaintiffs, | ) ) | PRECLUDE ANY TESTIMONY, EVIDENCE, OPINIONS, OR |
| vs. | ) ) | ARGUMENT THAT SUBSEQUENT MEDICAL PROVIDERS IN |
| COUNTY OF MAUI, ET AL., | ) ) | DALLAS ACTED NEGLIGENTLY WITH REGARD TO JESSICA |
| Defendants. | ) ) | DURHAM'S MEDICAL CARE OR CAUSED HER INJURIES, DOC. NO. |
| | ) ) | 1102; (2) GRANTING DEFENDANTS BYRON H. IZUKA, |
| | ) ) | M.D.'S AND BYRON H. IZUKA, M.D., LLC'S MOTION IN LIMINE |
| | ) ) | TO ADMIT EVIDENCE, TESTIMONY, AND ARGUMENT |
| | ) ) | REGARDING THE CARE PROVIDED TO JESSICA DURHAM |
| | ) ) | BY SUBSEQUENT MEDICAL PROVIDERS IN DALLAS, TEXAS, |
| | ) ) | DOC. NO. 1106; AND (3) GRANTING DEFENDANTS |
| | ) ) | JAMES Y. SIM, M.D. AND JAMES Y. SIM, M.D., LLC'S MOTION IN |
| | ) ) | LIMINE REGARDING ADMISSIBILITY OF PLAINTIFFS' |
| | ) ) | ORIGINAL PETITION FILED IN THE COUNTY COURT OF DALLAS |
| _____ | ) | COUNTY TEXAS, DOC. NO. 1099 |

## ORDER (1) DENYING PLAINTIFFS' MOTION IN LIMINE NO. 4 TO PRECLUDE ANY TESTIMONY, EVIDENCE, OPINIONS, OR ARGUMENT THAT SUBSEQUENT MEDICAL PROVIDERS IN DALLAS

**ACTED NEGLIGENTLY WITH REGARD TO JESSICA DURHAM'S
MEDICAL CARE OR CAUSED HER INJURIES, DOC. NO. 1102;
(2) GRANTING DEFENDANTS BYRON H. IZUKA, M.D.'S AND BYRON
H. IZUKA, M.D., LLC'S MOTION IN LIMINE TO ADMIT EVIDENCE,
TESTIMONY, AND ARGUMENT REGARDING THE CARE PROVIDED
TO JESSICA DURHAM BY SUBSEQUENT MEDICAL PROVIDERS IN
DALLAS, TEXAS, DOC. NO. 1106; AND (3) GRANTING DEFENDANTS
JAMES Y. SIM, M.D. AND JAMES Y. SIM, M.D., LLC'S MOTION IN
LIMINE REGARDING ADMISSIBILITY OF PLAINTIFFS' ORIGINAL
PETITION FILED IN THE COUNTY COURT OF DALLAS COUNTY
TEXAS, DOC. NO. 1099**

## I. INTRODUCTION

Plaintiffs Sheri Gail Durham ("Sheri Durham"), individually and as

next friend of Marisa Durham, and Denise Ann Jenkins ("Jenkins"), as the

Administrator of the Estates of Mark Durham and Jessica Durham, (collectively

"Plaintiffs"), allege negligence claims against Hawaii Pacific Health, Kapiolani

Medical Center for Women and Children ("KMCWC"), Kapiolani Medical

Specialists, Shilpa J. Patel, M.D. ("Dr. Patel") (collectively, "Kapiolani

Defendants"), James Y. Sim, M.D., and James Y. Sim, M.D., LLC (collectively,

"Dr. Sim"), and Byron H. Izuka, M.D. and Byron H. Izuka, M.D. LLC

(collectively, "Dr. Izuka"), (collectively together, "Medical Defendants"), relating

to medical treatment they provided Jessica Durham for the multiple injuries she

suffered in a two-vehicle accident on Maui on July 26, 2006.  Jessica was

subsequently transferred to Children's Medical Center ("CMC") in Dallas, Texas,

and passed away over two years later on December 25, 2008 from an aortic dissection.

Currently before the court are several motions in limine regarding whether Medical Defendants may present evidence regarding the treatment Jessica received at CMC and make arguments as to any negligence by CMC. Based on the following, the court finds this evidence admissible and (1) DENIES Plaintiffs' Motion in Limine No. 4 to Preclude Any Testimony, Evidence, Opinions, or Argument That Subsequent Medical Providers in Dallas Acted Negligently with Regard to Jessica Durham's Medical Care or Caused Her Injuries, Doc. No. 1102; (2) GRANTS Dr. Izuka's Motion in Limine to Admit Evidence, Testimony, and Argument Regarding the Care Provided to Jessica Durham by Subsequent Medical Providers in Dallas, Texas, Doc. No. 1106; and (3) GRANTS Dr. Sim's Motion in Limine Regarding Admissibility of Plaintiffs' Original Petition Filed in the County Court of Dallas County Texas, Doc. No. 1099.[1]

## II. BACKGROUND

At issue in this action is whether Medical Defendants breached the standard of care in treating Jessica's fractured leg, diagnosing and treating her

---

[1] Kapiolani Defendants and Dr. Sim join in Dr. Izuka's Motion in Limine, *see* Doc. Nos. 1109, 1132; and Dr. Izuka and Kapiolani Defendants join in Dr. Sim's Motion in Limine. *See* Doc. Nos. 1105, 1107. Because Dr. Izuka's and Dr. Sim's Motions in Limine raise substantive issues that apply to all Medical Defendants, the court GRANTS these joinders.

enlarged aorta, and transferring her from KMCWC to CMC.[2]

As to her leg injury, Dr. Izuka performed an open reduction and internal fixation, but the plate he installed subsequently bent, requiring additional surgery that was ultimately conducted at CMC. As to her heart murmur, Dr. Sim reviewed two echocardiograms, found that Jessica had an enlarged aorta, and recommended that she follow up with a pediatric cardiologist when she returned to Texas. As to her transfer to CMC, Dr. Patel prepared various documents explaining Jessica's care at KMCWC and spoke to Dr. Patrick Heiber, Jessica's pediatrician since her birth, and Dr. Maria Stephan, an emergency room doctor with CMC. *See Durham v. County of Maui*, 2010 WL 2943358, at *5 (D. Haw. July 28, 2010).

Based on Jessica's treatment and transfer, Plaintiffs assert various claims against Medical Defendants. Specifically, Plaintiffs assert negligence claims against Dr. Izuka for (1) failing to obtain informed consent, (2) performing surgery at a time and in a manner that was improper and contra-indicated, (3) failing to use the proper fixation device and adequately monitor Jessica post-operatively, and (4) failing to order, supervise, and communicate post-surgical instructions and discharge and/or transfer instructions. Doc. No. 508, Second Am.

---

[2] Because the court has recited the relevant facts in previous orders, the court now outlines only those facts that are relevant and/or necessary to determining the motions in limine.

Compl. ¶ 77.  Plaintiffs also assert negligence claims against Dr. Sim for his alleged failure to communicate his findings to Sheri Durham and to communicate specific recommendations for cardiology follow-up to KMCWC.  *Durham*, 2010 WL 2943358, at *10.  Finally, Plaintiffs assert negligence claims against Kapiolani Defendants for (1) failing to communicate to CMC the need for specific and urgent follow-up for Jessica's enlarged aorta; (2) limiting Jessica's transfer for orthopedic treatment (as opposed to including cardiology follow-up); and (3) failing to communicate to CMC new developments regarding Jessica's orthopedic condition.  *Id.* at *15.

In response to these claims, Medical Defendants have asserted, among other things, that Texas medical providers were negligent and/or caused Jessica's injuries.  The following facts are relevant to these assertions:

## A.    Jessica's Treatment at CMC

On August 15, 2006, Jessica traveled via commercial plane from Honolulu to Dallas, Texas and arrived at the emergency room at CMC on August 16, 2006.  During Jessica's admission, Sheri Durham provided CMC Jessica's medical records from KMCWC, including (1) Dr. Sim's two echocardiographic notes, (2) his August 10, 2006 consultation note advising that Jessica required follow-up with a pediatric cardiologist when she returned home, and (3) a Patient

Care Summary.  *Id.* at *6.  Sheri Durham also reported on a CMC "Visit

Documentation" form that within the past week, Jessica had an enlarged aorta, and

CMC emergency department staff wrote "enlarged aorta" as part of Jessica's past

history on an "Inpatient & Emergency Department Consultation Form."  *Id.*

Dr. Timothy Rupp, a CMC emergency room doctor, and Lori

Thornton, a CMC nurse practitioner from the orthopedic department, evaluated

Jessica and discharged her the same day.  Doc. No. 1106-4 at 856-57, 862.  The

only discharge instructions Sheri Durham received was to "follow up with Dr.

Hieber as needed" and "continue all current medications as prescribed until

completed."  *Id.* at 862.

Jessica was re-admitted to CMC on August 22, 2006.  Dr. Lawson

Copley performed surgery on Jessica's leg to repair the bent plate.  Doc. No. 1106-

5, at 743-45.  Post-surgery, Amy Holland, a pediatric nurse practitioner, ordered a

cardiology consult to evaluate Jessica's aorta after Sheri Durham had informed

CMC that Jessica had an enlarged aorta.  Doc. No. 1122-3, at 42, 62; *Durham*,

2010 WL 2943358, at *6.  Several minutes after putting in this order, however, Ms.

Holland put a hold on the cardiology consult.  Doc. No. 1122-3, at 62-63.  Jessica's

CMC attending physician instead ordered chest x-rays to "Evaluate Aorta," and

noted "Cardiology to review."  *Durham*, 2010 WL 2943358, at *7.  The resulting

August 23, 2006 radiology report states in part that "the cardiac silhouette is not enlarged. Aortic arch is left-sided." *Id.*

On August 31, 2006, Jessica was transferred to Texas Scottish Rite Hospital ("TSRH"). That same day, Dr. Philip Wilson requested a chest exam, and found that Jessica's aorta was normal. *Id.* The next day, a TSRH physician noted that Jessica's aorta was initially enlarged after the motor vehicle accident and is now normal. *Id.* Ultimately, Jessica did not have further cardiology follow-up or any echocardiograms beyond those interpreted by Dr. Sim.

Jessica was treated for various complications with her leg injury and ultimately had a mid-thigh amputation on August 5, 2008. Doc. No. 1102-5, at 4. On December 25, 2008, Jessica passed away from an aortic dissection.

## B.    Expert Opinions Regarding Jessica's Subsequent Care

The deadline for Kapiolani Defendants and Dr. Izuka to disclose expert witnesses was December 2, 2009, Doc. No. 279, and the deadline for Kapiolani Defendants and Dr. Sim to disclose expert witnesses regarding Jessica's wrongful death and negligence claims relating to her heart condition was May 5, 2010. Doc. No. 659. Medical Defendants have made the following expert disclosures relevant to the motions in limine:

## 1.    *Dr. Izuka's Expert Dr. John F. Sarwark*

On December 2, 2009, Dr. Izuka identified Dr. John F. Sarwark as an expert to testify "regarding standard of care, liability, and causation related to Jessica Durham's orthopedic injuries."  Doc. No. 1102-3.  As to the treatment Jessica received at CMC, Dr. Sarwark's report provides:

> It is my opinion that Jessica should have been seen and evaluated by an orthopaedic physician and possibly by a plastic surgeon when she was seen on August 16, 2006 in the ER at Children's Medical Center in Dallas and that she should have received interim wound care, instruction for dressing changes, and wound monitoring over the next five days until her follow up appointment on August 21, 2006.

*See* Doc. No. 1102-4, at 6.

On September 8, 2010, the parties took depositions of several of the Texas medical providers, and the deposition transcripts were provided to Dr. Sarwark.  Doc. No. 1113-1, Jeffrey Portnoy Decl. ¶ 5.  As a result, on April 14, 2011, Dr. Sarwark provided a supplemental report based on his review of the deposition transcripts.  Doc. No. 1102-5.  Dr. Sarwark now opines that "[g]iven the tenuous nature of the soft tissue injury, the delay in care upon arrival in Dallas contributed to the unsatisfactory outcome, to a reasonable degree of medical certainty." *Id.* at 5.  Dr. Sarwark further opines that:

> [T]he receiving hospital breached the standard of care in

not receiving the patient in transfer in a competent manner and in not providing competent evaluation of the patient in a professional manner and in not admitting the patient to the hospital on the day of arrival in Dallas for further acute care. These actions and failures to act, including failure to evaluate and failure to admit for appropriate care on the day of arrival in Dallas contributed to the patient's ultimate unsatisfactory outcome.

*Id.* at 6.

### 2. *Dr. Sim and Kapiolani Defendants' Expert Dr. Charles S. Kleinman*

Dr. Sim timely identified as experts Dr. Richard Friedman, Dr. Richard Mitchell, Dr. James Y. Sim, and Dr. Charles S. Kleinman. Doc. No. 1102-6. Kapiolani Defendants similarly identified Dr. Kleinman, and additionally identified Dr. Jeffrey Fineman, Dr. Lawrence Peebles, and Dr. George Woodward. Of these experts, Dr. Kleinman is the only expert that provided any opinions regarding CMC's medical treatment.[3]

In his expert report, Dr. Kleinman opines that the physicians in Hawaii were not responsible for the inadequate evaluation at CMC:

---

[3] Although some experts hint at the possibility of negligence, *see* Doc. No. 1102-7 at 4 (Dr. Friedman stating that there are multiple notes in Jessica's medical records regarding her enlarged aorta and as a result, "[t]hat no actual cardiology consultation at [CMC] was performed cannot be blamed on Dr. Sim or Patel"), they provide no opinions regarding the negligence elements, and Kapiolani Defendants and/or Dr. Sim do not assert that any of their experts other than Dr. Kleinman provided opinions regarding the Texas medical providers' treatment of Jessica. Rather, the other experts identified by Kapiolani Defendants and Dr. Sim opine regarding whether Defendants met the standard of care in their treatment of Jessica.

The fact that a chest X-ray was apparently the only laboratory test that was requested to evaluate this potential finding (a TOTALLY inadequate imaging modality to evaluate this ominous finding) was certainly NOT the responsibility of the physicians in Hawaii, and the decision to cancel the request for a cardiology consultation was also not the responsibility of those physicians. . . . [T]he physicians at Dallas Children's Medical Center certainly could have requested a consultation from Dr. Wright, [or] from any of their full-time, in house, faculty of pediatric cardiology. If the latter had been done, and the question of a dilated ascending thoracic aorta raised, I am CERTAIN that, at the very least, an echocardiographic study would have been performed, and the appropriate follow-up, and potentially treatment, could and almost certainly WOULD have been rendered by this excellent group of pediatric cardiologists.

Doc. No. 1102-10, at 4.

Dr. Kleinman further opines that the physicians in Dallas had ample time to properly evaluate and work up Jessica's enlarged aorta:

[T]he physicians in DALLAS had more than sufficient lead time to establish the diagnosis of dilated ascending thoracic aorta, and to ascertain its cause and potentially to initiate medical therapy to forestall further aortic dilation, mitigating the risk of rupture and tamponade, or to initiate careful follow-up that could and should have allowed surgical intervention to replace the dilated segment of aorta. The latter is STANDARD OF CARE for children with progressive aortic dilation.

*Id.*

Finally, Dr. Kleinman opines that given the resources available to

CMC, the failure to better evaluate Jessica's enlarged aorta was not reasonable:

> While it is NOT my role to point fingers at any physician, in particular, it must be considered that the managing physicians in Dallas, including the pediatrician of record and the admitting anesthesiologist, had a responsibility to review the patient chart in its entirety, and to carry out an evaluation of the nature of the dilated aorta, even while integrating the care of her complex orthopedic injury. While there is no note to explain these issues in the Dallas medical records, it is interesting to note that there was a physician order on August 22, 2006, requesting a cardiology consultation with a radiologic request for a PA and Lateral Chest X-Ray, to "evaluate the aorta." A follow-up order on August 22, 2006, cancelled the request for cardiology consultation. . . . [I]t is obvious that a simple chest X-Ray could neither rule in or rule out an aneurysmal dilation of the ascending thoracic aorta or arch in this young girl. . . . With the richness of these resources at the Children's Hospital Center in Dallas, there is really no reasonable explanation for the lack of follow-up of this issue in this patient during the more than two years that she survived between the initial diagnosis of aortic dilation and the eventual aortic tear and hemopericardium.

*Id.* at 10.

Beyond his expert report, during his October 25, 2010 deposition Dr.

Kleinman opined that CMC breached the standard of care in failing to adequately

review Jessica's medical chart from KMWC:

> Q. Why would it be that a really qualified healthcare team involving an emergency room physician who had an appreciation for the existence of an enlarged aorta, and several healthcare providers thereafter at Children's

Medical Center, including a nurse practitioner, and perhaps discussion with an attending physician, and a surgeon who did surgery on her, why is it that none of them appreciated the need for a specific kind of cardiology followup such that they implemented what you say is automatic: Getting a followup echo study?

A. There's no way I can answer that without basically saying that, despite the overall quality of, of Children's Medical Center in Dallas, that, that these individuals functioned at a level below the standard of care.

Q. Okay. Or is there another possibility, which is that the actual need for followup care for this particular condition hadn't been adequately communicated to them by the people who sent this patient to them in the first place?

A. I believe that's absolutely spurious.

Q. Spurious, okay.

A. The data is in the chart. It's one thing to say there was too much data for a busy emergency room physician to digest completely.

By the time she was admitted to the hospital another five days had passed. She didn't show up as a surprise five days later and yet it would appear that no one reviewed the chart during the course of that five-day interlude.

Then the anesthesiologist becomes involved, then the surgeon becomes involved. There's no evidence that the chart was reviewed by them.

It's a shame. It's a shame that the, that the aorta had to be brought to the attention of the nurse practitioner by the mother, because there were multiple opportunities and almost a week's time available to put the chart in order. . . .

It's either they didn't read it, or they didn't understand it, or they determined on their own that, that they weren't going to obtain a cardiology consultation.

Doc. No. 1122-4, at 124-26.

Dr. Kleinman further opined that this breach in the standard of care caused Jessica's death:

Q. . . . If I understand your testimony in this case at the bottom line on this communication topic, your theory is that it -- or your opinion is that, despite the absence of the -- well, I'm sorry -- in the face of the absence of direct hospital-to-hospital communication or physician-to-physician communication about this enlarged aorta issue, it was okay for Dr. Patel to simply assume that somebody in Dallas would cull through hundreds if not thousands of pages of records to find out about what this child's cardiac condition was and what needs for followup might exist, correct?

A. You keep coming back to the fact that there were thousands of pages. The bottom line is that the communication problems were the cause of this child's demise.
But it was because there was no communication, that I can determine, within the medical center at Dallas, not the hand-off of the patient from Hawaii to Dallas. So it was an intra-institutional problem, not an inter-institutional problem. . . .

Id. at 193-94. Dr. Kleinman asserted that he had reached these opinions to a degree of reasonable medical probability. Doc. No. 1160-2, at 3.[4]

---

[4] During the June 3, 2011 hearing, the court granted Kapiolani Defendants leave to
(continued...)

On December 27, 2010, Kapiolani Defendants submitted their

Supplemental Expert Witness Disclosures, asserting that Dr. Kleinman's opinions

remain unchanged as set forth in his report and deposition.  Doc. No. 1102-15,

Pls.' Ex. M.

## C.    Plaintiffs' Negligence Action Against Texas Medical Providers

On February 17, 2011, Plaintiffs filed a Petition in Texas State Court

asserting negligence claims against several of the Texas medical providers,

including CMC, Ms. Holland, Mr. Kines, Dr. Copley, Dr. Hieber, Ms. Thornton,

and Dr. Rupp (the "Texas Action").  *See* Doc. No. 1099-3.  The Amended Petition

makes several allegations regarding Jessica's transfer from KMCWC and

immediate treatment at CMC, including:

> 22.  . . .  Plaintiff Sheri Durham provided the medical
> staff at CMC with certain medical records from
> Kapiolani she had been given when Jessica and she left
> Kapiolani, and on arrival at CMC, Mrs. Durham provided
> Jessica's medical history.
>
> 23.  Prior to Jessica's transfer, Kapiolani and/or
> physicians working there, communicated with Defendant
> Hieber regarding Jessica's transfer and provided him
> with a copy of certain of her records from Kapiolani.
>
> 24.  On or about August 15, 2006, Jessica was evaluated
> by Defendant Rupp and discharged from CMC with

---

[4](...continued)
submit Doc. No. 1160, which contains certain pages from Dr. Kleinman's deposition.

14

instructions to return to the CMC orthopedic clinic on August 21, 2006 for follow-up care for her failed reduction internal fixation that had been performed at Kapiolani.

25. On or about August 21, Jessica was evaluated by Defendant Copley. She was admitted to CMC on August 22, 2006 for surgery to repair the unresolved femur fracture and treatment for other issues associated with the leg injury related to her prior, unsuccessful surgery. . . .

26. On August 22, 2006, Defendant Holland was advised by Plaintiff Sheri Durham that Jessica was diagnosed with an enlarged aorta in Hawaii. Defendant Holland ordered a cardiology consultation for further evaluation of the aortic condition; however, 30 minutes later she ordered a "hold" on that consult. An hour later, Defendant Kines ordered a 2-view chest x-ray to "evaluate the aorta." Records dated August 23, 2006 show that "cardiology" was to review the chest x-rays; however, there is no entry in the medical records of any such review or evaluation by a cardiologist.
. . .

Doc. No. 1124-2.

## III. DISCUSSION

The three motions in limine addressed in this Order all concern the admissibility of evidence and argument regarding negligence of the Texas medical providers, and can be boiled down to three main issues: (1) whether evidence of Jessica's medical care in Texas is admissible (Dr. Izuka's Motion in Limine); (2) whether Medical Defendants may present expert testimony opining on the

negligence of the Texas medical providers (Pls.' Motion in Limine No. 4 and Dr.

Izuka's Motion in Limine); and (3) whether Plaintiffs' Amended Petition asserting

negligence claims against the Texas Medical Providers is admissible (Dr. Izuka's

and Dr. Sim's Motions in Limine).  The court addresses these issues in turn.

## A.    Admissibility of Jessica's Medical Treatment in Texas

Dr. Izuka argues that evidence regarding Jessica's care at CMC is

admissible because it is (1) relevant to Medical Defendants' defenses and

Plaintiffs' claims for special damages, and (2) any prejudice does not substantially

outweigh the relevance of this evidence.  The court agrees.[5]

In general, Kapiolani Defendants and Dr. Izuka claim that they did not

breach the standard of care, and instead Jessica's injuries were caused by the Texas

medical providers.[6]  Given this defense, whether the Texas medical providers

breached the standard of care (thus resulting in the amputation and death) becomes

highly relevant.  Without evidence regarding Jessica's medical care in Texas, the

Medical Defendants would be forced to argue their case in a vacuum, claiming that

they did not breach the standard of care but being unable to explain to the jury why

---

[5]  The court addresses separately the parties' arguments as to specific evidence, including the Texas Amended Petition and Dr. Sarwark's supplemental expert report.

[6]  At the June 3, 2011 hearing, the parties further clarified their positions regarding the relevance of Jessica's medical treatment in Texas.

Jessica suffered her ultimate injuries, which occurred over two years after Medical Defendants treated Jessica. And a jury may very well speculate that, given the amputation and death, Medical Defendants must have breached the standard of care; otherwise, why did Jessica require the amputation and subsequently die? If not because the Medical Defendants breached the standard of care, then why? In short, the medical treatment that Jessica received in Honolulu and in Texas are inextricably intertwined -- that is, for a jury to determine "who's at fault" (that is, who breached the standard of care), the jury must be provided a full picture of the medical treatment in Honolulu and Texas, including expert opinions regarding that treatment.

This evidence is further relevant to the extent that Kapiolani Defendants have asserted that, in the alternative, the Texas medical providers were the superseding cause of Jessica's injuries. As the court has previously explained, "a superseding cause is generally one which operates, in succession to a prior wrong, as the proximate cause of an injury." *Keomaka v. Zakaib*, 8 Haw. App. 518, 530, 811 P.2d 478, 485 (1991) (quoting 57A Am. Jur. 2d Negligence § 596, at 569 (1989)); *see also* Restatement (Second) of Torts § 440 (1965) (defining "superseding cause" as "an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his

antecedent negligence is a substantial factor in bringing about"). In Hawaii, "[t]he test to determine whether an intervening negligent act is a superseding cause is one of foreseeability of the third person's conduct." *Ontai v. Straub Clinic & Hosp. Inc.*, 66 Haw. 237, 249, 659 P.2d 734, 743 (1983). Under this theory, it is beyond dispute that the Texas medical providers' care is relevant.[7]

As to the Rule 403 analysis, the court finds that the probative value of this evidence is "not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." This evidence is highly relevant -- it relates directly to the issues of standard of care and causation such that any danger of prejudice, confusion of the issues, or misleading of the jury is minimal.[8]

Accordingly, the court GRANTS Dr. Izuka's Motion in Limine and the joinders by Kapiolani Defendants (Doc. No. 1109) and Dr. Sim (Doc. No.

---

[7] Evidence of Jessica's subsequent medical treatment is also relevant to Plaintiffs' claim for special damages including the cost of medical treatment Jessica received, which must be proven "with reasonable certainty." *See* Haw. Civil Jury Instr. No. 8.2 (defining "special damages" as "damages which can be calculated precisely or can be determined by you with reasonable certainty from the evidence"); *see also* Doc. No. 1106-6, Dr. Izuka Ex. C, Gold Expert Report (opining that the total costs for medical treatment at CMC of $87,700.64 is "reasonable and within acceptable billing practices"). To establish the costs of Jessica's medical treatments, Plaintiffs will necessarily have to present evidence regarding what medical treatment Jessica received in Texas.

[8] In opposition, Plaintiffs argue that the Rule 403 analysis weighs against admission because Dr. Sarwark's opinion that the Texas medical providers were negligent is inadmissible. Doc. No. 112, Pls.' Opp'n at 14-16. As explained below, however, the court finds that Dr. Sarwark is not precluded from providing this opinion at trial.

1132) to the extent Medical Defendants generally seek admission of evidence regarding Jessica's medical care in Texas, including evidence and testimony regarding the care Jessica received in Texas and communications between Plaintiffs and the Texas medical providers regarding Jessica's care.

**B.     Admissibility of Medical Defendants' Expert Witnesses**

Plaintiffs argue that Medical Defendants should be barred from presenting any expert testimony asserting that the Texas medical providers were negligent because Medical Defendants did not timely disclose any opinions on this issue and the opinions provided are too vague to establish the negligence elements. The court first outlines the framework for analyzing expert disclosures, and then addresses each expert in turn.

*1.     Framework*

Federal Rule of Civil Procedure 26(a)(2)(A) requires that "a party must disclose to the other parties the identity of any witness it may use at trial to present [expert testimony]."  If the expert is "retained or specially employed to provide expert testimony in the case," the "disclosure must be accompanied by a written report [that contains] a complete statement of all opinions the witness will express and the basis and reasons for them."  Fed. R. Civ. P. 26(a)(2)(B)(i).  "The purpose of the rule is to eliminate 'unfair surprise to the opposing party.'"

*Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc*., 493 F.3d 160, 167 (D.C. Cir.

2007) (quoting *Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 284 (8th

Cir. 1995)).  With that said, however, the rule "'does not limit an expert's

testimony simply to reading his report . . . . The rule contemplates that the expert

will supplement, elaborate upon, [and] explain . . . his report' in his oral

testimony."  *Id.* (quoting *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203

(6th Cir. 2006).

   After providing an expert report, a party has a duty to supplement an

expert report as to both "information included in the report and [] information

given during the experts deposition . . . by the time the party's pretrial disclosures

under Rule 26(a)(3) are due."  Fed. R. Civ. P. 26(e)(2).  The duty to supplement

does not provide the opportunity to add information that should have been initially

provided under Rule 26(a); rather, "[s]upplementation under the Rules means

correcting inaccuracies, or filling the interstices of an incomplete report based on

information that was not available at the time of the initial disclosure."  *Keener v.*

*United States*, 181 F.R.D. 639, 640 (D. Mont. 1998); *Coles v. Perry*, 217 F.R.D. 1,

3 (D.D.C. 2003) ("[Rule] 26(e) does not grant a license to supplement a previously

filed expert report because a party wants to, but instead imposes an obligation to

supplement the report when a party discovers the information it has disclosed is

incomplete or incorrect."); *see also Luke v. Family Care & Urgent Med. Clinics*

323 Fed. Appx. 496, 500 (9th Cir. 2009).

   If a party fails to properly disclose an expert opinion, "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Factors that may assist the court in determining whether "a violation of a discovery deadline is justified or harmless are: (1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not timely disclosing the evidence." *Lanard Toys Ltd. v. Novelty, Inc*., 375 Fed. Appx. 705, 713 (9th Cir. 2010) (citing *David v. Caterpillar, Inc*., 324 F.3d 851, 857 (7th Cir. 2003)); *see also Transbay Auto Serv., Inc. v. Chevron U.S.A. Inc*., 2010 WL 4591596, at *7 (N.D. Cal. Nov. 3, 2010); *So. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 595-96 (4th Cir. 2003). "Implicit in Rule 37(c)(1) is that the burden is on the party facing sanctions to prove harmlessness." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp*., 259 F.3d 1101, 1107 (9th Cir. 2001).

## 2. *Dr. Izuka's Expert Witness Dr. Sarwark*

Plaintiffs argue that Dr. Sarwark's supplemental expert report, which opines that Texas medical providers breached the standard of care and caused Jessica's injuries, is untimely and should therefore be excluded. Doc. No. 1102-1, Pls.' Mot. 4, 8-12. To the extent Dr. Sarwark's supplemental expert report is truly "supplemental," it is timely -- it was produced well before the pretrial disclosure deadline of July 5, 2011. Thus, the issue is whether the supplemental report is a proper supplementation pursuant to Rule 26(e)(2), and if not, whether its disclosure was substantially justified or harmless. The court finds Dr. Sarwark's supplemental report admissible.

As an initial matter, Dr. Sarwark's supplemental report certainly expands upon the opinions in his initial report. In his initial report, Dr. Sarwark did not directly opine regarding the Texas medical providers' negligence, but did assert that upon admission to CMC, Jessica should have been evaluated by an orthopedic physician and/or plastic surgeon, and should have received more detailed instructions on how to care for her leg. *See* Doc. No. 1102-4 at 6. In his supplemental report Dr. Sarwark expands upon his opinion to assert that "the delay in care upon arrival in Dallas contributed to the unsatisfactory outcome, to a reasonable degree of medical certainty," Doc. No. 1102-5 at 5, and that CMC

"breached the standard of care in not receiving the patient in transfer in a competent manner and in not providing competent evaluation of the patient in a professional manner and in not admitting the patient to the hospital on the day of arrival in Dallas for further acute care." *Id.* at 6.

Comparing these two reports, Dr. Sarwark's supplemental report certainly appears to do more than merely correct inaccuracies and/or fill any interstices of an incomplete report -- whereas the original report merely hinted at the possibility that Texas medical professionals were negligent, the supplemental report adds two sentences to explicitly make this assertion by opining on the negligence elements. *See Keener*, 181 F.R.D. at 640. This supplementation, however, was for good reason -- these additional opinions were the result of Dr. Sarwark reviewing deposition transcripts of Texas medical professionals, which were not available prior to his original expert report. Thus, this supplemental report added information that was unavailable to Dr. Sarwark at the time of his original report, and was proper pursuant to Rule 26(e). *See Coles*, 217 F.R.D. at 3; *see also Churchill v. United States*, 2011 WL 444849, at *4 (E.D. Cal. Feb. 8, 2011) ("Rule 26 *anticipates* that an expert's written report may need to be updated to reflect newly discovered evidence after it has been disclosed.").

In opposition, Plaintiffs argue, among other things,[9] that Dr.

Sarwark's supplemental expert report is too conclusory to establish the elements of

negligence. Doc. No. 1152 at 8-9. The court disagrees.

It is well settled in Hawaii that to establish negligence in a medical

malpractice action, expert testimony is generally necessary to establish the

standard of care, breach of that standard, and causation "to a reasonable medical

probability." *Kahoʻohanohano v. Dep't of Human Servs.*, 117 Haw. 262, 296, 178

P.3d 538, 572 (2008) (citing *Exotics Hawaii-Kona, Inc. v. E.I. Du Pont De

Nemours & Co.*, 116 Haw. 277, 300, 172 P.3d 1021, 1044 (2007)); *Barbee v.

Queen's Med. Ctr.*, 119 Haw. 136, 163, 194 P.3d 1098, 1125 (Haw. App. 2008);

*Craft v. Peebles*, 78 Haw. 287, 305, 893 P.2d 138, 156 (1995).

Dr. Sarwark reviewed the records and evidence in this case, and his

supplemental expert report outlines Jessica's care from the time of the accident

through her treatment at TSRH. Based on this information and his medical

---

[9] In their Reply, Plaintiffs also argue that Dr. Sarwark's new opinions do not pass
scrutiny under *Daubert*, and that Medical Defendants should be barred from presenting evidence
regarding any negligence of subsequent medical providers because Medical Defendants are
liable for Jessica's injuries regardless of any subsequent negligence. *See* Doc. No. 1152, Pls.'
Reply at 7-10, 12-14. The court will not address arguments raised for the first time on Reply.
*See, e.g., Hi-Tech Rockfall Const., Inc. v. Cnty. of Maui*, 2009 WL 529096, at *18 n.9 (D. Haw.
Feb. 26, 2009) ("Local Rule 7.4 provides that '[a]ny arguments raised for the first time in the
reply shall be disregarded.'"); *Coos Cnty. v. Kempthorne*, 531 F.3d 792, 812 n.16 (9th Cir. 2008)
(declining to consider an argument raised for the first time in a reply brief).

expertise, Dr. Sarwark addresses the negligence elements by opining that the Texas medical professionals breached the standard of care by failing to competently evaluate and admit Jessica to the hospital on the day of her arrival, and that this delay in treatment contributed to her injuries. In other words, Dr. Sarwark provided an opinion regarding the standard of care, breach, and causation as to the CMC medical professionals. Although Dr. Sarwark might have been able to provide more details, the opinion is not complicated -- according to Dr. Sarwark, CMC should have better evaluated and admitted Jessica, and this delay in treatment contributed to her complications (described in detail in the report). Such opinion is sufficient to establish negligence, and Dr. Sarwark may elaborate upon and explain his report through in his oral testimony. *See Re-Direct, Inc*., 493 F.3d at 167.

Finally, the court finds that even if Dr. Sarwark's supplemental report exceeded the bounds of proper supplementation, it was justified. Dr. Sarwark's supplemental report was due to the fact that relevant discovery was taken after his expert report, and not any bad faith. Trial is not for several months such that it will not be disrupted by this disclosure. Further, Plaintiffs have long been aware that Medical Defendants assert that the Texas Medical Providers were negligent, *see Durham*, 2010 WL 2943358, at *13 (denying Kapiolani Defendants' summary judgment argument that CMC and TSRH are superseding causes of Jessica's

injuries and death), and do not otherwise assert any basis for prejudice.

The court therefore DENIES Plaintiffs' Motion in Limine No. 4 (Doc. No. 1102) to the extent it seeks to prevent Dr. Sarwark from opining regarding the Texas medical providers' negligence as presented in his supplemental report, and GRANTS Dr. Izuka's Motion in Limine (Doc. No. 1106) seeking admission of Dr. Sarwark's expert testimony.

### 3. *Kapiolani Defendants' and Dr. Sim's Expert Dr. Kleinman*

Plaintiffs' arguments regarding Dr. Kleinman have shifted over the course of this briefing. Plaintiffs originally argued that Kapiolani Defendants and Dr. Sim have presented no expert opinions regarding the negligence of the Texas medical providers. In response to Kapiolani Defendants' Opposition asserting that Dr. Kleinman opined regarding this issue in his deposition, however, Plaintiffs attack only the substance of Dr. Kleinman's opinion, and do not dispute either the timeliness or appropriateness of providing expert opinions through deposition testimony. Doc. No. 1152, Pls.' Reply at 11-12 ("Plaintiffs do not dispute the fact that deposition testimony in general is an appropriate type of expert testimony. However, Plaintiffs do not agree that the testimony supplied in Dr. Kleinman's deposition discusses or establishes the Dallas Medical Providers' malpractice."). The court therefore determines only whether Dr. Kleinman's opinions are

sufficient to allow him to testify at trial regarding the Texas medical providers' alleged negligence.

Specifically, Plaintiffs argue that Dr. Kleinman did not address all of the negligence elements. Doc. No. 1152, Pls.' Reply at 12. The court disagrees. As to the standard of care, Dr. Kleinman opines that physicians in Dallas had a responsibility to review Jessica's medical chart in its entirety and properly evaluate her aorta; they also had ample time to properly evaluate and work up this diagnosis. Dr. Kleinman further opines that this standard of care was breached by CMC's failure to appreciate the need for a cardiology follow-up -- whether due to the fact that the Texas medical professionals did not read her chart, did not understand her chart, or determined on their own that a cardiology consultation was not necessary. Doc. No. 1122-4, at 124-26. Finally, as to causation, Dr. Kleinman opines that these communication problems caused Jessica's ultimate death. Doc. No. 1122-4 at 193-95. By addressing each of these elements, Dr. Kleinman, similar to Dr. Sarwark, has set forth an opinion regarding the Texas medical providers' negligence such that there will be no unfair surprise to Plaintiffs at trial.

In further opposition, Plaintiffs argue that Dr. Kleinman did not adequately address these elements because he did not opine to a reasonable degree

of medical certainty.  Doc. No. 1152, Pls.' Reply at 12.  Plaintiffs are mistaken --

during his deposition, Dr. Kleinman asserted that he had reached all of his opinions

to a degree of reasonable medical probability, unless specifically stated otherwise.

Doc. No. 1160-2, at 3.  And in any event, specifically reciting that an opinion is to

a degree of "reasonable medical probability" is not necessary -- an expert is not

confined at trial to simply reading his opinions, but may "supplement, elaborate

upon, [and] explain . . . [them] in his oral testimony."  *Re-Direct, Inc*., 493 F.3d at

167 (citations omitted).  Rather, the relevant inquiry is whether Dr. Kleinman's

opinions establish the relevant elements.  *See id.* (rejecting as overly "formalistic"

party's position that expert testimony is "barred because he did not expressly use

the magic words 'based on generally accepted accounting principles'"); *see, e.g.*,

*W.C. LaRock, D.C., P.C. v. Smith*, 310 S.W.3d 48, 56 (Tex. App. 2010) ("[A]n

expert need not use the magic words "reasonable medical probability" if the

evidence establishes that was the substance of his opinion."); *Phelps v. Indus.*

*Comm'n*, 747 P.2d 1200, 1205 (Ariz. 1987) (holding that "magic words" are not

necessary so long as the testimony establishes the elements); *Nunez v. Wilson*, 507

P.2d 329, 334 (Kan. 1973) ("[W]e are not saying any particular words of art are

necessary to express the degree of proof required.  It is sufficient if the expert's

words can be interpreted to show reasonable probability.").  As described above,

Dr. Kleinman opined on the relevant negligence elements and Plaintiffs had, and will have again, the opportunity to cross-examine Dr. Kleinman regarding his opinions.[10]

The court therefore DENIES Plaintiffs' Motion in Limine No. 4 seeking to preclude Kapiolani Defendants and Dr. Sim from presenting evidence or arguments regarding any negligence of Texas medical professionals.

## C.    The Texas Amended Petition

In their Motions in Limine, Dr. Sim (Doc. No. 1099) and Dr. Izuka (Doc. No. 1106, which Kapiolani Defendants join, Doc. No. 1107) seek admission of the Texas Amended Petition on the grounds that it contains admissible, relevant statements by Plaintiffs that are admissible pursuant to Federal Rule of Evidence 801(d)(2).  The court agrees that the relevant allegations contained in the Amended Petition are admissible.

Rule 801(d)(2) provides that an admission by a party opponent statement is not hearsay if:

---

[10]  The court further finds that even if Kapiolani Defendants' disclosure of this opinion was improper pursuant to Rule 26, any error was harmless under Rule 37(c).  Plaintiffs were aware of Dr. Kleinman's opinions at the very latest since October 25, 2010 when he was deposed, and were also aware of Kapiolani Defendants' assertion that the Texas medical providers were the superseding cause of Jessica's injuries since their Motion for Summary Judgment filed on May 5, 2010.  Thus, there is no surprise or prejudice to Plaintiffs, trial will not be disrupted by allowing this testimony, and there does not appear to be any bad faith on the part of Kapiolani Defendants.

> The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship . . . .

Where statements qualify as admissions by a party opponent, the "statements are admissible if they are relevant under Fed. R. Evid. 401 and their probative value is not substantially outweighed by any prejudicial effect under Fed. R. Evid. 403." *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 829 (6th Cir. 2000); *see also White v. Honeywell, Inc.*, 141 F.3d 1270, 1276 (8th Cir. 1998) (recognizing that statements of party opponents are subject to a Rule 403 analysis).

In turn, Rule 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "[T]he application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000). The balancing of the unfair prejudice and probative value

lies within the district court's discretion.  *United States v. Larios*, 640 F.2d 938, 941 (9th Cir. 1981).

Applying this framework, the Amended Petition, submitted by Plaintiffs' counsel in the Texas action, falls squarely within Rule 801(d)(2).  "It is the general rule that 'statements made by an attorney concerning a matter within his employment may be admissible against the party retaining the attorney,'" *Williams v. Union Carbide Corp.*, 790 F.2d 552, 555 (6th Cir. 1986) (quoting *United States v. Margiotta*, 662 F.2d 131, 142 (2nd Cir. 1981)), and Plaintiffs do not contest that the Amended Petition was filed on their behalf.  Thus, the factual statements in the Amended Petition are statements by Plaintiffs.  *See, e.g.*, *id.* (allowing allegations made in prior complaint); *Kreidler v. Pixler*, 2010 WL 1537068, at *4 (W.D. Wash. Apr. 15, 2010) (finding that a complaint the plaintiff had filed in another action was admissible against him because it represents an admission relevant to the present action); *Barnes*, 201 F.3d at 829 (holding that complaints plaintiff brought against other asbestos defendants were not hearsay pursuant to Rule 801(d)(2) and were relevant to causation even if inclusion of non-party defendants may confuse the jury).

Second, the statements in the Amended Petition establish facts relevant to the issues in this action.  In the Amended Petition, Plaintiffs specifically

admit, among other things, that (1) Sheri Durham provided CMC with some of Jessica's medical records from KMCWC and Jessica's medical history; (2) upon initial admission, Jessica was evaluated by Dr. Rupp and discharged from CMC with instructions to return to the CMC orthopedic clinic on August 21, 2006 for follow-up care for leg; (3) upon returning five days later, Jessica was evaluated by Dr. Copley and admitted for surgery; (4) Sheri Durham advised Ms. Holland that Jessica was diagnosed with an enlarged aorta in Hawaii; (5) Ms. Holland ordered, but later put a hold a cardiology consultation; and (6) Mr. Kines ordered a chest x-ray to evaluate Jessica's aorta, yet Jessica's medical records do not indicate any review or evaluation by a cardiologist. These admissions -- explaining what information was provided to CMC during Jessica's transfer and what medical treatments Jessica received at CMC -- are relevant to Plaintiffs' claims that Medical Defendants breached the standard of care and caused Jessica injury by failing to communicate relevant information regarding her diagnoses and treatment.

Third, any potential prejudice to Plaintiffs is not substantially outweighed by its relevance. The statements in the Amended Petition are directly relevant to issues in this action, including whether Sheri Durham was adequately notified about Jessica's enlarged aorta and whether CMC was provided sufficient

information to treat Jessica's medical problems. In comparison, the prejudice to Plaintiffs of admitting these factual admissions is minimal, especially given that Plaintiffs do not dispute them. Further, the Amended Petition is not wholly cumulative of other evidence in this action, given that no other single document provides these concise admissions by Plaintiffs. Given the considerations, the court finds that the factual allegations in the Amended Petition are admissible pursuant to Rules 801(d)(2), 401, and 403.

In opposition, Plaintiffs argue that the Amended Petition is unverified and therefore hearsay. *See* Doc. No. 1124, Pls.' Opp'n at 9-10. The cases Plaintiff cite do not support the proposition that lack of verification prevents a pleadings' admission against a party opponent. For example, *Cristensen v. Trotter*, 171 F.2d 66, 68 (9th Cir. 1948), upheld exclusion of unverified complaints where there was no showing that the plaintiff had even read the pleadings and they were not relevant. *See also Fidelity & Deposit Co. of Maryland v. Redfield*, 7 F.2d 800, 803 (9th Cir. 1925) (affirming exclusion of answer and counterclaim where they were not signed by the party and it was "not shown that he was aware of the contents of the pleading, or was consulted concerning the same"). Unlike *Cristensen*, the Amended Petition is relevant to the issues in this action and Plaintiffs do not assert that their attorneys acted without their authorization. *See also Walko v. Acad. of*

*Bus. & Career Dev. LLC*, 493 F. Supp. 2d. 1042, 1044 n.4 (N.D. Ill. 2006)

(admitting statement in unverified complaint pursuant to Rule 801(d)(2)).

Plaintiffs also argue that the Amended Petition is not admissible

because there is no inconsistency between its factual allegations and the evidence

in this action.  Doc. No. 1124 at 10.  The court recognizes that although some

courts appear to limit Rule 801(d)(2) to prior inconsistent statements,[11] other

courts, including the Ninth Circuit, have held the opposite.  *See People of Territory*

*of Guam v. Ojeda*, 758 F.2d 403, 408 (9th Cir. 1985) ("Cases interpreting section

801(d)(2)(A) are in agreement that statements need not be incriminating to be

admissions.  For statements to constitute admissions they need only relate to the

offense."); *United States v. Kenny*, 645 F.2d 1323, 1340 (9th Cir. 1981) ("Kenny's

counsel argues that the scope of Rule 801(d)(2) is impliedly limited by Rule 613,

so that prior statements cannot be introduced unless they are inconsistent with

testimony on the stand. . . .  This reading of Rule 801(d)(2) is plainly wrong,

especially in light of the final sentence in Rule 613 expressly exempting Rule

801(d) from its provisions, and we reject it."); *see also United States v.*

---

[11] For example, *Dugan v. EMS Helicopters, Inc*., 915 F.2d 1428, 1432 (10th Cir. 1990), explains that "inconsistent allegations contained in prior pleadings are admissible in subsequent litigation." (citations omitted).  Even if this were the rule in this Circuit, *Dugan* further explains that "where a plaintiff files a lawsuit against different defendants for the same injuries, allegations from that prior complaint are considered evidentiary admissions against interest."  Applying this rule here would still allow admission of the Amended Petition.

*DiDomenico*, 78 F.3d 294, 303 (7th Cir. 1996) (stating that "a statement to be admissible as the statement of a party need not have been against interest when made (or at any time for that matter)"); *United States v. Turner*, 995 F.2d 1357, 1363 (6th Cir. 1993) ("On its face, Rule 801(d)(2) does not limit admission to a statement against interest.  Furthermore, this court has refused to place such a limited construction on the scope of an admission."); *Marquis Theatre Corp. v. Condado Mini Cinema*, 846 F.2d 86, 90 n.3 (1st Cir. 1988) ("A statement must be against the declarant's interest at the time it was made only when it is introduced as the hearsay exception found at Fed. R. Evid. 804(b)(3), not as an admission excluded from the definition of hearsay in Rule 801(d)(2)."); *United States v. Barletta*, 652 F.2d 218, 219 (1st Cir. 1981) ("[A] statement need not be inculpatory or against interest to be admissible under Rule 801(d)(2)").  Thus, the court need not determine whether the statements in the Amended Petition are inconsistent with Plaintiffs' allegations or statements in this action.

Finally, Plaintiffs argue that the allegations in the Amended Petition are not relevant as to Dr. Izuka because the Amended Petition does not allege any claims against Texas medical providers regarding treatment for Jessica's leg, and any facts regarding her leg that the Petition provides are simply background.  Doc. No. 1123 at 4-5 & n.5.  Plaintiffs misunderstand Rule 801(d)(2) -- the issue is not

whether the two actions involve the same injury, but rather whether the factual allegations in the Amended Petition are relevant and not unduly prejudicial in this action. The Amended Petition recites some facts relevant to CMC's treatment of Jessica's leg and therefore includes facts relevant to Dr. Izuka.

In sum, the court finds that the factual allegations in the Amended Petition are admissible pursuant to Rule 801(d)(2) and therefore GRANTS Dr. Izuka's and Dr. Sim's Motions in Limine, joined by Kapiolani Defendants (Doc. No. 1107) to admit the factual allegations in the Texas Petition.

This Order should not be construed, however, that the Amended Petition as a whole is admissible. That Plaintiff brought a malpractice action against certain Texas medical providers and made legal assertions regarding their negligence, on its own, is not relevant to Plaintiffs' negligence claims against Medical Defendants. Indeed, Medical Defendants proffer no explanation for why the mere fact that Plaintiffs filed an action against certain Texas medical providers is relevant, and the court does not see a reason either.[12] Further, even if such fact

_____

[12] Although Dr. Sim asserted during the June 3, 2011 hearing that courts have allowed entire pleadings into evidence, the cases Dr. Sim cites does not support that the Amended Petition should be admitted in its entirety. For example, in *Glaesman v. Shop-Rite Foods, Inc.*, 438 F.2d 341, 342 (10th Cir. 1971), the plaintiff "was permitted to read into the record *pertinent parts* of the pleadings and discovery interrogatories" (emphasis added), as opposed to the pleadings in their entirety. The only case Dr. Sim cites in which a pleading in its entirety was admitted at trial is *Burdis v. Texas & Pacific Railway Co.*, 569 F.2d 320 (5th Cir. 1978), in

(continued...)

was relevant, the court finds that its relevance is substantially outweighed by the danger of unfair prejudice to Plaintiffs, confusion of the issues, and misleading the jury. In advance of trial, the parties shall meet and confer regarding the particular allegations of the Amended Petition that should be submitted to the jury and the form in which they should be admitted. To be clear, any reference to the Texas Action should not be presented to the jury as part of the admissions.

## IV. <u>CONCLUSION</u>

Based on the above, the court: (1) DENIES Plaintiffs' Motion in Limine No. 4 to Preclude Any Testimony, Evidence, Opinions, or Argument That Subsequent Medical Providers in Dallas Acted Negligently with Regard to Jessica Durham's Medical Care or Caused Her Injuries, Doc. No. 1102; (2) GRANTS Dr. Izuka's Motion in Limine to Admit Evidence, Testimony, and Argument Regarding the Care Provided to Jessica Durham by Subsequent Medical Providers in Dallas, Texas, Doc. No. 1106, as well as Kapiolani Defendants' and Dr. Sim's Joinders in this Motion (Doc. Nos. 1109, 1132); and (3) GRANTS Dr. Sim's

---

[12](...continued)
which the plaintiff, a passenger in an automobile/train accident, brought suit against the railway company. *Burdis* found that the plaintiff's earlier petition against the driver of the car was admissible, including the allegation that Plaintiff's injuries were caused by the driver's negligence in driving the vehicle. *Id.* at 323. *Burdis* reasoned that if the plaintiff was aware the driver of the car was negligent, then the plaintiff's contributory negligence could be raised and the petition spoke to that issue. *Id.* at 324. No such similar facts exist here.

Motion in Limine Regarding Admissibility of Plaintiffs' Original Petition Filed in

the County Court of Dallas County Texas, Doc. No. 1099, as well as Dr. Izuka's

and Kapiolani Defendants' Joinders in this Motion (Doc. Nos. 1105, 1107).

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, June 23, 2011.



/s/ J. Michael Seabright
_____
J. Michael Seabright
United States District Judge

*Durham et al. v. County of Maui et al.*, Civ. No. 08-00342 JMS/RLP, Order (1) Denying Plaintiffs' Motion in Limine No. 4 to Preclude Any Testimony, Evidence, Opinions, or Argument That Subsequent Medical Providers in Dallas Acted Negligently with Regard to Jessica Durham's Medical Care or Caused Her Injuries, Doc. No. 1102; (2) Granting Defendants Byron H. Izuka, M.D.'s and Byron H. Izuka, M.D., LLC's Motion in Limine to Admit Evidence, Testimony, and Argument Regarding the Care Provided to Jessica Durham by Subsequent Medical Providers in Dallas, Texas, Doc. No. 1106; and (3) Granting Defendants James Y. Sim, M.D. and James Y. Sim, M.D., LLC's Motion in Limine Regarding Admissibility of Plaintiffs' Original Petition Filed in the County Court of Dallas County Texas, Doc. No. 1099